No. 24-10897

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

JOSIAH COLON; BRANDON KLING; ERIC MELE; WILLIAM MARTIN; and 2ND
AMENDMENT ARMORY, a Florida profit corporation;

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; DIRECTOR,
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; UNITED
STATES DEPARTMENT OF JUSTICE; and U.S. ATTORNEY GENERAL,

Defendants-Appellants.

On Appeal from the United States District Court
for the Middle District of Florida

# BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

ROGER B. HANDBERG
  *United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA
BEN LEWIS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7250*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2494*

*Colon v. ATF*, No. 24-10897 (11th Cir.)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for defendants-appellants certifies that, to the best of his knowledge, the following constitutes a complete list of trial judges, attorneys, persons, associations of person, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal:

2nd Amendment Armory, *Plaintiff-Appellee*

Bowen, Brigham J., *Attorney for Defendants-Appellants*

Boynton, Brian M., *Attorney for Defendants-Appellants*

Colon, Josiah, *Plaintiff-Appellee*

Dettelbach, Steven M., Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Defendant-Appellant*

Drezner, Michael, *Attorney for Defendants-Appellants*

Garland, Merrick B., United States Attorney General, *Defendant-Appellant*

Janda, Sean R., *Attorney for Defendants-Appellants*

Kling, Brandon, *Plaintiff-Appellee*

Lewis, Benjamin R., *Attorney for Defendants-Appellants*

Larosiere, Matthew, *Attorney for Plaintiffs-Appellees*

Lowenstein, Jody D., *Attorney for Defendants-Appellants*

Lowry, Faith E., *Attorney for Defendants-Appellants*

Martin, William, *Plaintiff-Appellee*

*Colon v. ATF*, No. 24-10897 (11th Cir.)

Mele, Eric, *Plaintiff-Appellee*

Pitz, Taylor, *Attorney for Defendants-Appellants*

Scriven, Mary S., *District Judge for the Middle District of Florida*

Wright, Abby C., *Attorney for Defendants-Appellants*

Zermay, Zachary Z., *Attorney for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

The district court entered preliminary relief against a rule issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives. The Rule interprets the National Firearms Act—which regulates especially dangerous firearms such as short-barreled rifles—explaining the considerations that bear on whether a firearm constructed with a so-called "stabilizing brace" is a rifle. Given the public safety interests at stake and the public interest in regulatory clarity furthered by the Rule, the government respectfully requests that the Court hold oral argument in this appeal.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

STATEMENT OF JURISDICTION ............................................................... 3

STATEMENT OF THE ISSUES ..................................................................... 4

STATEMENT OF THE CASE ......................................................................... 5

      A.     Statutory and Regulatory Background ....................................... 5

      B.     Procedural History ..................................................................... 11

      C.     Standard of Review .................................................................... 15

SUMMARY OF ARGUMENT ...................................................................... 15

ARGUMENT .................................................................................................. 20

I.     Plaintiffs Are Unlikely to Succeed on the Merits of Their Logical
      Outgrowth Claim ................................................................................. 21

      A.     The Rule Is an Interpretive Rule ............................................... 21

      B.     The Final Rule Is a Logical Outgrowth of the Proposed Rule ............... 29

      C.     Plaintiffs Have Not Demonstrated the Required Prejudice ................... 35

II.    The Equitable Factors Do Not Support Preliminary Relief ............................... 37

      A.     Plaintiffs Face No Irreparable Harm ........................................ 37

      B.     The Balance of the Equities Favors Reversal ........................... 42

III.   The Injunction is Overbroad ................................................................ 43

CONCLUSION .............................................................................................. 47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                     **Page(s)**

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ..................................... 39

*American Iron & Steel Inst. v. OSHA*,
  182 F.3d 1261 (11th Cir. 1999) ............................... 17, 29

*American Mining Cong. v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993) ............................... 24, 26

*Beirne v. Secretary of the U.S. Dep't of Agric.*,
  645 F.2d 862 (10th Cir. 1981)), *aff'd per curiam*,
  544 F.3d 1187 (11th Cir. 2008) ................................... 30

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................ 24

*Bezet v. United States*,
  276 F. Supp. 3d 576 (E.D. La.), *aff'd*,
  714 F. App'x 336 (5th Cir. 2017) ................................. 5

*Bob Jones Univ. v. Simon*,
  416 U.S. 725 (1974) ................................................ 40

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) ................................. 45

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ........................................ 20, 43-44

*Canal Auth. of State of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) ..................................... 38

*Colorado v. U.S. EPA*,
  989 F.3d 874 (10th Cir. 2021) ................................... 39

*Dennis Melancon, Inc. v. City of New Orleans*,
  703 F.3d 262 (5th Cir. 2012) ..................................... 40

*Flight Training Int'l, Inc. v. FAA*,
  58 F.4th 234 (5th Cir. 2023) ..................................... 21

*Florida v. Department of Health & Human Servs.*,
  19 F.4th 1271 (11th Cir. 2021) ................................... 21

*Flytenow, Inc. v. FAA,*
808 F.3d 882 (D.C. Cir. 2015) ................................................................. 24

*Forsyth County v. U.S. Army Corps of Eng'rs,*
633 F.3d 1032 (11th Cir. 2011) ................................................................ 15

*General Motors Corp. v. Ruckelshaus,*
742 F.2d 1561 (D.C. Cir. 1984) ........................................................16, 22, 26

*Gill v. Whitford,*
585 U.S. 48 (2018) ...................................................................... 20, 43, 45

*Hi-Tech Pharm., Inc. v. Crawford,*
505 F. Supp. 2d 1341 (N.D. Ga. 2007) ...................................................... 30

*Long Island Care at Home, Ltd. v. Coke,*
551 U.S. 158 (2007) .............................................................................. 18, 33

*Marshall Durbin Farms, Inc. v. National Farmers Org., Inc.,*
446 F.2d 353 (5th Cir. 1971) ................................................................. 44-45

*MediNatura, Inc. v. FDA,*
998 F.3d 931 (D.C. Cir. 2021) ............................................................... 42

*Mendoza v. Perez,*
754 F.3d 1002 (D.C. Cir. 2014) ............................................................. 22

*Metropolitan Sch. Dist. v. Davila,*
969 F.2d 485 (7th Cir. 1992) ................................................................. 27

*Miami-Dade County v. U.S. EPA,*
529 F.3d 1049 (11th Cir. 2008) .................................... 16, 17, 18, 21, 29, 30, 31, 32, 34, 35, 36, 37

*Morehouse Enters., LLC v. ATF,*
78 F.4th 1011 (8th Cir. 2023) ............................................................. 37, 40

*National Mining Ass'n v. Mine Safety & Health Admin.,*
116 F.3d 520 (D.C. Cir. 1997) ............................................................. 29

*Northeast Md. Waste Disposal Auth. v. EPA,*
358 F.3d 936 (D.C. Cir. 2004) ............................................................. 13

*Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville,*
896 F.2d 1283 (11th Cir. 1990) ............................................................. 42

*Owner-Operator Indep. Drivers Ass'n v. Federal Motor Carrier Safety Admin.,*
   494 F.3d 188 (D.C. Cir. 2007) ........................................................................... 18

*Perez v. Mortgage Bankers Ass'n,*
   575 U.S. 92 (2015) ..................................................................... 22, 26, 29

*POET Biorefining, LLC v. EPA,*
   970 F.3d 392 (D.C. Cir. 2020) ....................................................................... 23

*Shalala v. Guernsey Mem'l Hosp.,*
   514 U.S. 87 (1995) ........................................................................................... 26

*Siegel v. LePore,*
   234 F.3d 1163 (11th Cir. 2000) ................................ 18, 19, 20-21, 37, 39, 41

*Syncor Int'l Corp. v. Shalala,*
   127 F.3d 90 (D.C. Cir. 1997) ................................................................ 16, 22

*Texas v. Biden,*
   10 F.4th 538 (5th Cir. 2021) ................................................................... 39, 41

*Texas v. Lyng,*
   868 F.2d 795 (5th Cir. 1989) ......................................................................... 36

*United States v. Freed,*
   401 U.S. 601 (1971) ........................................................................................ 5

*United States v. Gresham,*
   118 F.3d 258 (5th Cir. 1997) ........................................................................... 6

*United States v. Johnson,*
   632 F.3d 912 (5th Cir. 2011) ................................................................... 36-37

*United States v. Parish of St. Bernard,*
   756 F.2d 1116 (5th Cir. 1985) ...................................................................... 37

*United States v. Thompson/Center Arms Co.*
   504 U.S. 505 (1992) ......................................................................................... 5

*Warshauer v. Solis,*
   577 F.3d 1330 (11th Cir. 2009) ......................... 12, 16, 21-22, 22, 24, 26, 27

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ........................................................................................... 20

vi

**Statutes:**

Administrative Procedure Act (APA):

  5 U.S.C. § 533(b) ............................................................................. 11

  5 U.S.C. § 553(b)(A) .................................................................. 15, 21

  5 U.S.C. § 706 ...................................................................... 13, 18, 36

National Firearms Act (NFA):

  26 U.S.C. § 5801 *et seq.* .............................................................. 5

  26 U.S.C. § 5801 ............................................................................ 5

  26 U.S.C. § 5811 ............................................................................ 6

  26 U.S.C. §§ 5811-5812 ................................................................ 6

  26 U.S.C. § 5821 ......................................................................... 5-6

  26 U.S.C. §§ 5821-5822 ................................................................ 6

  26 U.S.C. § 5822 ............................................................................ 6

  26 U.S.C. § 5841 ............................................................................ 6

  26 U.S.C. § 5845 ............................................................................ 1

  26 U.S.C. § 5845(a)(3) ................................................................... 7

  26 U.S.C. § 5845(c) ..................................................... 4, 7, 16, 22

26 U.S.C. § 6511 ............................................................................. 6

26 U.S.C. § 7422 ...................................................................... 7, 40

26 U.S.C. § 7801 ............................................................................. 7

28 U.S.C. § 1292(a)(1) ................................................................... 4

28 U.S.C. § 1331 ............................................................................ 3

**Regulations:**

27 C.F.R. § 478.11 .................................................................. 4, 22

27 C.F.R. § 479.11 .................................................................. 4, 22

27 C.F.R. § 479.64 ......................................................................... 6

**Rule:**

Fed. R. Civ. P. 65(a)(1) ................................................................ 44

**Legislative Materials:**

H.R. Rep. No. 73-1780 (1934) .......................................................... 5

H.R. Rep. No. 83-1337 (1954) ..................................................... 5, 42

H.R. Rep. No. 90-1956 (1968) .......................................................... 5

**Other Authorities:**

ATF, Rev. Rul. 61-45, 1961-1 C.B. 663 ............................................. 7

ATF, Rev. Rul. 61-203, 1961-2 C.B. 224 ......................................... 7

86 Fed. Reg. 30,826 (June 10, 2021) ...................... 17, 29, 30, 31, 35

88 Fed. Reg. 6478 (Jan. 31, 2023) ............................ 1, 2, 7, 8, 9, 10, 11, 17, 22, 23, 24,
27, 28, 30, 31, 33, 34, 35, 38, 39, 42

## INTRODUCTION

For almost a century, Congress has regulated short-barreled rifles under the National Firearms Act (NFA) as particularly dangerous weapons. A short-barreled rifle is a "rifle"—that is, a firearm "designed," "made," and "intended" to be "fired from the shoulder"—with a barrel shorter than 16 inches. 26 U.S.C. § 5845. A typical short-barreled rifle is shown below:



*See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6525 (Jan. 31, 2023) (Rule). Such a firearm is designed for the shooter to press the "stock"—the rearward piece—against his or her shoulder when firing.

Recently, some manufacturers have sold firearms with short barrels and rearward attachments marketed as "stabilizing braces." These manufacturers claim that those firearms are not rifles because they are not designed to be fired from the shoulder. Instead—these manufacturers claim—the stabilizing brace is designed to rest against or wrap around a shooter's forearm to assist with one-handed firing. Many braced weapons, however, are indistinguishable from those with stocks:

1



*See* Dkt. No. 22, at 7; 88 Fed. Reg. at 6494 (top item equipped with "brace" and bottom equipped with traditional stock). Such weapons should therefore be sold in compliance with the NFA.

In response to this evasion of federal law—and resulting confusion among the public—the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) issued an interpretive rule articulating the framework that the agency will employ to determine whether any particular braced firearm is a short-barreled rifle within the meaning of the NFA. The Rule explains that the agency had previously issued individual determinations evaluating whether braced firearms constituted short-barreled rifles—with many, though not all, classified as short-barreled rifles—but that those classifications were not consistent and sometimes gave undue weight to the manufacturer's stated intent. The Rule therefore clarifies that whether a braced weapon is designed and intended to be fired from the shoulder does not turn solely on the manufacturer's claimed intent; instead, the standard also focuses on the weapon's objective design features and other evidence. The Rule then sets forth the

criteria that ATF will consider when determining whether any particular firearm equipped with a brace is designed and intended to be shoulder-fired.

Plaintiffs filed suit and sought a preliminary injunction against enforcement of the Rule. They contend that ATF violated the Administrative Procedure Act's (APA) notice-and-comment requirements in issuing the Rule because—in their view—the Rule is a legislative rule and was not properly a logical outgrowth of the earlier proposed rule. The district court agreed with that claim and enjoined the government from enforcing the Rule against plaintiffs and the commercial plaintiff's Florida customers.

That decision was incorrect on every level. The Rule is an interpretive rule not subject to the APA's notice-and-comment requirements. And, in any event, ATF complied with any application procedural requirements when it issued a proposed rule, solicited comments, evaluated those comments, and issued a final rule hewing closely to the proposal. Nor have plaintiffs identified any prejudice from the asserted inadequate notice and comment. And beyond all that, plaintiffs have also failed to satisfy the equitable factors necessary to justify preliminary relief. This Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. *See* Dkt. No. 1, at 5. The district court granted plaintiffs' motion for preliminary injunction on January 26, 2024. *See* Dkt. No. 47, at 51. The government filed a timely

3

notice of appeal on March 22, 2024. *See* Dkt. No. 49, at 1. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

The NFA defines a "rifle" as a weapon that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). ATF issued a rule explaining the considerations that bear on when a firearm with "an accessory, component, or other rearward attachment (*e.g.*, a 'stabilizing brace')" is designed and intended to be fired from the shoulder—and is, thus, a "rifle" under the statute. 27 C.F.R. § 478.11; *id.* § 479.11.

Plaintiffs—four individuals and a retailer—challenged the Rule and moved for preliminary relief. The district court concluded that plaintiffs were likely to succeed on the merits of their claim that the Rule violated the APA's notice-and-comment procedures because the final rule was a legislative rule that was not a logical outgrowth of the proposed rule. After assessing the equities, the district court issued a preliminary injunction preventing ATF from enforcing the Rule against the named plaintiffs and the plaintiff retailer's past and future customers who reside in Florida. The issues presented are the following:

1. Whether plaintiffs are likely to succeed on their claim that the Rule violated the APA's notice-and-comment requirements;

2. Whether the equitable factors weigh in favor of preliminary relief; and

3. Whether the injunction entered by the district court was impermissibly overbroad.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

**1.** The National Firearms Act, 26 U.S.C. § 5801 *et seq.*, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), that can "be used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954). These firearms include powerful "concealable weapon[s]," *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion), like short-barreled shotguns and, as relevant here, short-barreled rifles. *See* H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.).

For those firearms, the NFA establishes a taxation-and-registration scheme "in the interest of the public safety." *United States v. Freed*, 401 U.S. 601, 609 (1971). This scheme tracks "the flow of [NFA] firearms" to ensure they stay away from criminal, dangerous, or irresponsible individuals. *Bezet v. United States*, 276 F. Supp. 3d 576, 612 (E.D. La.), *aff'd*, 714 F. App'x 336 (5th Cir. 2017). Importers, manufacturers, and dealers in covered firearms, including short-barreled rifles, must pay an annual special occupational tax of $1000 or $500. *See* 26 U.S.C. § 5801. In addition, individuals who are not engaged in a firearms business but who wish to make an NFA-regulated firearm, including a short-barreled rifle, must pay a $200 tax per firearm made. *See id.*

5

§ 5821. Finally, any entity or individual who wishes to transfer an NFA firearm is required to pay a $200 tax for each firearm transferred. *See id.* § 5811.

In addition, "[i]n order to facilitate enforcement" of the NFA's tax, the statute imposes registration and approval requirements. *United States v. Gresham*, 118 F.3d 258, 261 (5th Cir. 1997). Thus, individuals who are not engaged in a firearms business but who wish to make an NFA-regulated firearm must obtain prior approval. *See* 26 U.S.C. §§ 5821-5822. To that end, the individual must file a written application with ATF that includes identifying information about "the firearm to be made" as well as identifying information, including fingerprints and a photograph, about the maker. *Id.* § 5822. Once the application is filed and the tax is paid, ATF may approve the application. *See id.* "Upon receipt of the approved application, the maker is authorized to make the firearm described therein." 27 C.F.R. § 479.64.

Moreover, both a qualified manufacturer and an individual who has his application to make a firearm approved must register each firearm made. *See* 26 U.S.C. § 5841. And to transfer a covered firearm, a transferor must go through a similar process to obtain prior approval—identifying a transferee, registering the firearm to the new owner, and paying a $200 tax. *See id.* §§ 5811-5812.

If the maker of a firearm wishes to challenge the assessment of the NFA's tax against him, the Internal Revenue Code provides a mechanism to do so. The maker may file a claim for a refund or credit with the Attorney General. *See* 26 U.S.C. § 6511.

6

If the maker is dissatisfied with the result of that administrative process, she may bring suit in district court in a civil action for a refund of the tax. *See id.* § 7422.

**2.** ATF is responsible for enforcing the NFA. *See* 26 U.S.C. § 7801. ATF must therefore determine which firearms constitute "short-barreled rifles." Under the NFA, a "rifle" is a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). A rifle with a barrel under 16 inches is a short-barreled rifle subject to the NFA's requirements. *Id.* § 5845(a)(3).

As shown in the previous images, *see supra* pp. 1-2, a short-barreled rifle has, at the front end, a receiver and a short barrel. At the back, it has a "stock," "butt stock," or "shoulder stock," which is pressed against the shoulder when firing. 88 Fed. Reg. at 6522. It has long been the case that the stock, like many firearm components, is often detachable or sold separately. *See, e.g.*, ATF, Rev. Rul. 61-45, 1961-1 C.B. 663; ATF, Rev. Rul. 61-203, 1961-2 C.B. 224.

Over the last decade, ATF has received an increasing number of requests to determine whether short-barreled firearms equipped with so-called "stabilizing brace[s]"—rather than stocks—constitute "rifles." *See* 88 Fed. Reg. at 6482-84. These braces are also rearward attachments, but they have features—such as an opening or straps—that may be used to fasten the firearm against the forearm. *See, e.g., id.* at 6483. Manufacturers have claimed that braced firearms are not designed to be fired from the shoulder but, instead, that the brace is designed to "assist people with disabilities or limited strength or mobility with firing heavy pistols" with one hand. *Id.* at 6482.

7

In many cases, however, firearms with stabilizing braces appear nearly identical to those with stocks:



*See* 88 Fed. Reg. at 6527-29 (left item equipped with stock; right items with brace). And as shown in marketing materials and trade magazines, many firearms equipped with braces are designed to be shouldered in the same way as firearms with stocks.



*See id.* at 6527, 6546 (both "arm braces"; gun publication on left; trade magazine on right).

Between 2012 and 2020, ATF reviewed various braced weapons for classification under the NFA, assessing whether each firearm was designed and intended to be fired from the shoulder. ATF made clear that designing a "stabilizing brace for use as a shoulder stock" or "configur[ing] the [brace] device for use as a

shoulder-stock" may yield a short-barreled rifle, and ATF classified "the majority" of submitted samples as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492 (quotation omitted). But these classifications, which applied "only to the particular sample[s]" submitted, were not always consistent, either in their methodologies or in their conclusions. *Id.* at 6482, 6484 n.26; *see id.* at 6479 n.9 (collecting examples). The agency's analysis sometimes improperly focused on "whether the 'stabilizing brace' at issue could be used as a 'brace' to support single-handed fire rather than whether the overall configuration of the firearm with the attached 'brace' is designed and intended to be fired from the shoulder." *Id.* at 6501-02. And ATF sometimes "plac[ed] improper weight on the manufacturer's stated intent," *id.* at 6502, even when that stated intent was inconsistent with "the objective design features" of the firearm or how the firearm was "being used in the general community," *id.* at 6479. By 2020, ATF concluded that its case-by-case "classification determinations had led to confusion and there was a need to provide clarity to the firearm industry and public on how ATF evaluates firearms equipped with a 'stabilizing brace.'" *Id.* at 6494.

**3.** To provide that clarity, the agency issued the Rule, which "inform[s] the public of the best interpretation" of how to apply the NFA's design-and-intent standard to firearms equipped with a "stabilizing brace." 88 Fed. Reg. at 6502. The Rule primarily reiterates that in determining whether such firearms are "rifles"—that is, whether they are designed and intended to be fired from the shoulder—the manufacturer's "stated intent will not necessarily be dispositive." *Id.* at 6479. Instead,

the agency will consider whether other relevant evidence, such as the firearm's "objective design features," marketing materials, and the "likely use of the weapon" in the general community, "support[s] or undermine[s] that intent." *Id.*

More specifically, the Rule states that the statutory definition of "rifle" encompasses a firearm equipped with a stabilizing brace "that provides surface area that allows the weapon to be fired from the shoulder, provided that other" evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. The Rule then identifies evidence that ATF believes will generally be probative in determining whether any particular firearm is designed and intended to be shoulder-fired. That evidence includes objective design features: whether the weapon has a "weight or length" and a "length of pull" similar to that of similar model rifles; whether it is equipped with "sights or a scope" that require shouldering to use; and whether the surface area that allows the weapon to be fired from the shoulder is created by a "rearward attachment that is necessary for the cycle of operations." *Id.* It also includes the "manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and information showing "the likely use of the weapon in the general community." *Id.* at 6570.

The Rule estimates that at least "a majority" of existing firearms equipped with braces are likely to be classified as "rifles" or "short-barreled rifles" configured to be fired from the shoulder. 88 Fed. Reg. at 6480. But the Rule also makes clear that it is

possible to design a braced weapon that is not a rifle. For example, a braced weapon might not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." *Id.* at 6529. Or it might have "a feature intended specifically to prevent shooting the firearm from the shoulder," such as "a permanently attached protrusion" that would prevent comfortable shouldering. *Id.* at 6530.

The Rule also provides compliance options for individuals who possess unregistered brace-equipped short-barreled rifles, with the Department exercising its enforcement discretion to permit registration by May 31, 2023, without penalty or tax. 88 Fed. Reg. at 6480-81. Finally, because not all previous classification letters had followed a proper approach, the Rule clarifies that those letters are no longer valid. *Id.*

### B.     Procedural History

Plaintiffs—four individuals and a retailer of firearms parts and accessories— challenged the Rule and moved for a preliminary injunction. *See* Dkt. No. 1, at 2-4; Dkt. No. 21, at 17. As relevant, plaintiffs claim that the Rule was issued in violation of the APA's notice-and-comment procedures. *See* 5 U.S.C. § 533(b). In plaintiffs' view, the Rule is a legislative rule, and the public was not given an adequate opportunity to comment on the Rule because it was not a "logical outgrowth" of the proposed rule. Dkt. No. 1, at 20-21; Dkt. No. 21, at 9-13.

11

The district court granted plaintiffs' motion for a preliminary injunction, concluding that plaintiffs demonstrated a likelihood of success on the merits of their APA claim. *See* Dkt. No. 47, at 25-42.

At the outset, the district court concluded that the Rule is not an interpretive rule—that is, a rule that "states what the administrative agency thinks the statute means," *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (quotation omitted)— but is instead a legislative rule by which ATF "intend[ed] to create new law, rights or duties," *id.* (quotation omitted). Although the court recognized the Rule's repeated statement that "it did not intend to create any new obligations or duties," Dkt. No. 47, at 28-29, the court believed that the Rule did in fact create "new obligations and duties."

In reaching that conclusion, the district court emphasized its belief that the Rule altered the legal status of brace-equipped firearms. In the court's view, before the Rule, "brace-equipped pistol owners were unencumbered by the NFA" and "had no duty or legal obligation to register, transfer, surrender, alter, or destroy their firearms"—but after the Rule, owners have "legal duties" that they must "comply with or risk criminal and monetary penalties." Dkt. No. 47, at 27; *see also id.* ("The Final Rule imposes associated duties: it expressly commands owners" of braced firearms "to comply with preexisting NFA registration requirements by May 31, 2023."). Moreover, the court stated that the Rule has the "force or effect of law" because it "offer[ed] a tax shield to those who comply" and "supersede[d] all prior

'ATF classifications involving "stabilizing brace" attachments for firearms.'" *Id.* at 28 (quotation omitted).

Next, the district court concluded that ATF did not give the public an adequate opportunity to comment on the Rule. The court described the relevant test as whether interested parties "should have anticipated" changes made in the Final Rule, such that they "reasonably should have filed their comments on the subject during the notice-and-comment period." Dkt. No. 47, at 29 (quoting *Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004) (per curiam)). It determined that the public did not have proper notice because the proposed rule proffered a points-based worksheet for analyzing braced firearms but the Rule ultimately "focuse[d] on six factors" without "scoring criteria." Dkt. No. 47, at 40. The court also highlighted that the Rule, unlike the proposal, clarified that "surface area" is the "threshold, and most important, factor because [a] firearm that does not have [a] surface area that allows for the weapon to be fired from the shoulder cannot qualify as a rifle." *Id.* (alterations in original) (quotation omitted). And the court stated that the proposal did not suggest that ATF would consider a manufacturer's marketing and promotional materials or the likely use of a weapon in the community in determining the manufacturer's intent, even though the Rule's factors incorporate that evidence as relevant. *Id.* at 41.

Finally, the district court briefly addressed whether the error it identified prejudiced plaintiffs. *See* 5 U.S.C. § 706 (directing reviewing courts in APA suits to take "due account" of "the rule of prejudicial error"). Without additional explanation,

13

the court stated that it was "satisfied Plaintiffs would likely have been able to mount a credible challenge to the Final Rule if the subjective test and [these] factors . . . had properly been presented for notice and comment." Dkt. No. 47, at 41.

The district court then determined that the equities supported an injunction. First, the court stated that the individual plaintiffs would be irreparably harmed absent an injunction because they "face direct penalization of their right to own, possess, or sell brace-equipped pistols." Dkt. No. 47, at 47. The court did not articulate any conclusion regarding irreparable harm faced by the commercial plaintiff. Balancing the equities, the court determined that the equities favored an injunction because plaintiffs "have shown a likelihood of success on their claim, and the Government suffers no countervailing harm from being prevented from violating their rights." *Id.* at 48. The court further stated that "the public suffers minimal harm from nonenforcement." *Id.*

Finally, on the scope of relief, the district court rejected plaintiffs' argument that a nationwide injunction is appropriate. Dkt. No. 47, at 48-51. The court thus stated that it was appropriate to "limit[] its relief to the parties before it." *Id.* at 49. In then fashioning relief, however, the court did not limit its injunction to the individual plaintiffs and the commercial plaintiff. Instead—although no party moved for such relief—the court also enjoined the government from enforcing the Rule against the commercial plaintiff's "past and future customers . . . who reside in the State of Florida." *Id.* at 51. In so extending the injunction, the court did not determine that such an injunction was necessary to provide full relief to the named plaintiffs, nor did

14

the court otherwise explain why it believed extending relief to unnamed past and future customers was appropriate.

The government timely filed a notice of appeal. *See* Dkt. No. 49, at 1.

### C.    Standard of Review

The district court's grant of a preliminary injunction is reviewed for abuse of discretion. *Forsyth County v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011). The court's factual findings are reviewed for clear error, and its legal conclusions are reviewed de novo. *Id.*

## SUMMARY OF ARGUMENT

This Court should reverse. The district court's merits analysis failed in all relevant respects, flouting the administrative-law principles governing this case. And beyond the merits, the district court made fundamental errors concerning the availability of equitable relief and the scope of any such relief. This Court should vacate the preliminary injunction, and at the very least, it should vacate the portion of the injunction running beyond the named plaintiffs to all Florida residents who are past or future customers of the plaintiff retailer.

**I.** The district court erred in concluding that plaintiffs were likely to succeed on a claim that the Rule violated notice-and-comment procedures.

**A.** The Rule is exempt from notice and comment under the APA, *see* 5 U.S.C. § 553(b)(A), because it is an interpretive rule, not a legislative rule. As an interpretive rule, the Rule "simply states what the administrative agency thinks [a] statute means."

15

*Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (quoting *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc)). It does not "intend[] to create new law, rights or duties," *id.* (quoting *General Motors*, 742 F.2d at 1565), or "claim to be exercising authority to itself make positive law," *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997).

This is apparent from the face of the Rule. The NFA regulates short-barreled firearms as rifles if they are "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). The Rule clarifies this phrase by explaining the considerations that bear on whether a firearm with a stabilizing brace is designed and intended to be shoulder-fired. Indeed, the Rule repeatedly explains that the statute is the source of law for any restrictions and that the Rule does not have the independent force and effect of law. In this way, the Rule is just an explanation for a regulatory requirement in light of accumulated experience in a particular context. Because the Rule was exempt from the APA's notice-and-comment requirements, it was improper for the district court to issue an injunction on plaintiffs' APA claim.

**B.** Regardless, the Rule did satisfy notice-and-comment procedures, as ATF provided notice and an opportunity to comment, and the Rule was a "logical outgrowth" of the proposed rule. *Miami-Dade County v. U.S. EPA*, 529 F.3d 1049, 1058 (11th Cir. 2008) (per curiam). The Rule followed from the draft rule, where ATF announced its intention to amend the regulatory definition of "rifle" to "publish[] the criteria" the agency uses to "evaluate on a case-by-case basis whether a particular

16

firearm configured with a 'stabilizing brace' bears the objective features of a firearm designed and intended to be fired from the shoulder." 86 Fed. Reg. 30,826, 30,828 (June 10, 2021).

And the changes made after the comment period ended were appropriately responsive to comments and in character with the original scheme. As relevant, the agency decided not to adopt a point-based worksheet because it had solicited comment on "the clarity of th[e] proposed rule," 86 Fed. Reg. at 30,849, and the regulated public that responded overwhelmingly found the worksheet to be "confusing and overly complex," 88 Fed. Reg. at 6510. ATF therefore distilled the worksheet into the "objective design features and factors" listed in the Rule that indicate when a weapon is designed and intended to be fired from the shoulder. *Id.* at 6480. In addition, ATF further clarified those criteria because it had solicited comment on whether it had "selected the most appropriate criteria," 86 Fed. Reg. at 30,850, and commenters wanted assurance that ATF would continue to assess the manufacturer's "stated intent," 88 Fed. Reg. at 6544. The agency responded accordingly by explaining in the Rule that it would consider "direct and indirect marketing and promotional materials" and "likely use" to assess that intent. *Id.* Nothing about this back-and-forth reflects that "interested parties could not reasonably have anticipated the final rulemaking from the draft rule." *Miami-Dade County*, 529 F.3d at 1059 (quoting *American Iron & Steel Inst. v. OSHA*, 182 F.3d 1261, 1276 (11th Cir. 1999)). To the contrary, given the notice, the "possibility" that ATF

might adjust the specific framework in these ways was more than "reasonably foreseeable." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007).

**C.** In any event, plaintiffs failed to demonstrate prejudice from any notice-and-comment deficiencies. *See* 5 U.S.C. § 706. In this context, a plaintiff "'must indicate with reasonable specificity,' the aspect of the rule to which it objects and 'how it might have responded if given the opportunity,'" showing that it "'can mount a credible challenge'" to this new aspect of the Rule. *Miami-Dade County*, 529 F.3d at 1061 (quoting *Owner-Operator Indep. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 494 F.3d 188, 202 (D.C. Cir. 2007)). Despite the district court's conclusion, plaintiffs did not make this showing below, failing to identify any new information that they would have submitted to the agency or an argument that the agency did not consider in issuing the Rule. To the contrary, plaintiffs had "ample opportunity to make all of [their] arguments" regarding their substantive criticism of the Rule during the comment period. *Id.* at 1062.

**II.** Plaintiffs also uniformly failed to demonstrate that the equitable factors counsel in favor of injunctive relief.

**A.** No plaintiff demonstrated any irreparable harm from the Rule. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam). As an initial matter, almost all of the plaintiffs have not identified their braced firearms, and no plaintiff has attempted a showing that their braced firearm is not a short-barreled rifle under the best interpretation of the NFA, so they have not substantiated any

argument that they would not otherwise be subject to the statute's regulatory requirements. Furthermore, those requirements are not sufficiently burdensome to constitute irreparable harm, and plaintiffs could have avoided much of those burdens anyway. If plaintiffs have short-barreled rifles, they cannot manufacture irreparable harm by choosing not to comply with the NFA, including the periods of time where ATF has exercised its enforcement discretion, and then complain about the consequences after the fact.

In addition, the district court did not articulate any theory of irreparable harm at all that it found with respect to the commercial plaintiff, which is grounds for reversal. *Siegel*, 234 F.3d at 1178-79. Such "proof of irreparable injury is an indispensable prerequisite to a preliminary injunction," *id.* at 1179, and the commercial plaintiff presented no evidence of any quantifiable economic injury at all.

**B.** In addition, the balance of equities and the public interest weigh against relief. As the Rule explains, ATF's previous approach to classifying braced weapons led to confusion, regulatory inconsistency, and circumvention of the controls Congress deemed necessary for public safety. The Rule alleviates those problems by providing a clear and current explanation of ATF's understanding of the statute's application to braced firearms. The relief granted in these cases undermines the substantial public interests that the Rule advances and should not be countenanced.

**III.** Even assuming relief were appropriate, the district court erred in entering overbroad relief. Constitutional and equitable principles require a court to limit

19

equitable relief to redressing the injuries of specific plaintiffs before the court. *See Gill v. Whitford*, 585 U.S. 48, 65-67 (2018); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Although the district court recognized these principles, it nevertheless granted an injunction not only to the individual plaintiffs in this case but also to the plaintiff retailer's past and future customers who reside in the State of Florida. Plaintiffs did not move for that injunction, which is reason enough to vacate it. And on its own terms, the district court's extension of relief was unjustified. The district court made no finding that the plaintiff retailer would suffer irreparable injury in the absence of an injunction. There is also no reason to give past customers an injunction to prevent future harm to the plaintiff retailer. More fundamentally, the plaintiff retailer's customers are not plaintiffs, and nothing justifies imperiling the public interest in service of extending the injunction to various unnamed and unknowable third-party customers.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify that relief, a plaintiff must show that: (1) "it has a substantial likelihood of success on the merits"; (2) it will suffer "irreparable injury" unless an "injunction issues"; (3) this "threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party"; and (4) "the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per

curiam). Where an injunction is sought against the government, "its interest and harm—the third and fourth elements—merge with the public interest." *Florida v. Department of Health & Human Servs.*, 19 F.4th 1271, 1293 (11th Cir. 2021).

## I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Logical Outgrowth Claim

At the outset, plaintiffs have failed to demonstrate that they are likely to succeed on their claim that the Rule violated the APA's notice-and-comment requirements. To make out that claim, plaintiffs need to demonstrate (1) that the Rule is a legislative rule subject to the APA's notice-and-comment requirements; (2) that the Rule differs so dramatically from the proposed rule that plaintiffs were denied a fair opportunity to comment on the Rule; and (3) that the lack of an opportunity to comment prejudiced plaintiffs. *See Miami-Dade County v. U.S. EPA*, 529 F.3d 1049, 1058-62 (11th Cir. 2008) (per curiam). Plaintiffs' claim fails on each level.

### A.    The Rule Is an Interpretive Rule

**1.** The Rule, which clarifies ATF's understanding of the best meaning of the NFA's definition of a rifle, is an interpretive rule that is not subject to the APA's notice-and-comment requirements. *See* 5 U.S.C. § 553(b)(A). There is therefore no need to consider whether the APA's notice-and-comment requirements were satisfied.

The Rule is an interpretive rule: it "clarifies, rather than creates, law." *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 240 (5th Cir. 2023) (quotation omitted). In issuing the Rule, ATF did not "intend[] to create new law, rights or duties," *Warshauer*

*v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (quoting *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc)); in other words, ATF did not through the Rule "claim to be exercising authority to itself make positive law," *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). *See also Warshauer*, 577 F.3d at 1337 (relying on *Syncor*).

The Rule instead articulates ATF's understanding of the best interpretation of the NFA. Enforcing the NFA requires ATF to assess whether short-barreled firearms are rifles—that is, whether they are "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). The Rule sets out a regulatory definition, *see* 27 C.F.R. §§ 478.11, 479.11, to "clarify the meaning of this phrase," 88 Fed. Reg. at 6500, explaining the considerations that bear on whether a firearm with a stabilizing brace is designed and intended to be shoulder-fired. It is therefore a rule "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation omitted); *see also Warshauer*, 577 F.3d at 1337 (similar). In short, the Rule "simply states what [ATF] thinks the [NFA] means," *Warshauer*, 577 F.3d at 1337 (quotation omitted), and "explain[s] something the" NFA "already required," *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014).

The Rule makes clear that it does not have the independent force and effect of law and that the statute is the source of legal force for any of the NFA's restrictions relating to "rifles." *See, e.g.*, 88 Fed. Reg. at 6478 ("[T]his rule does not impose any

new legal obligations on owners of 'stabilizing braces' at all, as any obligations for these owners result only from the NFA and the [Gun Control Act]. Instead, this rule merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes."); *id.* at 6480 ("The revised definition in this final rule clarifies, consistent with the best interpretation of the statutory provision, that firearms with an attached 'stabilizing brace' can possess objective design features that make them 'rifles,' as that term is defined under the NFA . . . ."); *id.* at 6501 ("[T]he rule does not create any new law; instead it simply implements the relevant statutes based on the Department's best interpretation of those statutes."); *see also id.* at 6500-02, 6507-11, 6531, 6548, 6551-57, 6559-61, 6569 (all similar). Thus, in any enforcement proceeding, the statute remains the operative law, and the government could not rely on the Rule to establish that a weapon is a rifle; instead, the adjudicator would apply the statute.

In this way, the Rule fits comfortably with other agency actions that interpret "regulatory requirement[s] in light of [an agency]'s accumulated experience in [a] particular context." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020). Though such rules may sometimes "narrow or remove leeway afforded to regulated parties under a prior interpretation," they "remain[] interpretive so long as [they] can 'fairly be viewed as interpreting—even incorrectly—a statute or regulation.'" *Id.* at 408. Thus, for example, the Mine Safety and Health Administration issued an "interpretive rule" when it advised that a chest x-ray needed a minimum

23

opacity to count as a reportable "diagnosis" even where prior letters had afforded more leeway. *American Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). The Federal Aviation Administration issued a "quintessential interpretive rule" when it advised that the Federal Aviation Act's requirements for "common carriers" applied to a company that offered "planned itineraries to passengers willing to share the pilots' expenses" even though the petitioner protested that earlier guidance was more permissive. *Flytenow, Inc. v. FAA*, 808 F.3d 882, 884-85, 890 (D.C. Cir. 2015). The Department of Labor issued an "interpretive rule" when it advised that the Labor-Management Reporting and Disclosure Act's reporting requirements for an "employer" applied to a "designated legal counsel" even where a different view would have left counsel unregulated. *Warshauer*, 577 F.3d at 1332, 1337-38 (quotation omitted). The Rule here similarly reflects no more than an interpretation based on experience that certain considerations—such as a weapon's "objective design features," "marketing materials," and "likely use in the general community"—bear on the question whether a braced firearm is designed and intended to be fired from the shoulder and is thus a "rifle" under the NFA. 88 Fed. Reg. at 6480, 6495.

A proper understanding of the Rule as interpretive also makes clear that the relevant portions of the Rule are not final agency action subject to APA review. ATF's articulation of its view of the best understanding of the statute does not itself determine any legal rights or impose any legal obligations, as would be required to demonstrate finality. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). The Rule instead

24

provides a framework for future determinations. Plaintiffs have not attempted to show that the particular braced firearms they possess or wish to possess will be classified as "short-barreled rifles" under the Rule but would not be under the correct interpretation of the statute. If plaintiffs disagree with ATF about whether a particular braced firearm they currently own is a short-barreled rifle, the proper course is to seek relief specific to that firearm under the statute, not mount a broadside attack on the Rule.

**2.** Although the Rule repeatedly makes clear that it is an articulation of ATF's best interpretation of the NFA, the district court nevertheless held that the Rule is legislative, not interpretive, and therefore subject to the APA's notice-and-comment requirements. But none of the reasons given by the court support that conclusion.

The district court's holding was based primarily on its belief that the Rule has independent force and effect of law because it alters the legal status of braced firearms: in the court's view, before the Rule, owners of braced firearms had "no duty or legal obligation to register, transfer, surrender, alter, or destroy their firearms," but after the Rule, they had "legal duties to comply with [the Rule] or risk criminal and monetary penalties." Dkt. No. 47, at 27. That statement reflects an incorrect view of the distinction between interpretive and legislative rules and misunderstands the relevant history.

The district court seemed to recognize that the statute is the ultimate source of all legal obligations both before and after the Rule: even when suggesting that the

Rule "imposes" duties and "commands obedience," the court recognized that the relevant duty that the Rule commands individuals to fulfill is the duty "to comply with preexisting NFA registration requirements." Dkt. No. 47 at 27-28. Because these duties and obligations "derive from the statute itself," *Warshauer*, 577 F.3d at 1340, and the statute remains the authoritative source of law, the Rule is interpretive; as explained, the Rule provides the agency's best understanding of the statutory commands.

That the Rule uses imperative language is of no moment. An interpretive rule may well "use imperative language—or at least have imperative meaning—if the interpreted term is part of a command." *American Mining Cong.*, 995 F.2d at 1111. The NFA's underlying requirements are themselves imperative; the Rule reminds individuals of the need to comply with those requirements. That is precisely the kind of "remind[er]" to "affected parties of existing duties" that makes a rule interpretive. *Warshauer*, 577 F.3d at 1337 (quoting *General Motors*, 742 F.2d at 1565).

Nor does it matter that the district court believed that the Rule represented a significant shift in the agency's position. Even where a rule works a "fundamental change in [the agency's] interpretation" of the statute, it remains an interpretive rule so long as it does no more than "advise the public of the agency's construction of the statute[]." *Perez*, 575 U.S. at 97, 101 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). And that is the case here. As explained, it is the statute—not the Rule—that imposes the relevant legal obligations, and the Rule does not have any

"effects completely independent of the statute." *Warshauer*, 577 F.3d at 1337 (emphasis omitted) (quoting *Metropolitan Sch. Dist. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992)).

In any event, the agency did not interpret the statute to exempt all braced pistols before the Rule; nor is it the case that all such firearms are now covered. Before the Rule, ATF made clear that designing a "stabilizing brace for use as a shoulder stock" may yield a short-barreled rifle, and ATF made classification determinations on a case-by-case basis with "the majority" of submitted samples classified as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492 (quotation omitted). Similarly, ATF has made clear in the Rule that the statutory determination whether any particular braced firearm is a short-barreled rifle must be made based on the particular design features and other relevant evidence specific to any particular weapon platform. *See id.* at 6569 (stating that a braced firearm will be classified as a short-barreled rifle only if, among other things, the evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder"). The Rule estimates that at least "a majority" of existing firearms equipped with braces are likely to be classified as "rifles" or "short-barreled rifles" configured to be fired from the shoulder. *Id.* at 6480. But the Rule also clarifies that it is possible to design a braced weapon that is not a rifle. For example, a braced weapon might not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." *Id.* at 6529-30. Or it might have "a feature intended specifically to

27

prevent shooting the firearm from the shoulder," such as "a permanently attached protrusion" that would prevent comfortable shouldering. *Id.* at 6530. Thus, far from reflecting some about-face by the agency, the Rule simply reflects ATF's attempt to refine and clarify its approach to the question of how to apply the statute to braced weapons.

Nor is it relevant, as the district court held, that the agency "offer[ed] a tax shield to those who comply" with the statute, Dkt. No. 47, at 28, or that ATF gave possessors until May 31, 2023, to comply with the preexisting statutory requirements, *id.* at 27. As the Rule explains, those were exercises of the agency's "own enforcement discretion"; they do not alter any underlying legal duties or obligations. 88 Fed. Reg. at 6481.

The district court's concern that the Rule "supersedes all prior" agency classifications of braced firearms, Dkt. No. 47, at 28, is no more availing. As explained, interpretive rules need not reflect an agency's first attempt to interpret a statutory provision; instead, they may properly reflect an alteration or refinement of an agency's previous interpretation. *See supra* pp. 23-24. Here, the Rule embodies an interpretation of the NFA that—as the Rule explains—is not fully reflected in previous classification letters. *See, e.g.*, 88 Fed. Reg. 6479-80. Rescinding those classification letters—themselves not issued through notice and comment—does not change the nature of the Rule. And because ATF "is not required to use notice-and-

28

comment procedures" to issue those interpretations, "it is also not required to use those procedures when it amends or repeals" them. *Perez*, 575 U.S. at 101.

**B.    The Final Rule Is a Logical Outgrowth of the Proposed Rule**

Even if the agency were required to follow notice-and-comment procedures in issuing the Rule, those requirements were satisfied here because the agency provided notice and an opportunity for comment, and the Rule was a "logical outgrowth" of original proposal. *Miami-Dade County*, 529 F.3d at 1058-59 (quotation omitted).

**1.** ATF's "final rulemaking" followed directly "from the draft rule." *American Iron & Steel Inst. v. OSHA*, 182 F.3d 1261, 1276 (11th Cir. 1999) (quoting *National Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 531 (D.C. Cir. 1997) (per curiam)). In its proposed rule, ATF announced its intent to amend the regulatory definition of "rifle." 86 Fed. Reg. at 30,826-29. ATF stated that the Rule was designed to "publish[] the criteria" the agency uses to "evaluate on a case-by-case basis whether a particular firearm configured with a 'stabilizing brace' bears the objective features of a firearm designed and intended to be fired from the shoulder and is thus subject to the NFA." *Id.* at 30,828. ATF thus explained that it would consider evidence beyond a manufacturer's statements in determining whether a firearm was designed and intended to be shoulder-fired and included a list of specific factors—arranged in a points-based worksheet—that ATF proposed to consider. *See id.* at 30,826-29.

Specifically, the agency made clear that "[t]he characterization of an accessory by the manufacturer, including assertions in advertising, is not dispositive," and it

29

would also consider whether "the objective design features of the firearm, as configured, . . . support the manufacturer's purported intent and, in fact, suggest an altogether different intent." 86 Fed. Reg. at 30,828. It also explained that "likely use may be relevant in assessing the manufacturer's or maker's purported intent with respect to the design of a firearm." *Id.* ATF solicited comment on the proposed Rule and ultimately received 237,000 comments from interested parties*, see* 88 Fed. Reg. at 6497, reflecting "the adequacy of notice" provided by the proposal, *Miami-Dade County*, 529 F.3d at 1059.

After the comment period ended, ATF made appropriately responsive changes in "character with the original scheme," *Hi-Tech Pharm., Inc. v. Crawford*, 505 F. Supp. 2d 1341, 1348 (N.D. Ga. 2007) (quoting *Beirne v. Secretary of the U.S. Dep't of Agric.*, 645 F.2d 862, 865 (10th Cir. 1981)), *aff'd per curiam*, 544 F.3d 1187 (11th Cir. 2008). Among other things, the agency simplified the points-based worksheet. The agency's proposal specifically requested comment on "the clarity of th[e] proposed rule and how it may be made easier to understand," 86 Fed. Reg. at 30,849, and in response, several commenters suggested that the regulated public found the worksheet's approach to be "confusing and overly complex," 88 Fed. Reg. at 6510. Heeding that dissatisfaction, ATF abandoned the specific points-based system and instead identified considerations—such as specific design features noted in the Worksheet—that ATF would use to assess whether a firearm is designed and intended to be fired from the shoulder. *See id.* at 6513 ("[T]his rule clarifies and simplifies the criteria from the

Worksheet . . . ."). In all cases, however, "the objective design features and factors listed in the rule that indicate the weapon is designed, made, and intended to be fired from the shoulder [we]re derived from the [notice of proposed rulemaking (NPRM)] and proposed Worksheet 4999." *Id.* at 6480; *see also id.* at 6494 ("The factors discussed in the NPRM will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle' . . . .").

ATF also further clarified its criteria based on comments requested and received. ATF solicited comment on whether it had "selected the most appropriate criteria for determining whether a stabilizing brace has made a firearm subject to the NFA" and whether commenters had "additional criteria that should be considered," raising those criteria for discussion. 86 Fed. Reg. at 30,850. In response, commenters sought assurance that ATF would continue to assess the manufacturer's "stated intent." 88 Fed. Reg. at 6544. ATF responded in turn by making clear that it would consider "direct and indirect marketing and promotional materials" and "likely use" to assess that intent. *Id.* These considerations were "derived from the NPRM," where the agency had already mentioned that such factors were relevant to assessing design and intent. *Id.* at 6480. Their inclusion reflects an appropriately responsive administrative process.

This back-and-forth is precisely the kind of agency engagement that this Court approved in *Miami-Dade County*, 529 F.3d at 1059. There, the Environmental Protection Agency solicited comment on whether a proposed "demonstration

requirement" was practical and feasible, and its final rule withdrew the requirement in response to comments that the requirement was inappropriate due to "technical challenges and factual uncertainties." *Id.* at 1060. The final rule was upheld as a logical outgrowth to the proposal and comments.

The Rule challenged here is equally valid. Although ATF's Rule reflects some changes made to its approach, that is not extraordinary—as this Court explained in *Miami-Dade County*, the agency "can obviously promulgate a final regulation that differs in some respects from its proposed regulation." 529 F.3d at 1059 (quotation omitted). The agency "learn[ed] from the comments" and, in response, adopted a simplified version of its proposal. *Id.* (quotation omitted). That change resulted in a clearer Rule that was still closely tied to the proposal, thereby fulfilling "the purpose of notice and comment—to allow an agency to reconsider, and sometimes change, its proposal based on the comments of affected persons." *Id.* (quotation omitted).

In short, nothing about the rulemaking reflects that "interested parties could not reasonably have anticipated the final rulemaking from the draft rule." *Miami-Dade County*, 529 F.3d at 1059 (quotation omitted). The proposed rule put the public on notice of the subjects that the Rule would address and of the general objective-evidence approach that ATF intended to take to the problem of evaluating design and intent. Given that close connection between the proposal and the Rule and the specific comments solicited, the "possibility" that ATF might adjust the specific

32

framework for feasibility or other reasons was more than "reasonably foreseeable." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007).

**2.** In concluding that the Rule was not properly a logical outgrowth of the proposal, the district court primarily focused on two asserted differences between the Rule and the proposal. First, the court believed that the public was not offered adequate notice of the agency's shift from the proposed points-based worksheet to a more qualitative balancing inquiry. Dkt. No. 47, at 40. Second, the court believed that the public did not have adequate notice of three of the specific factors identified in the Rule. *Id.* at 40-41. Neither of those concerns justifies the conclusion that the Rule was not a logical outgrowth of the proposed rule.

First, the agency's shift from a points-based worksheet to a qualitative assessment incorporating many of the factors from the worksheet did not generate a fair notice problem. As explained, *see supra* pp. 29-33, both the proposed worksheet and the adopted Rule reflect a similar approach to how the agency will assess whether a firearm is designed and intended to be fired from the shoulder. Both make clear that a manufacturer's statements regarding its intent are not dispositive and that the agency will consider other objective evidence that may confirm or undermine that stated intent. And both adopt an approach that makes an individualized assessment of a particular firearm. Beyond this, the Rule continues to use the "factors discussed in the" proposal "to help determine whether a weapon meets the statutory definition of a 'rifle,'" 88 Fed. Reg. at 6494; indeed, "the objective design features and factors listed

33

in the rule that indicate the weapon is designed, made, and intended to be fired from the shoulder are derived from the" proposal and worksheet, *id.* at 6480. Where the Rule and proposal primarily differ is that the Rule "clarifies and simplifies the criteria from the Worksheet." *Id.* at 6513. But as explained, *supra* pp. 29-33, that change was a direct and appropriate outgrowth of the comment process.

To the extent that the district court was under the impression that commenters were not specifically on notice that ATF might adopt a so-called "subjective balancing test," Dkt. No. 47, at 40 (quotation omitted), that is belied by the comments made, *see Miami-Dade County*, 529 F.3d at 1059 (assessing comments as "evidence of the adequacy of notice"). Commenters criticized the proposed worksheet on the same (unpersuasive) grounds as the Rule: that it "contain[ed] ambiguous terms that are subject to interpretation and no measurable standards for many of the criteria"; "that the highly subjective factors would allow ATF to arbitrarily weigh points in favor of regulation under the NFA"; and that "the ATF Worksheet 4999 was subjective." 88 Fed. Reg. at 6513. Such parties had "ample opportunity to comment" to express such criticisms, *Miami-Dade County*, 529 F.3d at 1059; that the agency rejected those comments does not demonstrate a lack of notice.

Second, the district court erred in concluding that the public did not have an adequate opportunity to comment on three specific factors in the Rule. The district court's conclusion proceeded from its erroneous premise that two of the factors—a manufacturer's "direct and indirect marketing and promotional materials" and other

34

information "demonstrating the likely use of the weapon in the general community,"
88 Fed. Reg. at 6480—did not appear at all in the proposed rule. Although those
factors did not appear on the worksheet included with the proposed rule, the proposal
made clear that "regardless of the points accrued" on the worksheet, "efforts to
advertise" "short-barreled rifles as such will result in a classification as a 'rifle'"
because those efforts remove "any question" about the manufacturer's intent. 86 Fed.
Reg. at 30,834 (quotation omitted). And the proposed rule also made clear ATF's
understanding that a brace's "likely use may be relevant in assessing the
manufacturer's or maker's purported intent." *Id.* at 30,828. Similarly, although the
district court emphasized that the final Rule, unlike the proposed rule, treats a
firearm's rear "surface area" as a threshold factor, *see* Dkt. No. 47, at 40 (quotation
omitted), the proposed rule did not ignore surface area; rather, it gave serious
consideration to a firearm's rear surface area, with that factor receiving many potential
points on the worksheet, *see* 86 Fed. Reg. at 30,841. And interested parties "[co]uld
have anticipated" the conclusion that if a firearm does not have surface area that
allows the weapon to be fired from the shoulder, then it is not designed to be fired
from the shoulder. *Miami-Dade County*, 529 F.3d at 1059 (quotation omitted).

## C.    Plaintiffs Have Not Demonstrated the Required Prejudice

Regardless, even if ATF improperly failed to provide notice to plaintiffs of
certain changes made between the proposal and the Rule, that failure would be
harmless. A court reviewing an APA claim is required to take "due account . . . of the

rule of prejudicial error," 5 U.S.C. § 706; thus, a plaintiff asserting a logical outgrowth argument must "show that it was prejudiced by the lack of opportunity to comment," *Miami-Dade County*, 529 F.3d at 1061. To show prejudicial error in this context, a plaintiff "must indicate with reasonable specificity, the aspect of the rule to which it objects and how it might have responded if given the opportunity." *Id.* (quotation omitted). In other words, a plaintiff is required to show that it "can mount a credible challenge" to the aspects of the Rule that changed without proper notice and that it was "prejudiced by the absence of an opportunity to do so before the agency." *Id.* (quotation omitted).

In concluding that plaintiffs met this requirement, the district court stated without additional explanation that it believed that plaintiffs "would likely have been able to mount a credible challenge to the Final Rule if the subjective test and factors 5 and 6"—an analysis of the manufacturer's marketing materials and the likely use by the community—"had properly been presented for notice and comment." Dkt. No. 47, at 41.

But nothing in the record supports the district court's conclusion. Indeed, plaintiffs have not seriously attempted to demonstrate prejudice. They have not identified, for example, "any new information [that] they would have submitted to the agency if given the opportunity," *Texas v. Lyng*, 868 F.2d 795, 800 (5th Cir. 1989), or otherwise demonstrated that "if given the opportunity to comment, [they] would have presented an argument the [agency] did not consider in issuing the" regulation, *United*

36

*States v. Johnson*, 632 F.3d 912, 932 (5th Cir. 2011). Nor have plaintiffs explained how any of their asserted legal claims turn on the specific differences between the proposal and the Rule that the district court believed resulted in inadequate notice. To the contrary, plaintiffs had "ample opportunity to make all of [their] arguments" regarding their substantive criticisms of the Rule during the comment period. *See Miami-Dade County*, 529 F.3d at 1062. Accordingly, there is no basis for plaintiffs to get an injunction for reasons of lack of notice and comment.

## II.    The Equitable Factors Do Not Support Preliminary Relief

### A.    Plaintiffs Face No Irreparable Harm

Even setting aside the merits, plaintiffs have not demonstrated that they will suffer irreparable harm absent an injunction. To make that showing, plaintiffs must establish a "substantial likelihood" of an "actual and imminent"—and irreparable—injury from the challenged conduct. *Siegel*, 234 F.3d at 1176 (quotation omitted). Beyond that, the harm must be so "certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quotation omitted). None of the plaintiffs have demonstrated such harm.

**1.** As an initial matter, no plaintiff has shown that *the Rule* is the source of their alleged harm. It is "black letter law that an injunction will not issue when it would be ineffectual." *United States v. Parish of St. Bernard*, 756 F.2d 1116, 1123 (5th Cir. 1985). As explained, well before the Rule, the NFA required that short-barreled rifles be

taxed and registered; ATF had to determine whether braced firearms were short-barreled rifles; and ATF classified the "majority" of the braced firearms it assessed as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492.

Plaintiffs have not met their burden to provide evidence demonstrating that the Rule changed the legal status of the particular weapons that they possess or manufacture. *See Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) ("The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff."). Plaintiffs have failed to substantiate any assertion that their braced firearms are not short-barreled rifles under the best understanding of the NFA, and nothing in the district court's discussion on the merits—which focused on a perceived procedural flaw in the Rule—implies that the weapons plaintiffs possess or sell are *not* short-barreled rifles. Indeed, in many cases, plaintiffs have not identified their braced weapons at all. Accordingly, they cannot show that the Rule itself has caused them any irreparable harm such that a preliminary injunction against the Rule could redress any harm.

**2.** Regardless, neither the individual plaintiffs nor the business plaintiff have made any evidentiary showing substantiating a need for preliminary injunctive relief. In concluding otherwise, the district court stated only that "the Individual Plaintiffs face direct penalization of their right to own, possess, or sell brace-equipped pistols" in the absence of an injunction, seemingly because they "face the threat of criminal

38

prosecution" if they violate the NFA. Dkt. No. 47, at 45, 47. That conclusion is unpersuasive.

First, the district court's statement that plaintiffs face some sort of penalization of their possession or sale of braced firearms is incorrect. As explained, *see supra* p. 11, the Rule provided that individuals who possessed unregistered brace-equipped short-barreled rifles could register those firearms—without penalty or tax—by May 31, 2023. 88 Fed. Reg. at 6480-81. Thus, the Rule did not penalize plaintiffs' preexisting possession of any braces or firearms. And to the extent that plaintiffs chose not to take advantage of the Rule's penalty-free registration period, any resulting harm is "self-inflicted" injury and "does not qualify as irreparable." *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam) (quotation omitted); *see also Colorado v. U.S. EPA*, 989 F.3d 874, 888 (10th Cir. 2021) (explaining that injury is not "legally cognizable" where "self-inflicted"); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (explaining that the plaintiff "'severely undermines' its claim" where "harm is largely self-inflicted").

Nor, moving forward, does the Rule impose any cognizable cost on the individual plaintiffs' ability to possess or transfer braced firearms. To constitute irreparable harm, compliance costs must reflect at least "serious harm," *Siegel*, 234 F.3d at 1177, and it is plaintiffs' burden to substantiate such harm. No plaintiff provided any evidence that the Rule—as opposed to the NFA—would impose that harm. And even the NFA's requirements are relatively modest: besides the $200 tax,

the NFA requires that an individual who wishes to make or transfer a covered firearm must receive approval and register and mark the firearm. Such minor regulatory burdens are not extraordinary and do not reflect harm so "certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters.*, 78 F.4th at 1017 (quotation omitted).

Separately, although the NFA requires that the maker or transferor of a covered firearm pay a $200 tax, that tax cannot constitute irreparable harm because it is remediable by a tax refund. An individual who pays the tax but believes the statute does not cover his weapon may request, or sue for, a refund. *See* 26 U.S.C. § 7422. That refund-suit remedy "offer[s a taxpayer] a full, albeit delayed, opportunity to litigate the legality" of a disputed tax. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 746 (1974). Such a "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (alteration in original) (quotation omitted).

Although the costs of complying with the NFA are minimal, the district court nevertheless seemed to believe that the individual plaintiffs demonstrated the requisite irreparable harm based on a perceived threat of criminal prosecution if they chose not to comply with the statute. But it is undisputed that individual plaintiffs may continue to make, possess, and transfer short-barreled rifles—with no threat of criminal or civil liability—so long as they comply with the NFA's requirements. And plaintiffs cannot

40

manufacture irreparable harm simply by choosing not to comply with minimally burdensome statutory requirements. Any such harm would again constitute "self-inflicted" injury that is not irreparable. *Texas*, 10 F.4th at 558.

Finally, to the extent that the district court also intended to suggest that plaintiffs had suffered some procedural irreparable injury by the "deprivation" of their "rights under the APA" to comment on the Rule, Dkt. No. 47, at 47, that suggestion is unavailing. There is no basis to think that an agency's failure to give an opportunity to comment on a rule, without more, leads to any immediate need for injunctive relief. That is especially true here, where plaintiffs did not even attempt a showing that they were prejudiced by a failure to participate in ATF's rulemaking. *See supra* pp. 35-37.

**3.** The district court did not articulate *any* theory of irreparable harm that it found persuasive with respect to the commercial plaintiff. That failure alone is sufficient to reverse the preliminary injunction with respect to that plaintiff. *Siegel*, 234 F.3d at 1178-79 (explaining that "proof of irreparable injury is an indispensable prerequisite to a preliminary injunction" and denial is appropriate where a "limited record . . . did not support" harm). But to the extent that the commercial plaintiff intended to argue in district court that it would suffer irreparable economic injury from the Rule, that assertion was unpersuasive (and, thus, properly not credited by the district court). Indeed, the commercial plaintiff submitted no evidence that it suffered any quantifiable losses at all: no reduced revenue, no loss in customers, no cancelled orders, nor any other financial impact fairly attributable to the Rule. Against that lack

41

of evidence, any "conclusory allegation[s] of 'irreparable harm'" or "assertion[s] of speculative economic injury . . . at the injunction hearing" cannot support a finding of injury. *Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1286 (11th Cir. 1990).

### B.    The Balance of the Equities Favors Reversal

Even assuming plaintiffs had demonstrated some irreparable harm, their minimal asserted harms could not outweigh the countervailing public interest in regulatory clarity and public safety.

**1.** As an initial matter, the Rule promotes regulatory clarity and consistency, as has been explained. ATF's previous "classification determinations had led to confusion" about how to evaluate a braced firearm and inconsistent determinations. *See* 88 Fed. Reg. at 6494. Thus, the Rule provides an in-depth explanation of the proper approach for the benefit of the agency and the regulated public. Enjoining the Rule would promote confusion and might require ATF to revert to an outdated approach "that no longer reflects its current enforcement thinking," which "is not in the public interest." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

Second, the NFA, and the Rule clarifying its application, benefit public safety. As explained, Congress has found that short-barreled rifles are powerful concealable weapons that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395, and has established a registration-and-taxation scheme to track such firearms to keep them away from non-law-abiding citizens. The Rule reinforces those

controls that Congress deemed necessary for public safety by preventing circumvention of the requirements.

The district court did not seriously contest any of those substantial clarity and public-safety interests weighing in favor of continued implementation of the Rule. Instead, the court—without meaningful analysis—stated simply that the government would "suffer[] no countervailing harm" from an injunction. Dkt. No. 47, at 48. That bare conclusion is insufficient to support a preliminary injunction.

## III.    The Injunction is Overbroad

Even setting aside the merits, the district court provided overbroad relief that should be reversed. Constitutional and equitable principles compelled the court to limit its relief to the specific named plaintiffs. The district court transgressed this limitation by extending relief to all Florida residents who are past or future customers of the plaintiff retailer, even though plaintiffs did not move for such relief, and that relief was not justified by the court.

In rejecting plaintiffs' request for a nationwide injunction, the district correctly acknowledged that it had authority to provide relief only to the named plaintiffs. Under Article III, a court may entertain a suit by a plaintiff who has suffered a concrete injury and may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury," *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quotation omitted). And under principles of equity, injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v.*

43

*Yamasaki*, 442 U.S. 682, 702 (1979). As the district court understood, *see* Dkt. No. 47, at 48-50, plaintiffs' overbroad request for nationwide relief was improper for these reasons.

Although the district court recognized these principles, the court nevertheless granted an injunction not only to the individual plaintiffs in this case but also to the plaintiff retailer's past and future customers who reside in the State of Florida. Plaintiffs did not move for such an injunction, which is alone sufficient to vacate it. Nor was the injunction's scope properly justified by the district court, which did not explain how extending relief to many unnamed and unknown third-party customers was justified by the relevant equitable principles.

As an initial matter, plaintiffs did not move for an injunction running specifically to the plaintiff retailer's customers—instead, plaintiffs' request in their preliminary injunction motion was for nationwide relief. *See* Dkt. No. 21, at 17. And the district court did not provide notice of its intent to enter an injunction drawing the line at customers. As a result, the government never had the opportunity to explain to the district court the legal and equitable reasons that such an injunction would be unwarranted. That lack of notice means that the injunction for customers fails to comply with the requirement that a preliminary injunction be issued "only on notice to the adverse party," Fed. R. Civ. P. 65(a)(1)—a requirement that encompasses a right to "fair notice and an effective opportunity" to respond, *Marshall*

*Durbin Farms, Inc. v. National Farmers Org., Inc.*, 446 F.2d 353, 356 (5th Cir. 1971).[1]

Thus, that portion of the injunction should be vacated.

Moreover, even on its own terms, the district court's extension of relief to the plaintiff retailer's past and future customers was unwarranted. To begin, as explained, *see supra* pp. 41-42, the district court did not articulate any finding that the plaintiff retailer would suffer irreparable injury in the absence of an injunction. Thus, no relief running to the plaintiff retailer at all—much less to the plaintiff retailer's customers—was appropriate. *Cf. Gill*, 585 U.S. at 64-66 (explaining that equitable relief is limited to redressing the plaintiffs' injury).

And, even assuming some injury, the injunction is too broad. An injunction protecting previous customers or firearms purchased through previous transactions (even for "future" customers who plan to buy additional short-barreled rifles) is plainly not necessary to halt any financial harm the plaintiff retailer might suffer prospectively.

More fundamentally, the plaintiff retailer has not shown that any of its customers must be protected by an injunction for it to receive relief. Constitutional and equitable principles require limiting any preliminary injunctive relief to redressing the specific irreparable injury asserted by the plaintiff retailer. But the plaintiff

---

[1] "[D]ecisions of the United States Court of Appeals for the Fifth Circuit" that were "handed down by that court prior to" October 1, 1981, "shall be binding as precedent in the Eleventh Circuit." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

retailer's customers are not plaintiffs, and the district court nowhere explained how the relevant equitable principles justified relief to those individuals. Nor could anything found in the district court's opinion justify imperiling the public interest in service of extending the injunction to various unnamed and unknowable third-party customers. That is especially the case here, where the court's injunction ignores the reality of firearm sales. The district court did not conclude that any braced product that the plaintiff retailer sells is, in fact, not a "rifle" under the NFA. Rather it identified a procedural error in an agency rule. Its injunction nonetheless facilitates circumvention of the NFA, so long as an individual shops at the plaintiff retailer (or has previously done so). That result would permit continued widespread—not limited and tailored—circumvention of Congress's requirements.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

ROGER B. HANDBERG
*United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA

*s/ Ben Lewis*
BEN LEWIS
*Attorneys, Appellate Staff*
*Civil Division, Room 7250*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2494*

May 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,556 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Ben Lewis*
Ben Lewis

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Ben Lewis*
Ben Lewis

**ADDENDUM**

## TABLE OF CONTENTS

26 U.S.C. § 5845 ................................................................................................ A1

**National Firearms Act**

**26 U.S.C. § 5845**

**§ 5845. Definitions**

For the purpose of this chapter—

**(a) Firearm.**—The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection I; (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

**(b) Machinegun.**—The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

**(c) Rifle.**—The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

**(d) Shotgun.**—The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed shotgun shell.

**(e) Any other weapon.**—The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged

through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

***