No. 24-10897

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————————

JOSIAH COLON; BRANDON KLING; ERIC MELE; WILLIAM MARTIN; and 2ND
AMENDMENT ARMORY, a Florida profit corporation;

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; DIRECTOR,
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; UNITED
STATES DEPARTMENT OF JUSTICE; and U.S. ATTORNEY GENERAL,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the Middle District of Florida

————————————

## APPENDIX

————————————

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney General*

ROGER B. HANDBERG
   *United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA
BEN LEWIS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7250*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-2494*

*Colon v. ATF*, No. 24-10897 (11th Cir.)

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for defendants-appellants certifies that, to the best of his knowledge, the following constitutes a complete list of trial judges, attorneys, persons, associations of person, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal:

2nd Amendment Armory, *Plaintiff-Appellee*

Bowen, Brigham J., *Attorney for Defendants-Appellants*

Boynton, Brian M., *Attorney for Defendants-Appellants*

Colon, Josiah, *Plaintiff-Appellee*

Dettelbach, Steven M., Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Defendant-Appellant*

Drezner, Michael, *Attorney for Defendants-Appellants*

Garland, Merrick B., United States Attorney General, *Defendant-Appellant*

Janda, Sean R., *Attorney for Defendants-Appellants*

Kling, Brandon, *Plaintiff-Appellee*

Lewis, Benjamin R., *Attorney for Defendants-Appellants*

Larosiere, Matthew, *Attorney for Plaintiffs-Appellees*

Lowenstein, Jody D., *Attorney for Defendants-Appellants*

Lowry, Faith E., *Attorney for Defendants-Appellants*

Martin, William, *Plaintiff-Appellee*

*Colon v. ATF*, No. 24-10897 (11th Cir.)

Mele, Eric, *Plaintiff-Appellee*

Pitz, Taylor, *Attorney for Defendants-Appellants*

Scriven, Mary S., *District Judge for the Middle District of Florida*

Wright, Abby C., *Attorney for Defendants-Appellants*

Zermay, Zachary Z., *Attorney for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Document:**                                                                                    **Page:**

Complaint,
   Dkt. No. 1 ........................................................................................ App. 1

Motion for Preliminary Injunction,
   Dkt. No. 21 .................................................................................... App. 26

Motion to Dismiss,
   Dkt. No. 22 .................................................................................... App. 43

Transcript of Motions Hearing,
   Dkt. No. 40 .................................................................................. App. 104

District Court Order,
   Dkt. No. 47 .................................................................................. App. 163

Notice of Appeal,
   Dkt. No. 49 .................................................................................. App. 214

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
      *General*

ROGER B. HANDBERG
  *United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA

 *s/ Ben Lewis*
BEN LEWIS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7250*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2494*

May 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Ben Lewis*

Ben Lewis

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE №:

JOSIAH COLON; BRANDON KLING;
ERIC MELE; WILLIAM MARTIN;
and 2ND AMENDMENT ARMORY,
 a Florida profit corporation,

*Plaintiffs*,

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, STEVEN
DETTELBACH, in his official capacity as
Director of the Bureau of Alcohol, Tobacco,
Firearms, and Explosives, UNITED STATES
DEPARTMENT OF JUSTICE, and
MERRICK B. GARLAND, in his official
capacity as Attorney General, U.S.
Department of Justice,

*Defendants*.

_____/

## **COMPLAINT**

1.     Defendant officials at the Bureau of Alcohol, Tobacco, Firearms and Explosives have engaged in conduct violative of the Administrative Procedures Act, and Second and Fifth Amendments to the United States Constitution.

2.     In an aggressive misinterpretation of laws concerning firearms that are in no way longstanding, Defendants threaten Plaintiffs, and an unknowable number of other Americans for the simple possession of firearms.

3. The Defendants' wrongdoing is ongoing. Plaintiffs therefore seek declaratory and injunctive relief requiring Defendants to cease their unlawful conduct.

## I.   PARTIES

### A. Plaintiffs

4. Plaintiff Josiah Colon ("Colon") is a natural person, citizen of the United States and the State of Florida, county of Hillsborough. Colon works as a branch manager of a financial institution in Polk County and is a part-time college student. Colon depends on a Palmetto State Armory AK-P GF3 with an attached stabilizing brace for lawful purposes including defense of hearth and home. A firearm configured like Colon's was listed by ATF in its 2023 rulemaking as a short barreled rifle. Colon routinely travels interstate and relies on his firearms to ensure his personal safety. Colon's ability to lawfully possess, alienate, and travel with his firearms are directly threatened by the unlawful actions of Defendants.

5. Plaintiff Brandon Kling ("Kling") is a natural person, citizen of the United States and the State of Florida, city of Largo. Kling is employed by the Sixth Judicial Circuit of Florida and attends Family Oasis Church. Kling owns two AR-style pistols with attached stabilizing braces which he built using commonly available AR components, and an AR-15-derived receiver he lawfully machined for himself. Kling routinely travels out-of-state to visit

friends and family, as well as to attend shooting events hosted by Project Appleseed, where Kling serves as an instructor. Kling depends on his AR pistols with attached stabilizing braces for lawful purposes such as self-defense, especially while traveling as Kling has found them to be the easiest to travel with while meeting airline regulations. Kling's ability to lawfully possess, alienate, and travel with his firearms are directly threatened by the unlawful actions of Defendants.

6.      Plaintiff Eric David Mele ("Mele") is a natural person, citizen of the United States and the State of Florida, city of Groveland. Mele is an AC service contractor—likely the most valuable and honorable trade for a Floridian to undertake—and depends on his AR-type pistol with attached stabilizing brace for lawful purposes such as self-defense. Mele depends on this firearm as, being a business owner in the AC industry, he occasionally finds himself in areas where the need for an effective mechanism of self-defense is acute. Additionally, Mele occasionally travels out of state and brings his firearm with him. Mele's ability to lawfully possess, alienate, and travel with his firearms are directly threatened by the unlawful actions of Defendants.

7.      Plaintiff Ted William Martin ("Martin") is a natural person, citizen of the United States and the State of Florida. Martin is a veteran of the United States Armed Forces and owns 2nd Amendment Armory, a firearms retailer in Brandon, Florida. Martin depends on firearms with attached stabilizing braces

for lawful purposes such as defense of hearth, home, and his business. Martin's ability to lawfully possess, alienate, and travel with his firearms are directly threatened by the unlawful actions of Defendants.

8.      Plaintiff 2nd Amendment Armory is a private business corporation that is headquartered and has its principal place of business in the State of Florida, city of Brandon. 2nd Amendment Armory is in the business of selling firearms parts and accessories, and has in its inventory pistols with attached stabilizing braces that are directly affected by the unlawful actions of Defendants.

### B. Defendants

9.      Defendant United States Department of Justice ("DOJ") is, and was at all relevant times, an executive department of the United States subject to the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 551(1). The DOJ is headquartered in Washington, DC.

10.     Defendant Merrick Garland is the Attorney General of the United States. He is sued in his official capacity. In that capacity, he oversees the DOJ and its components. He is responsible for the federal conduct that is the subject of this action and for the related acts and omissions alleged herein.

11.     Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is, and was at all relevant times, a component of the DOJ subject to the APA. *See* 5 U.S.C. § 551(1). ATF is headquartered in Washington DC.

App.4

12.     Defendant Steven Dettelbach is the Director of ATF. He is sued in his official capacity. In that capacity, he is responsible for the federal conduct that is the subject of this action and for the related acts and omissions alleged herein.

## II.     JURISDICTION AND VENUE

13.     This Honorable Court has original federal question jurisdiction over this action because it arises under the Constitution and laws of the United States. 28 U.S.C. § 1331.

14.     This action seeks declaratory, injunctive, and other relief pursuant to the Constitution of the United States of America and the laws of the United States.

15.     There exists here an active, justiciable controversy between the parties about whether the DOJ complied with the APA, 5 U.S.C. §§ 551-559, violated the Second and Fifth Amendments to the Constitution, and exceeded the limits of the tax and spend clause in promulgating the 2023 rulemaking as it pertains to firearms with barrels less than sixteen inches. The rulemaking is attached to this complaint as Exhibit A. Declaratory relief will resolve this controversy and eliminate the burdens unlawfully imposed on Plaintiffs.

16.     This Honorable Court constitutes a proper venue for this action because this action is against officers and agencies of the United States,

multiple plaintiffs reside in this judicial district, and no real property is involved in the action. *See* 28 U.S.C. § 1391(e)(1)(C).

## III.   BACKGROUND

### A. The National Firearms Act & Gun Control Act

17.    The National Firearms Act of 1934 ("NFA"), Pub.L. 73-474, 48 Stat. 1236 imposed a manifestly prohibitory tax on the making and transfer of "firearms," as defined in the NFA, as well as imposing a burdensome tax— stylized as a "special (occupational) tax"—on persons and entities engaged in the business of importing, manufacturing, and dealing in firearms covered by the NFA. *See* ATF, *National Firearms Act*, https://www.atf.gov/rules-and-regulations/national-firearms-act (In ATF's own words, the NFA's "underlying purpose was to curtail, if not prohibit, transactions in NFA firearms." Not quite a revenue-raising purpose or result. *Cf. Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012)).

18.    The NFA requires that all firearms within its purview be registered with the Secretary of the Treasury.

19.    In its original drafts, the NFA imposed a prohibitory tax on the transfer and possession of handguns. Short barreled rifles and shotguns (hereinafter "SBR"s and "SBS"s) were added to the Act in order to prevent individuals from circumventing the handgun tax by simply cutting down long guns into what would be the effective equivalent of a handgun. Prior to

passage, the handgun regulations were removed from the NFA, but the restrictions on SBRs and SBSs remained, a vestige of the handgun regulations.[1]

20.    In 1968, Congress passed the Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, 82 Stat. 1213. The GCA revised the NFA through Title II, which regulated machineguns, SBSs, and SBRs. Rifles and pistols not subject to the NFA were regulated under Title I of the GCA. § 18 U.S.C. § 921 *et seq.*

21.    The NFA defines a "rifle" and a "shotgun" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder" 26 U.S.C. §§ 5845(c), (d).

22.    Short-barreled rifles and shotguns subject to the NFA are defined as those "having a barrel or barrels of less than 16 inches in length" with respect to rifles and 18 inches in length with respect to shotguns. *Id*. at § 5845(a).

23.    The GCA defines, in pertinent part, a "handgun" as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand" 18 U.S.C. § 921(a)(29). A "pistol," in ATF regulations has been

---

[1] The NFA sought to regulate handguns, SBRs, SBSs, as well as other weapons due to concealability. The handgun—the most concealable firearm of all—has since been recognized as "the quintessential self-defense weapon" and thus closest to the core of Second Amendment protection. *District of Colombia v. Heller*, 554 U.S. 570 at 629 (2008). That the Government here so aggressively fights to criminalize what it considered at the time of the NFA's passage to be almost as concealable as handguns does, to say the least, cause one to scratch one's head.

defined as a "weapon originally designed, made, and intended to fire a projectile [] from one or more barrels when held in one hand, and having [a] chamber[] as an integral part[] of, or permanently aligned with, the bore[]; and a short stock designed to be gripped by one hand and at an angle to and extending below the line of the bore[]." 27 C.F.R. § 479.11.

### B. Pistol Braces

24.    Stabilizing arm braces ("pistol brace(s)") are accessories installed on firearms that allow the user to stabilize the firearm with the support of the user's wrist.

25.    Pistol braces were originally developed for use by people with disabilities, and became incredibly popular with the American people.[2]

### C. The Government's Inconsistency With Regard to Pistol Braces

26.    In November of 2012, ATF determined that a pistol equipped with a pistol brace was not a "firearm" within the purview of the NFA in a private letter regarding a popular arm brace design.

---

[2] By ATF's estimation, there are between three and seven million pistol braces in the United States. 88 Fed. Reg. at 6550 (Jan. 31, 2023). The Congressional Research Service, on the other hand, places that estimate between 10 and 40 million. "Handguns, Stabilizing Braces, and Related Components," Congressional Research Service (April 19, 2021), https://bit.ly/3JuOvht.

App.8

27.    In March of 2014, ATF determined in a classification letter that, even if one fired a pistol with a brace from the shoulder, it would not change the classification of the pistol under federal law.

28.    In January of 2015, ATF reversed its position and issued an "Open Letter on the Redesign of 'Stabilizing Braces'", which stated that the use of a pistol brace, as designed, would not subject a firearm to NFA treatment, but that "use" of a pistol brace as a shoulder stock would constitute a "redesign" of the firearm to which it was attached, thereby without any physical change by the end user, resulting in it becoming an SBR for NFA purposes.

29.    Following the 2015 open letter, ATF issued a series of private classification letters stating that "incidental, sporadic, or situational 'use'" of a pistol brace for shouldering would not subject the firearm to the NFA.

30.    In a 2017 letter to SB Tactical, a manufacturer of pistol braces and other firearm accessories, ATF explained that "to the extent the January 2015 Open Letter implied or has been construed to hold that the incidental, sporadic, or situational "use" of an arm-brace (in its original approved configuration) equipped firearm from a firing position at or near the shoulder was sufficient to constitute "redesign," such interpretations **are incorrect and not consistent with ATF's interpretation of the statute or the manner in which it has historically been enforced**." (emphasis added).

31.    On June 10, 2021, ATF published a notice of proposed rulemaking proposing to amend the regulatory definition of the term "rifle" to "clarify" at what point the attachment of a stabilizing brace would transform a "pistol" into a "rifle." *Factoring Criteria for Firearms with Attached 'Stabilizing Braces'* (hereinafter the "Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021).

32.    The Proposed Rule listed factors and proposed worksheet for determining whether a firearm was a pistol or SBR, which listed *some* objective criteria for evaluating where a firearm stands, although many factors were vague.

33.    The Final Rule, published to the Federal Register January 31, 2023, which lies at the core of the instant action, dispensed with the worksheet and any objective criteria, replacing the entire inquiry for whether a common firearm was a "pistol", which is presumably constitutionally protected, and an SBR, which would subject the user to prohibitory registration, tax, and possessory requirements. The inquiry under the final rule is simply whether the Government thinks the "objective design criteria and other factors" renders the firearm's possession presumably protected or presumably felonious. 88 Fed. Reg. 6,478 (Jan 31, 2023). Essentially jettisoning the Proposed Rule's factoring criteria in favor of an "I know it when I see it" approach.[3]

---

[3] This is far from a "clarifying" action. *Cf. Miller v. California*, 413 U.S. 15 (1973).

App.10

## IV.   THE FINAL RULE'S IMPACT ON PLAINTIFFS

34.   The Final Rule causes Plaintiffs concrete injuries. The rule affects all Americans who own pistols equipped with pistol braces and those who might use them in the future. *See id.* at 282.

35.   Plaintiffs Colon, Kling, Martin, and Mele own firearms that ATF contends are regulable as SBRs under the Final Rule.

36.   Plaintiff 2nd Amendment Armory has firearms in its inventory that ATF contends to be regulable as SBRs under the Final Rule.

37.   Plaintiffs Colon, Kling, Martin, and Mele depend on their affected firearms for lawful purposes of self-defense, target shooting, and other activities.

38.   Plaintiffs Colon, Kling, Martin, and Mele would be proscribed from traveling interstate with the firearms they depend on without first obtaining permission from the federal government.

39.   Plaintiffs Colon, Kling, Martin, and Mele desire to continue using their lawfully acquired firearms for lawful purposes such as self-defense without being subjected to the arbitrary registration and reporting provisions of the NFA and GCA that presently attend SBRs.

40.   Plaintiffs, even if they desired to register their firearms (which they do not), would be imperiled with criminal consequences should the FBI fail to complete their background check within 88 days of ATF's opening of a

background check on registering firearm—which they lawfully acquired and own—as an SBR. Should this non-approval happen beyond the 120 day discretionary period offered by ATF and Plaintiffs still possess their lawfully acquired firearm—which ATF now suddenly considers an SBR—they would be subject to criminal consequences and faced with an untenable choice.

41. Plaintiff 2nd Amendment Armory faces the loss of the value and ability to sell the firearms it lawfully acquired, relying on the guidance of the very agency here at issue.

42. But for the Final Rule, Plaintiffs would be able to continue to peaceably own, use, dispose of, and possess their lawfully acquired firearms. Accordingly, the actions of Defendants are a direct cause of injury to Plaintiffs.

## V.   FACTS COMMON TO ALL CLAIMS

43. Congress is the only branch of government able to write new laws. U.S. Const. Art. I, § 1.

44. The APA permits limited enabling regulation, but not changes in law or "gap-filling."

45. The Final Rule, without notice and comment, entirely abandoned the fundamental claims of the Proposed Rule, is inconsistent with the underlying law, is arbitrary and capricious, and spits in the face of the rule of lenity.

46.   Published alongside the Final Rule, a list of "Commercially Available Firearms equipped with a 'stabilizing brace' that are short-barreled rifles", and a list of "Common weapon platforms with attached 'stabilizing brace' designs that are short-barreled rifles", encompass the vast and sweeping majority of firearms with equipped pistol braces nationwide. ATF, "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'", https://bit.ly/3HM3CSv.

47.   The Final Rule impermissibly redefines "rifle," "short-barreled rifle" and "firearm," all terms which are already substantially defined in statute. *See* 18 U.S.C. § 921(a)(7), (8); 26 U.S.C. § 5845(a)(3), (4).

48.   The Final Rule purports to take into account the actions of third parties, which may be entirely unknown to the end user, in determining whether a particular firearm is subject to the NFA, such as use by unknown persons in the firearms community or in marketing materials. *See*, *e.g.*, Final Rule at 6,512, 52.

49.   Firearms subject to the NFA are subject to burdensome restrictions unlike other common firearms, including the need to request permission from the federal government in order to travel interstate with the firearm.

50.   It can take months for the government to respond to a request for permission to travel interstate with an NFA firearm.

51.    Anyone who violates any of the litany of restrictions on the possession, transportation, and alienation of SBRs is subject to substantial monetary fines and up to ten years imprisonment. 26 U.S.C. § 5871.

52.    Firearms registered pursuant to the NFA require the payment of a $200 transfer tax and the submission of an ATF Form 4 through a licensed special occupational taxpayer. The transfer of an NFA firearm from an unlicensed individual to another unlicensed individual requires the item first be transferred on a Form 4 to a special occupational taxpayer, then another Form 4 from the special occupational taxpayer to the end user. Each Form 4 transfer can take more than 1 year and the payment of a $200 tax. Meaning to alienate a pistol affected by this Final Rule in the State of Florida, rather than a simple transfer between eligible owners, would require years of waiting and hundreds of dollars spent.

53.    ATF, in issuing its Final Rule, faced gun owners with the untenable choice between registering the firearm—thus subjecting it to severe restrictions and making it practically inalienable, removing their lawfully owned pistol brace and destroying it—as the government opines that simply removing the brace may still subject the possessor to an NFA violation if owned at the same time as a firearm it could potentially be attached to, destroying the firearm, or turning it in to ATF. None of these options are terribly attractive to Plaintiffs.

App.14

## VI.   COUNT I: VIOLATION OF THE RIGHT TO KEEP AND BEAR ARMS

54.   Plaintiffs incorporate and re-allege the preceding paragraphs as if fully set forth herein.

55.   The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II.

56.   The Supreme Court has held that the Second Amendment protects an individual right to possess firearms—especially concealable firearms like pistols. *See District of Colombia v. Heller*, 554 U.S. 570 (2008).

57.   Pistol braces are commonly owned firearm accessories that firearms are commonly sold with for lawful purposes including self-defense.

58.   In addition to the Second Amendment claim itself, the APA independently requires the Court to "hold unlawful and set aside agency action, findings and conclusions" that are found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

59.   *Bruen* held as unconstitutional New York's 1911 Sullivan Act, requiring a license and demonstration of "proper cause" for the possession and carrying of a concealable firearm. *Bruen*, 597 U.S. __ at *2.

60.   *Bruen* identified the Court of Appeals' "coalesce[ing] around a 'two-step' framework for analyzing Second Amendment challenges that combines

App.15

history with means-ends scrutiny", the Court correctly identified this as "one step too many[.]" *Id*. *9-10.

61.    To summarize *Bruen*: any law, regulation, or government policy affecting the "right of the people to keep and bear arms," U.S. Const., Amend. II, can **only** be constitutional if the Government demonstrates analogous restrictions deeply rooted in American history evinced by historical materials contemporaneous with the adoption of the Bill of Rights in 1791. *Bruen*, 597 U.S. at *29.

62.    No federal regulation of firearms existed before the 1934 enactment of the main laws here at issue.

63.    There is no historical basis, and no historical law analogous to the attachment of felony treatment to firearms by barrel length.

64.    There is no historical basis, and no historical law analogous to the attachment of felony treatment to firearms by the presence of an accessory to facilitate easier, more accurate use of the firearm, as a pistol brace or stock does.

65.    There is no historical basis, and no historical law analogous to the attachment of felony consequences for traveling interstate with a firearm without bureaucratic permission.

66.    The government's unlawful conduct here presents a case of Schrodinger's gun: is it a pistol, and thus protected, or it is an SBR which is in

App.16

common lawful use and thus cannot be so intensely regulated. Plaintiffs submit that a firearm cannot, consistent with the Second Amendment, be both in common lawful use—as firearms with pistol braces are—and also subject to NFA treatment, which ATF admits is prohibitive.

67.     Defendants violated the Second Amendment by subjecting Plaintiffs to an unconstitutional abridgment of their rights to keep and bear arms. By ignoring the requirements of the APA, Defendants' Final Rule impermissibly attempted to amend the GCA and NFA to regulate firearms far beyond the scope of that intended by Congress.

68.     Defendants violated the Second Amendment by subjecting Plaintiffs to an unconstitutional abridgment of their rights to keep and bear arms. By giving force to an irrational regulatory scheme which threatens to imprison Americans by virtue of the length of a firearm component part, requiring the destruction, surrender, or other unfavorable treatment, the enforcement of 26 U.S.C. § 5861 in this manner violates the fundamental rights of Plaintiffs.

## VII.   COUNT II: THE GOVERNMENT HAS EXCEEDED THE LIMITS OF THE TAX AND SPEND CLAUSE

69.     Plaintiffs re-incorporate and re-allege all of the preceding paragraphs as if fully set forth herein.

70.     The NFA was brought as a tax and passed under the taxing power.

71.    "Congress cannot punish felonies generally." *Cohens v. State of Virginia*, 19 U.S. 264, 428 (1821). Accordingly, every criminal penalty it enacts "must have some relation to the execution of a power of Congress" (*Bond v. U.S.*, 572 U.S. 844, 844, 134 S. Ct. 2077, 2083 (2014)), like the "power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States," so long as they are "uniform throughout the United States." U.S. Const., Art. I, § 8, cl. 1.

72.    A law which does not attach consequences "beyond requiring a payment to the IRS" is a penalty—not a tax. *Id.* at 567-68.

73.    Individuals who possess an NFA firearm, which they did not believe to be an NFA firearm when it came into their possession, have no option to pay a tax, as the making or transferring of an NFA firearm requires tax payment *before* its transfer or manufacture, with incurable criminal consequences attaching to the possession.

74.    ATF's purported exercise of "discretion" in the Final Rule does not cure this defect in the law. In fact, by forgoing tax collection in the Final Rule, ATF is *violating* the law in an attempt to salvage it. *See* 26 U.S.C. §5811 ("There **shall** be **levied, collected, and paid** on firearms transferred a tax at the rate of $200 for each firearm transferred[.])

75.    In addition, for a tax to be a constitutional exercise of the taxing power, it must have a revenue-raising purpose. *See Nat'l Fed'n of Indep. Bus.*

*v. Sebelius*, 567 U.S. 519, 564 (2012) ("This process yields the essential feature of any tax: It produces at least some revenue for the Government.")

76.   The NFA's taxing requirement was passed with a prohibitory purpose, has not been revenue-positive for the government, and as it applies to the firearms here at issue, cannot be, as it is *waiving the payment of the purported tax.*

## VIII. COUNT III: THE FINAL RULE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

77.   Plaintiffs re-incorporate and re-allege the preceding paragraphs as if fully set forth herein.

### A. Inconsistency With The Relevant Statutes

78.   "The reviewing court shall . . . hold unlawful and set aside agency action . . . fount to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right". 5 U.S.C. §706(2)(c).

79.   Because ATF's authority is derived from the statutes it administers, it cannot act in a manner inconsistent with the statute. *See West Virginia v. EPA*, 142 S.Ct. 2587, 2609 (2022) (Noting that "enabling legislation is generally not an open book" to which the government can "add pages and change the plot line.").

80.    The relevant terms here are defined in both the NFA and GCA. ATF's attempt to re-define them very literally adds pages and changes the plot line. *See id.*

81.    The Final Rule amends the regulatory definition of "rifle" to force it to include "a weapon that is equipped with an accessory, component, or other rearward attachment" that would indicate—in an unknown way—to the government that "the weapon is designed, made, and intended to be fired from the shoulder." Final Rule at 6,480.

82.    The Final Rule impermissibly expands the definition of "rifle" to make it incompatible with the previously exclusive treatment the statute established.

**B. Failure to Follow Procedure**

83.    Additionally, 5 U.S.C. §706(2)(D) provides that this Court shall "hold unlawful and set aside" an action that is "without observance of procedure required by law."

84.    The APA requires that administrative agencies issue a notice of proposed rulemaking and provide the opportunity to comment on the proposed rulemaking. 5 U.S.C. §533(b).

85.    The extent to which agencies can make changes to a proposed rule in the final rule is a developing area of law, but the final rule "must be a logical

App.20

outgrowth of the rule proposed" to provide fair notice. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 at 174 (2008).

86.    The Final Rule here at issue jettisoned the entirety of objective guidance that was in the proposed rulemaking, replacing it with a malleable, uncertain balancing test of sorts, purporting to assess "objective design criteria," such as length of pull, with no goalposts or guidelines therefore.

87.    In addition, the Proposed Rule provided several examples of popular firearms equipped with stabilizing braces that would not constitute SBRs. The Final Rule lists only firearms that are SBRs, some of which are configured exactly as those ATF indicated were not SBRs in the Proposed Rule.

88.    In short, the Final Rule effectively works a global treatment of braced pistols as SBRs, entirely inconsistently with the Proposed Rule, without providing an opportunity for notice and comment as required by the APA.

### C. Arbitrary, Capricious, and Contrary to Law

89.    The Court shall hold unlawful and set aside any agency action that is arbitrary, capricious, an abuse of discretion, and not in accordance with law. 5 U.S.C. § 706(2)(A).

90.    As explained *supra*, the Final Rule is not only inconsistent with the supreme law of the land, but the very statute it purports to enable.

91.    Additionally, ATF failed to properly consider or respond to comments concerning the impact of major Second Amendment cases decided

since *Heller*, as it ignored the common lawful use of the affected firearms, only aggressively misinterpreting *Bruen* dicta.

92.   ATF also, in aggressively underestimated the size of the affected community, failed to consider and respond to comments considering the effects on firearms businesses and owners.

### D. Violation of Rights

93.   Agency actions inconsistent with rights, privileges, and immunities of the People must be considered unlawful and set aside. 5. U.S.C. § 706(2)(B).

94.   As explained *supra*, the Final Rule violates the fundamental right of the People to keep and bear arms.

95.   The Final Rule violates the Fifth Amendment in that it works an unconstitutional taking of property, and is unconstitutionally vague.

96.   The Final Rule recommends the destruction of personal property dozens of times, and is bereft of objective criteria such that an individual can comprehend whether the possession of a firearm is lawful or felonious.

### IX.   PRAYER FOR RELIEF

97.   Plaintiffs pray this Honorable Court grant the following relief:

    a. Declaratory relief holding the statutes at issue unconstitutional as they apply to common arms by reference to barrel length.

b.  Declaratory relief holding the National Firearms Act an unconstitutional exercise of the Tax and Spend Clause.

c.  In the alternative, issue a preliminary and permanent injunction preventing Defendants from enforcing the National Firearms Act against common arms by reference to barrel length.

d.  In the alternative, this court set aside the Final Rule as unlawful, and/or vacatur of the Final Rule.

e.  Awarding Plaintiffs such other legal and equitable relief as is just and proper under the circumstances; and

f.  Award Plaintiffs their attorney fees and costs under 28 U.S.C. § 2412, 5 U.S.C. § 504, or other relevant laws.

Respectfully Submitted,

DATED:  February 1, 2023

_____
Matthew Larosiere, Esq.
Zermay-Larosiere
1762 Windward Way
Sanibel, FL 33957
Email: info@zermaylaw.com
Telephone: 305-767-3529
*Lead Counsel for Plaintiffs*

_____
Zachary Z. Zermay, Esq.
Zermay-Larosiere
1762 Windward Way
Sanibel, FL 33957
Email: zach@zermaylaw.com
Telephone: 305-767-3529
*Counsel for Plaintiffs*

App.23

JS 44 (Rev. 04/21)  **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

JOSIAH COLON, et al.

**DEFENDANTS**

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.

**(b)** County of Residence of First Listed Plaintiff   Hillsborough
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   District of Columbia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Zermay-Larosiere, 1762 Windward Way, Sanibel FL 33957, (305) 767-3529

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
        Plaintiff

☐ 3  Federal Question
        *(U.S. Government Not a Party)*

☒ 2  U.S. Government
        Defendant

☐ 4  Diversity
        *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** — **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability    ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &    Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability    ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine    Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product    Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability   **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury    ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -    Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/    Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment   **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other    ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education    ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1  Original
        Proceeding

☐ 2  Removed from
        State Court

☐ 3  Remanded from
        Appellate Court

☐ 4  Reinstated or
        Reopened

☐ 5  Transferred from
        Another District
        *(specify)*

☐ 6  Multidistrict
        Litigation -
        Transfer

☐ 8  Multidistrict
        Litigation -
        Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
28 U.S.C. § 1391(e)(1)(C)

Brief description of cause:
Action for declaratory relief

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions)*

JUDGE                                    DOCKET NUMBER

DATE   Feb 1, 2023

SIGNATURE OF ATTORNEY OF RECORD   /s/Zachary Z. Zermay

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

App.24

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

III.   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case № 8:23-cv-00223-MSS-MRM

JOSIAH COLON; BRANDON KLING;
ERIC MELE; WILLIAM MARTIN;
and 2ND AMENDMENT ARMORY,
 a Florida profit corporation,

*Plaintiffs*,

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, STEVEN
DETTELBACH, in his official capacity as
Director of the Bureau of Alcohol, Tobacco,
Firearms, and Explosives, UNITED STATES
DEPARTMENT OF JUSTICE, and
MERRICK B. GARLAND, in his official
capacity as Attorney General, U.S.
Department of Justice,

*Defendants*.

_____/

## **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs request a preliminary injunction, and humbly move for this

honorable Court to enjoin Defendants from enforcing "Factoring Criteria for

Firearms with Attached 'Stabilizing Braces'" (hereinafter "the Final Rule"), the

rule promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives

(hereinafter "ATF") on January 31, 2023. 2021R-08F, 88 Fed. Reg. 6478 (Jan.

31, 2023).

## I.   <u>INTRODUCTION AND LEGAL STANDARD</u>

Plaintiffs seeking a preliminary injunction must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The APA authorizes judicial review of "agency action" taken in violation of law. 5 U.S.C. §§ 706(2)(A)–(D). "Agency action" includes rule making. 5 U.S.C. § 501(13).

The Final Rule purported to re-classify at least 3 million[1] firearms that, prior to the rule, were lawfully sold, purchased, and possessed across the United States. By that regulatory fiat, and without any Congressional action, Defendants prohibited Plaintiffs, and millions of other Americans, from traveling with, alienating, and ultimately even possessing those firearms which they had lawfully dealt with for decades. Moreover, Defendants demand

---

[1] By ATF's estimation, there are between three and seven million pistol braces in the United States. 88 Fed. Reg. at 6550 (Jan. 31, 2023). The Congressional Research Service, on the other hand, places that estimate between 10 and 40 million. "Handguns, Stabilizing Braces, and Related Components," Congressional Research Service (April 19, 2021), https://bit.ly/3JuOvht.

App.27

that Plaintiffs—under threat of decades in prison and hundreds of thousands of dollars in fines—either destroy their lawfully possessed property or comply with the burdensome registration and reporting requirements of the National Firearms Act (hereinafter "NFA").

As will be thoroughly explained *infra*, Defendant's threatened conduct is incredibly severe, would result in irreparable harm to Plaintiffs if not enjoined, and Plaintiffs are likely to succeed on the merits of this action. Put very succinctly: enjoining Defendants' unlawful conduct is the only way to preserve a decades-long status quo based on reasonable reliance, to prevent severe arbitrary enforcement of a novel and aggressive regulatory interpretation that poses exclusively felonious consequences, and prevent the destruction of an unknowably large monetary value of lawfully held, Constitutionally protected firearms and accessories.

Plaintiffs recognize that preliminary relief is extraordinary, but the case at bar—and the government's extraordinary administrative overreach— presents the exact circumstances which warrant such relief, as has already been recognized by the Fifth Circuit. In other circuits, lawsuits challenging the Final Rule have lodged motions for preliminary injunctions, and relief has been granted in one thus far. *Mock v. Garland*, No. 23-10319, Doc. 52-2 (5th Cir. May 23, 2023) (order granting Appellants' Opposed Motion for a Preliminary

App.28

Injunction Pending Appeal after the district court for the Northern District of Texas had denied the initial motion).

It is further essential that "we are mindful that the Supreme Court recently cautioned against federal criminal statutes being read too expansively." *United States v. David McLean*, No. 14-10061 (11th Cir. Sept. 24, 2015) (citing *Yates v. United States*, 135 S. Ct. 1074 (2015) (concluding the term "tangible object" within the Sarbanes-Oxley Act not to apply to an undersized red grouper thrown overboard by a commercial fishing vessel's captain) in upholding a judgment of acquittal). This case presents a similar issue to the ones discussed in *Yates* and *McLean*: an aggressive, novel application of a federal criminal statute.

Non-registration is not a simple choice for Plaintiffs, either. Defendants have been intensely unclear as to how to avoid the criminal consequences of non-registration. Defendant ATF stated in the Final Rule that it is not simply enough to remove the brace, but that it must be either destroyed or the firearm modified to be incompatible with the stabilizing brace. This, of course, with no guidance as to what modifications are sufficient. Defendant Dettelbach, in Congressional testimony, stated that simply removing the brace was enough. Defendants have taken further divergent positions in other litigation across the country, so divergent that counsel for Plaintiffs are entirely unsure which

divergent path—or perhaps paths—to expect in the government's reply. This level of inconsistency underlines the lenity concerns outlined in our complaint.

In light of the extreme concerns posed by Defendants unlawful actions, preliminary relief is not just appropriate—it is essential.

## **ARGUMENT**

I. **Plaintiffs Are Likely to Succeed on the Merits**
   a. **Defendants Violated Plaintiffs' Right to Keep and Bear Arms**

Under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. 2111, 2132 (2022). When the Amendment's plain text covers an individual's conduct, the Constitution **presumptively** protects it. *Id*. at 2129–30. "The government must ***then*** justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. ***Only then*** may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2130 (emphasis added). Defendants cannot plausibly justify the Final Rule under *Bruen*'s analytical framework. The Rule identifies no founding-era precedent of regulating weapons based on barrel length—much less regulating handguns more stringently because the possessor dared to attach an accessory that would enhance its accuracy and utility.

App.30

To summarize *Bruen*: any law, regulation, or government policy affecting the "right of the people to keep and bear arms," U.S. Const., Amend. II, can **only** be constitutional if the Government demonstrates analogous restrictions deeply rooted in American history evinced by historical materials contemporaneous with the adoption of the Bill of Rights in 1791. Bruen, 597 U.S. at *29. Plaintiffs are likely to succeed on this claim for the simple reason that the government's regulation is literally unsupportable. Plaintiffs anticipate that the government may attempt to wriggle away from the burden mandated by *Bruen* by attempting to argue that it is not regulating arms, but rather accessories. This is inconsistent with Defendants' own position taken in the Final Rule, which clearly recognizes that the enabling statute *only* allows it to regulate firearms.

The meat and potatoes are simple: Not only is there no historical basis for the regulation, and no historical law analogous to the attachment of felonious consequences to firearms by barrel length, but no federal regulation of firearms existed before the 1934 enactment of the main laws here at issue. While we didn't yet have the pleasure of Alaska or Hawaii, 1934 is about a hundred-and-some-odd years late for an applicable historical analogue.

### b. The Government Has Exceeded the Limits of the Tax and Spend Clause

Plaintiffs are likely to succeed on Count II. The Final Rule is not an exercise of the taxing power because it does not actually collect any tax. Thus, it is unjustified under—and even contrary to—the NFA. "Congress cannot punish felonies generally." *Cohens v. State of Virginia*, 19 U.S. 264, 428 (1821). Accordingly, every criminal penalty it enacts "must have some relation to the execution of a power of Congress" (*Bond v. U.S.*, 572 U.S. 844, 844, 134 S. Ct. 2077, 2083 (2014)), like the "power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States," so long as they are "uniform throughout the United States." U.S. Const., Art. I, § 8, cl. 1. The NFA is purportedly an exercise of the taxing power, which includes the power to assess and collect taxes and associated requirements such as "requir[ing] the submission of tax-related information that [the IRS] believes helpful in assessing and collecting taxes." *CIC Servs., LLC v. IRS*, 141 S. Ct. 1582, 1586–87 (2021). But the Final Rule's requirement, however, that gun owners apply for permission to keep their handguns with stabilizing braces, or else discard them or turn them in to ATF, is not an exercise of the taxing power, because "Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other. Congress may not, for example, expand its

power under the Taxing Clause, or escape the Double Jeopardy Clause's constraint on criminal sanctions, by labeling a severe financial punishment a 'tax.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012).

A law which does not attach consequences "beyond requiring a payment to the IRS" is a penalty—not a tax. Id. at 567-68. Individuals who possess an NFA firearm, which they did not believe to be an NFA firearm when it came into their possession, have no option to pay a tax, as the making or transferring of an NFA firearm requires tax payment before its transfer or manufacture, with incurable criminal consequences attaching to the possession. The requirement to ask for permission to possess an SBR (or else suffer severe criminal penalties) is not a permissible exercise of taxing power because failure to obtain permission results in a criminal "penalty"—potential imprisonment—and not a mere collection of revenue. *Cf. e.g.*, *NFIB*, 567 U.S. at 566 (the Affordable Care Act's individual mandate was permissible exercise of taxing power because IRS was "not allowed to use those means most suggestive of a punitive sanction, such as criminal prosecution").

Assessing a fine on those who fail to pay is one thing. That might resemble the Affordable Care Act's individual mandate. But it is quite another thing to require persons to seek permission to register their weapons— regardless of their willingness to pay a tax—and then slap criminal penalties on persons who fail to obtain the permission even though they may very well

be willing to pay the requisite tax. That is not an exercise of taxing power, and thus the Final Rule must be set aside as "contrary to constitutional … power" under 5 U.S.C. § 706(2)(B).

### c.  The Final Rule Violates the Administrative Procedure Act

Plaintiffs are likely to succeed on Count III because the Final Rule is inconsistent with the relevant statutes, failed to follow procedure, is arbitrary, capricious, and contrary to law, violates the rights of Americans, and is not a logical outgrowth of the initial proposed rule.

"The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right". 5 U.S.C. §706(2)(c). 79. Because ATF's authority is derived from the statutes it administers, it cannot act in a manner inconsistent with the statute. *See West Virginia v. EPA*, 142 S.Ct. 2587, 2609 (2022) (Noting that "enabling legislation is generally not an open book" to which the government can "add pages and change the plot line" as it attempted here). The relevant terms here are defined in both the NFA and GCA. ATF's attempt to re-define them very literally adds pages and changes the plot line. *See id*.

The Final Rule amends the regulatory definition of "rifle" to force it to include "a weapon that is equipped with an accessory, component, or other rearward attachment" that would indicate—in an unknown way—to the government that "the weapon is designed, made, and intended to be fired from

the shoulder." Final Rule at 6,480. The Final Rule impermissibly expands the definition of "rifle" to make it incompatible with the previously exclusive treatment the statute established.

Additionally, 5 U.S.C. §706(2)(D) provides that this Court shall "hold unlawful and set aside" an action that is "without observance of procedure required by law." The Final Rule here at issue jettisoned the entirety of objective guidance that was in the proposed rulemaking, replacing it with a malleable, uncertain balancing test of sorts, purporting to assess "objective design criteria," such as length of pull, with no goalposts or guidelines therefore.

In so far as the Final Rule's arbitrariness, the Court shall hold unlawful and set aside any agency action that is arbitrary, capricious, an abuse of discretion, and not in accordance with law. 5 U.S.C. § 706(2)(A).

Not only is the Final Rule inconsistent with the Constitution, it is inconsistent with the very statute it purports to enable. Furthermore, ATF failed to properly consider or respond to comments concerning the impact of major Second Amendment cases decided post-*Heller*, as it ignored the common lawful use of the affected firearms, paying only lip service to a single scintilla of *Bruen* dicta.

Notice under the APA "suffices if [a final rule] is a 'logical outgrowth' of the proposed rule, meaning the notice must adequately frame the subjects for

discussion such that the affected party should have anticipated" the agency's final rule from the notice of proposed rulemaking. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021). "[A] final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine [the agency's] unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (cleaned up). That, in exact point of fact, is what happened here.

The Final Rule's definition of "rifle" is not a logical outgrowth of the NPRM's definition. The NPRM proposed an "ATF Worksheet 4999" that used a three-part points system to classify a firearm as either a handgun or a rifle. 86 Fed. Reg. at 30841-42. Yet the Final Rule entirely discards Worksheet 4999, replacing it with a vague six-part test discussed *supra*. This test was never suggested in the NPRM and is entirely impossible to implement. 88 Fed. Reg. at 6569-70. This is a wholesale change in methodology that a commenter on the NPRM could not have foreseen, and is in no way a "logical outgrowth" thereof. In fact, the approaches in the Final Rule and the NPRM yield conflicting results, which the Final Rule does not acknowledge, much less justify. As one example, under Worksheet 4999 in the Final Rule, a firearm would score "4" points and be considered a SBR if it had a "length of pull" over 13.5 inches, without any other considerations. 86 Fed. Reg. at 30842. Yet under

the Final Rule, length of pull merely, "in combination with other features –
could indicate" an SBR. 88 Fed. Reg. at 6534. And as ATF explains, one style
of firearm may permissibly have a longer length of pull than another style of
firearm. *Id*. at 6535 (compared to the NPRM, which imposed the same length
of pull measurements across-the-board). The Final Rule does not acknowledge,
much less justify, these conflicting results.

ATF admits that "the proposed Worksheet 4999, including the points
assigned to each criterion … was intended to ensure uniform consideration and
application [but] did not achieve these intended purposes." 88 Fed. Reg. at
6510. But rather than, as required by the APA, provide notice of and seek
comment on the new guidelines that replace the proposed worksheet and point
system, ATF simply jettisoned any attempt at making the test objective,
substituting it with an un-implementable mire of its own unstated,
unpromulgated opinion that firearms dealers, manufacturers, and owners like
Plaintiffs would be imperiled with divining.

In sum, the Final Rule represents a complete and total divergence that
those commenting on the NPRM could not have predicted. It is in no way a
"logical outgrowth" from the NPRM. By "promulgating a requirement that is
different in kind than the proposed requirement, the Government did not
adequately frame the subjects for discussion" and violated the logical-
outgrowth requirement. *Mexican Gulf Fishing Co. v. United States Dep't of*

*Commerce*, No. 22-30105, 2023 WL 2182268, at *13 (5th Cir. Feb. 23, 2023). The Final Rule therefore should be set aside, having been adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## II.   <u>**Plaintiffs are Suffering Irreparable Harm**</u>

As explained *supra*, in the Introduction, Plaintiffs face the threat of criminal prosecution, felony arrest, imprisonment, and accompanying irreparable loss of their civil rights by the untenable "choice" to either destroy their lawfully possessed, constitutionally protected property, or submit to an intense and burdensome regime with consequences that cannot be undone.

To show irreparable injury, Plaintiffs need not demonstrate that harm is inevitable and irreparable. *Humana, Inc. v. Avram A. Jacobson*, M.D., P.A., 804 F.2d 1390, 1394 (5th Cir. 1986). Rather, they "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id*.

The Final Rule threatens Plaintiff Second Amendment Armory's business, forcing it to either risk criminal consequences or the loss of its license—and thereby its livelihood—or to make choices that cannot be undone, including the destruction of valuable inventory. Plaintiffs Colon, Kling, Martin, and Mele face untenable choices as well. If these individual Plaintiffs submit to NFA treatment of their firearms, they lose the alienability of their firearms and the ability to depend on these firearms for personal protection

while traveling interstate without first getting the permission of Defendants each time they cross a state line. While Defendants may argue that these firearms could be removed from NFA treatment in the future, Plaintiffs still cannot un-disclose their personal information to Defendants, nor can Plaintiffs un-disclose this same information to the local law enforcement agencies Defendants require it be disclosed to. It bears emphasis that a national registry on common firearms is specifically unlawful. *See* 18 U.S.C. § 926 ("No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established.") While the law allows the registration of NFA firearms, Congress *specifically* forbade Defendants from engaging in activity to collect information amounting to a registry on common firearms and their owners because of the unique and irreparable harms that attend registries of firearms and their owners. That Defendants are attempting to create a database of these common arms is itself constitutionally and otherwise legally suspect, the simple fact is that, even if the firearms are removed from the registry at some point, that cat simply cannot return to its proverbial bag.

Individual Plaintiffs, should they choose registration, would also have to pass an additional background check, submit even more acute personal information in the form of fingerprints, passport photographs, and more, and be subject to still more limitations on how their firearms could be transported, stored, bought, or sold. Not to mention that individual Plaintiffs would suddenly risk felonious consequences should they allow their wives or beloved friends to borrow one of these firearms.

The fact that the Final Rule technically presents an (untenable) choice does not cure its unconstitutionality. As the Fifth Circuit observed in *BST Holdings v. OSHA*, "the loss of constitutional freedoms 'for even minimal periods of time ... unquestionably constitutes irreparable injury.'" 17 F.4th 604, 618 (5th Cir. 2021) (burden on liberty interests posed by vaccination mandate was irreparable harm) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The vaccination mandate in *BST Holdings* "threaten[ed] to substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)." *Id*. Here, the Final Rule imposes a similarly untenable choice, forcing individuals to choose between destroying their property or facing threat of a potentially life-destroying prosecution.

### III.   <u>The Balance of Equity and Public Interest Favor Plaintiffs</u>

The state of administrative law—especially where criminal consequences attach—is an extremely important question that is manifestly

important to the courts and has intense potential dangers for Americans. When the government is a party, the balance-of-equities and public-interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A court therefore must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997). There is absolutely no harm to Defendants from pausing enforcement of the Final Rule and maintaining the status quo. While the Final Rule claims to "enhance[] public safety," 88 Fed. Reg. at 6481, Defendants point to only two brace-equipped firearms (out of millions) that have been criminally misused, *see* 88 Fed. Reg. at 6495. Even then, there is no evidence that those crimes could not have been committed without the brace or with a different firearm.

Weighing against the government's unsupported talismanic invocation of public safety, are the very acute irreparable harms posed to Plaintiffs discussed *supra*. Indeed, the public is served when the law is followed, and "there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., LLC, v. U.S. Food & Drug Admin.*, 16 F.4th 528, 560 (5th Cir. 2021). The balance of equities and public interest weigh heavily in favor of an injunction.

App.41

## IV.   **Plaintiffs Pray for Nationwide Relief**

The acute nature of the potential harms posed by Defendants, the implication of Plaintiffs' interstate travel rights, and the interstate nature of Plaintiffs' business, plus the complications and pitfalls of local injunctions against the Final Rule, supports this Court granting nationwide relief.

## CONCLUSION

For the reasons stated *supra*, this honorable Court should preliminarily enjoin Defendants from enforcing the Final Rule.

Respectfully Submitted,

DATED:  May 24, 2023

_____
Matthew Larosiere, Esq.
Zermay-Larosiere
1762 Windward Way
Sanibel, FL 33957
Email: info@zermaylaw.com
Telephone: 305-767-3529
*Lead Counsel for Plaintiffs*

Zachary Z. Zermay, Esq.
Zermay-Larosiere
1762 Windward Way
Sanibel, FL 33957
Email: zach@zermaylaw.com
Telephone: 305-767-3529
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on  May 24, 2023 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

Zachary Z. Zermay, Esq.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOSIAH COLON, *et al.*,

      *Plaintiffs*,

      v.

BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND
EXPLOSIVES, *et al.*,

      *Defendants*.

Case No. 8:23-cv-223

## <u>DEFENDANTS' PARTIAL MOTION TO DISMISS</u>

App.43

## TABLE OF CONTENTS

INTRODUCTION.................................................................................1

BACKGROUND..................................................................................3

I.    Statutory and Regulatory Background.................................................3

II.   ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces" ................................................6

III.  The Rule ...............................................................................10

IV.  This Lawsuit .........................................................................14

LEGAL STANDARDS ........................................................................14

ARGUMENT ....................................................................................15

I.    The Rule does not violate the APA.................................................15

     A.   The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the statutory definition of "rifle."...........15

     B.   Notice and comment was not required, and in any case, the Rule is a logical outgrowth of the NPRM..................................24

II.   The NFA and Rule are constitutional. ........................................28

     A.   Rule does not infringe Second Amendment rights. ..........................28

         1.   Firearm braces are not bearable arms protected by the Second Amendment. ................................................29

         2.   Registration of short-barreled rifles does not implicate the Second Amendment. ..............................................30

         3.   Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment. ..................33

         4.   Historical tradition of regulation supports the Rule and the NFA.................................................................36

     B.   The NFA is a constitutional exercise of Congress's taxing power. ......39

     C.   Plaintiffs' vagueness claim fails as a matter of law. ............................40

App.44

D.     The Rule does not violate the Takings Clause. ...................................42

CONCLUSION .................................................................................................45

ii

App.45

## TABLE OF AUTHORITIES

**Cases**

*Am. Iron & Steel Inst. v. OSHA,*
 182 F.3d 1261 (11th Cir. 1999)................................................................26

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)................................................................................15

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,*
 910 F.3d 106 (3d Cir. 2018), *abrogated on other grounds* .........................44

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007)..........................................................................14, 15

*Bezet v. U.S.,*
 714 F. App'x 336 (5th Cir. 2017)............................................................31

*Caetano v. Massachusetts,*
 577 U.S. 411 (2016)..........................................................................34, 35

*Chem. Mfrs. Ass'n v. EPA,*
 870 F.2d 177 (5th Cir. 1989)..................................................................26

*Crenshaw v. Lister,*
 556 F.3d 1283 (11th Cir. 2009)..............................................................43

*District of Columbia v. Heller,*
 554 U.S. 570 (2008)................................................................................29

*Flight Training Int'l, Inc. v. FAA,*
 58 F.4th 234 (5th Cir. 2023)...................................................................25

*Garelick v. Sullivan,*
 987 F.2d 913 (2d Cir. 1993) ...................................................................44

*Gonzales v. Oregon,*
 546 U.S. 243 (2006)................................................................................16

*Guedes v. ATF,*
 356 F. Supp. 3d 109 (D.D.C. 2019).........................................................17

App.46

*Gun Owners of Am., Inc. v. Garland*,
   19 F.4th 890 (6th Cir. 2021) ...................................................... 19

*Hollis v. Lynch*,
   827 F.3d 436 (5th Cir. 2016) ......................................... *passim*

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) .......................................................... 26

*Huddleston v. U.S.*,
   415 U.S. 814 (1974) ....................................................................... 4

*Int'l Harvester Co. v. Wisc. Dep't of Tax'n*,
   322 U.S. 435 (1944) ..................................................................... 40

*James v. Global Tel\*Link Corp.*,
   2020 WL 998858 (D.N.J. Mar. 2, 2020) .................................. 44

*Kanarr Corp. v. U.S.*,
   188 Ct. Cl. 1051 (1969) ......................................................... 20, 21

*Kelly Servs., Inc. v. Creative Harbor, LLC*,
   846 F.3d 857 (6th Cir. 2017) ...................................................... 23

*Knick v. Township of Scott*,
   139 S. Ct. 2162 (2019) ......................................................... 42, 43

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ..................................................................... 41

*Lane v. Holder*,
   703 F.3d 668 (4th Cir. 2012) ...................................................... 31

*Lingle v. Chevron U.S.A. Inc.*,
   544 U.S. 528 (2005) ..................................................................... 42

*Lomont v. O'Neill*,
   285 F.3d 9 (D.C. Cir. 2002) .......................................................... 3

*McCutchen v. U.S.*,
   14 F.4th 1355 (Fed. Cir. 2021) .................................................. 44

*Md. Shall Issue, Inc. v. Hogan*,
   963 F.3d 356 (4th Cir. 2020) ...................................................... 44

App.47

*Mock v. Garland*,
　2023 WL 2711630 (N.D. Tex. Mar. 30, 2023),
　*appeal filed*, No. 23-10319 (5th Cir. Mar. 31, 2023)..........................*passim*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983)....................................................................................18

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
　142 S. Ct. 2111 (2022) ...........................................................................*passim*

*Nat'l Nutritional Foods Ass'n v. Mathews*,
　557 F.2d 325 (2d Cir. 1977) ......................................................................23

*Nat'l Rifle Ass'n v. Bondi*,
　61 F.4th 1317 (11th Cir. 2023) ..................................................................38

*Nat'l Rifle Ass'n v. Brady*,
　914 F.2d 475 (4th Cir. 1990) .....................................................................17

*Neitzke v. Williams*,
　490 U.S. 319 (1989) ...................................................................................15

*Newbauer v. Carnival Corp.*,
　26 F.4th 931 (11th Cir. 2022) ....................................................................15

*NFIB v. Sebelius*,
　567 U.S. 519 (2012) ...................................................................................39

*Omanwa v. Catoosa Cnty.*,
　711 F. App'x 959 (11th Cir. 2017) .............................................................15

*Or. Firearms Fed'n, Inc. v. Brown*,
　2022 WL 17454829 (D. Or. Dec. 6, 2022).................................................32

*Oxford Asset Mgmt., Ltd v. Jaharis*,
　297 F.3d 1182 (11th Cir. 2022)..................................................................15

*Perez v. Mortg. Bankers Ass'n*,
　575 U.S. 92 (2015).....................................................................................25

*Posters 'N' Things, Ltd. v. U.S.*,
　511 U.S. 513 (1994) .............................................................................23, 24

*Preseault v. ICC*,
　494 U.S. 1 (1990).......................................................................................42

v

App.48

*Rancho de Calistoga v. City of Calistoga*,
  800 F.3d 1083 (9th Cir. 2015) ............................................................45

*Reg'l Rail Reorganization Act Cases*,
  419 U.S. 102 (1974) ............................................................................43

*Romag Fasteners, Inc. v. Fossil, Inc.*,
  140 S. Ct. 1492 (2020) ........................................................................21

*Ruckleshaus v. Monsanto Co.*,
  467 U.S. 986 (1984) ....................................................................... 43, 44

*Rupp v. Becerra*,
  2018 WL 2138452 (C.D. Cal. May 9, 2018) .......................................44

*S. Terminal Corp. v. EPA*,
  504 F.2d 646 (1st Cir. 1974) ...............................................................27

*Sig Sauer, Inc. v. Brandon*,
  826 F.3d 598 (1st Cir. 2016) ......................................................... 22, 23

*Sipes v. U.S.*,
  321 F.2d 174 (8th Cir. 1963),
  *overruled on other grounds by Haynes v. U.S.*, 390 U.S. 85 (1968) ............................21

*Sozinsky v. U.S.*,
  300 U.S. 506 (1937) ............................................................................39

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ..............................................................................5

*Texas v. EPA*,
  389 F. Supp. 3d 497 (S.D. Tex. 2019) .................................................25

*U.S. v. Al-Azhari*,
  2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) .....................................29

*U.S. v. Boggess*,
  511 F. Supp. 3d 735 (S.D.W.V. 2021) .................................................40

*U.S. v. Bolatete*,
  977 F.3d 1022 (11th Cir. 2020) ..................................................... 30, 39

*U.S. v. Cox*,
  906 F.3d 1170 (10th Cir. 2018) ..................................................... 29, 34

App.49

*U.S. v. Gilbert,*
  286 F. App'x 383 (9th Cir. 2008)................................................34

*U.S. v. Gonzalez,*
  2011 WL 5288727 (D. Utah Nov. 2, 2011).............................34

*U.S. v. Hall,*
  714 F.3d 1270 (11th Cir. 2013)..............................................33

*U.S. v. Hasson,*
  2019 WL 4573424 (D. Md. Sept. 20, 2019) ...........................30

*U.S. v. Hayes,*
  555 U.S. 415 (2009) ..............................................................22

*U.S. v. Majid,*
  2010 WL 5129297 (N.D. Ohio Dec. 10, 2010) .....................34

*U.S. v. Mazurie,*
  419 U.S. 544 (1975) ...........................................................40-41

*U.S. v. Rose,*
  695 F.2d 1356 (10th Cir. 1982).........................................20, 21

*U.S. v. Royce,*
  2023 WL 2163677 (D.N.D. Feb. 22, 2023)........................30, 33

*U.S. v. Ruggiero,*
  791 F.3d 1281 (11th Cir. 2015)..............................................41

*U.S. v. Rush,*
  2023 WL 403774 (S.D. Ill. Jan. 25, 2023) .............................33

*U.S. v. Saleem,*
  ---F. Supp. 3d---, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) .....................29, 32

*U.S. v. Santoro,*
  242 F. App'x 627 (11th Cir. 2007).........................................20

*U.S. v. Schuhmann,*
  963 F.2d 381 (9th Cir. 1992) .................................................21

*U.S. v. Spoerke,*
  568 F.3d 1236 (11th Cir. 2009)..........................................39, 40

App.50

*U.S. v. Syverson*,
    90 F.3d 227 (7th Cir. 1996) ....................................................................23

*U.S. v. Tagg*,
    572 F.3d 1320 (11th Cir. 2009)..............................................................33

*U.S. v. Thompson/Center Arms Co.*,
    504 U.S. 505 (1992) ............................................................... 3, 17, 20

*U.S. v. Wayerski*,
    624 F.3d 1342 (11th Cir. 2010)..............................................................40

*U.S. v. Zeidman*,
    444 F.2d 1051 (7th Cir. 1971) ..............................................................20

*United Steelworkers of Am. v. Schuylkill Metals Corp.*,
    828 F.2d 314 (5th Cir. 1987) ................................................................28

*Va. Hosp. & Healthcare Ass'n v. Roberts*,
    2023 WL 3132005 (E.D. Va. Apr. 27, 2023).......................................44

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*,
    455 U.S. 489 (1982) ..............................................................................42

*Ziyadat v. Diamondrock Hospitality Co.*,
    3 F.4th 1291 (11th Cir. 2021) ..............................................................15

**U.S. Constitution**

U.S. Const., amend. V ...................................................................................42

**Federal Statutes**

5 U.S.C. § 706 ........................................................................................42, 43

18 U.S.C. §§ 921–931....................................................................................4

18 U.S.C. § 921 .....................................................................................*passim*

18 U.S.C. §§ 922–923....................................................................................4

18 U.S.C. § 922 .............................................................................................5

18 U.S.C. § 926 ........................................................................................5, 16

26 U.S.C. §§ 5801–5872................................................................................3

26 U.S.C. § 5801 ................................................................................. 4

26 U.S.C. § 5802 ................................................................................. 4

26 U.S.C. § 5811 ................................................................................. 4

26 U.S.C. § 5812 ................................................................................. 4

26 U.S.C. § 5821 ................................................................................. 4

26 U.S.C. § 5822 ................................................................................. 4

26 U.S.C. § 5841 .............................................................................. 1, 4

26 U.S.C. § 5845 ........................................................................... *passim*

26 U.S.C. § 7801 ............................................................................ 5, 16

26 U.S.C. § 7805 ....................................................................... 5, 16, 17

28 U.S.C. § 1346 ............................................................................... 42

28 U.S.C. § 1491 ............................................................................... 42

Pub. L. No. 90-351, § 1201 (1968) ..................................................... 4

**State Statutes**

11 R.I. Gen. Laws Ann. § 11-47-8 ..................................................... 35

Ala. Code § 13A-11-63 ...................................................................... 35

Alaska Stat. Ann § 11.61.200 ............................................................ 35

Ariz. Rev. Stat. Ann. § 13-3101 ........................................................ 35

Cal. Penal Code § 16590 ................................................................... 35

Colo. Rev. Stat. Ann. § 18-12-102 .................................................... 35

D.C. Code Ann. § 7-2502.02 ............................................................. 35

Fla. Stat. Ann. § 790.221 .................................................................. 35

Ga. Code Ann § 16-11-121 ............................................................... 35

Ga. Code Ann § 16-11-122 ............................................................... 35

App.52

Haw. Rev. Stat. Ann. § 134-8 ................................................. 35

Iowa Code Ann § 724.1C ...................................................... 35

La. Stat. Ann. § 40:1785 ....................................................... 35

Md. Code Ann., Pub. Safety § 5-203 ..................................... 35

Mich. Comp. Laws Ann. § 750.224b ...................................... 35

Mo. Ann. Stat. § 571.020 ...................................................... 35

Mont. Code Ann. § 45-8-340 ................................................. 35

N.C. Gen. Stat. Ann. § 14-288.8 ........................................... 35

N.D. Cent. Code Ann. § 62.1-02-03 ...................................... 35

N.J. Stat. Ann. § 2C:39-1 ..................................................... 35

N.J. Stat. Ann. § 2C:39-3 ..................................................... 35

N.Y. Penal Law § 265.00 ...................................................... 35

N.Y. Penal Law § 265.01-b ................................................... 35

Neb. Rev. Stat. Ann. § 28-1203 ............................................. 35

Nev. Rev. Stat. Ann. § 202.275 ............................................. 35

Ohio Rev. Code Ann. § 2923.17 ............................................ 35

Okla. Stat. Ann. tit. 21, § 1289.18 ......................................... 35

Or. Rev. Stat. Ann. § 166.272 ............................................... 35

S.C. Code Ann. § 16-23-250 ................................................. 35

Tex. Penal Code Ann. § 46.05 ............................................... 35

Va. Code Ann. § 18.2-303.1 .................................................. 35

Wash. Rev. Code Ann. § 9.41.190 ......................................... 35

Wis. Stat. Ann. § 941.28 ....................................................... 35

x

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ............................................................. 3, 14

**Legislative Materials**

H.R. Rep. No. 83-1337 (1954) ....................................................................... 3, 20

S. Rep. No. 90-1097 (1968) ................................................................................ 4

**Regulations**

27 C.F.R. part 478 ...................................................................................... 5, 16

27 C.F.R. § 478.11 .................................................................................... 11, 19

27 C.F.R. part 479 ...................................................................................... 5, 16

27 C.F.R. § 479.11 .................................................................................... 11, 19

28 C.F.R. § 0.130 ....................................................................................... 5, 16

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
  86 Fed. Reg. 30,826 (June 10, 2021) ............................................. 11, 24, 26, 27

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
  88 Fed. Reg. 6,478 (Jan. 31, 2023) ................................................................ *passim*

*Objective Factors for Classifying Weapons with "Stabilizing Braces,"*
  85 Fed. Reg. 82,516 (Dec. 18, 2020) .............................................................. 11

*Objective Factors for Classifying Weapons With "Stabilizing Braces"; Withdrawal of
  Guidance,*
  85 Fed. Reg. 86,948 (Dec. 31, 2020) .............................................................. 11

**Other Authorities**

2 General Laws of Massachusetts from the Adoption of the Constitution to
  February 1822 (1823) .................................................................................. 37

15 The Public Records of the Colony of Connecticut 191 (1890) ............................ 37

1775-1776 Mass. Acts 18 ............................................................................... 37

Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191,
  (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)) ......................................... 37

xi

App.54

Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65 .................................................37

Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25,
    (codified at 1879 Tex. Crim. Stat. 24)...............................................37-38

Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352.................................38

Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27 ..................38

Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412. ........38

Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59...........................38

Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39 ..............................37

Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175 .....................................37

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210,
    (codified at Kan. Gen. Stat. § 1003 (1901))..........................................38

Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231.....................38

An Act About Powder Money,
    1759-1776 N.H. Laws 63 .......................................................................38

"An Act for the better regulating of the Militia of this Province,"
    1747, McCord, *Statutes at Large*, 9:647..................................................37

An Act to License the Carrying of Fowling Pieces and other Fire-Arms,
    1870 Haw. Sess. Laws 26........................................................................38

An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the
    Limits of this State, § 1, 1890 S.C. Acts 653 .......................................37

ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-
    barreled rifles*,
    https://perma.cc/BK6C-BRGQ .................................................................6

ATF, *Current Processing Times*,
    https://perma.cc/8VW8-CCDZ................................................................32

ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
    https://perma.cc/MRR9-ZBJ2.................................................................14

ATF, *FINAL RULE 2021R-08F*,
    https://perma.cc/W6ZW-8FUL ...............................................................18

App.55

ATF, *National Firearms Act Handbook* (Apr. 2009),
https://perma.cc/P3NL-G35G ............................................................5, 6

Cameron Knight, *Dayton shooter used a modified gun that may have exploited a legal loophole,* USA Today (Aug. 6, 2019),
https://perma.cc/89XK-SNVR ...............................................................11

Colonial Laws of Massachusetts Reprinted from the Edition of 1672 (1890)..........37

County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28 ........................................38

Forbes, *U.S. Bought Almost 20 Million Guns Last Year—Second-Highest Year On Record*,
https://perma.cc/TVS8-NNVW .........................................................35

IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961) .................20

Joseph Abram Walker, The Revised Code of Alabama 169 § 10,
(Reid & Screws, State Printers, 1867)....................................................38

Laws of the Commonwealth of Massachusetts from November 28, 1780 to
February 28, 1807 (1807)......................................................................37

Laws of the State of Maine 546 (1830) ....................................................................37

Laws of the State of New Hampshire; with the Constitutions of the United
States and of the State Prefixed 277 (1830)...........................................37

Melissa Macaya *et al.*, 10 killed in Colorado grocery store shooting, CNN (Mar. 23,
2021),
https://perma.cc/HG5S-3NAF.............................................................11

*Records of the Colony of Rhode Island and Providence Plantations, In New England*,
2:196 (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother
vol. 2, 1857) ........................................................................................37

Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34..................................................38

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep
Arms in Early America: The Legal Context of the Second Amendment,"
25 Law & Hist. Rev. 139 (2007)..........................................................37

The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51
(James T. Mitchell & Henry Flanders comps. 1911)............................38

Washington Post, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership*, https://perma.cc/LNE7-8TZQ ..........................................................................35

App.57

## INTRODUCTION

For nearly a century, Congress has regulated the possession, manufacture, and sale of short-barreled rifles, weapons that it determined were especially dangerous. Federal law defines the term "rifle" to mean any rifle-bored weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel shorter than 16 inches in length, it is a short-barreled rifle under the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), 26 U.S.C. § 5841; 18 U.S.C. § 921(a)(8), and is subject to certain registration and taxation requirements, among other federal controls.

Over the last decade, firearms manufacturers have marketed devices widely referred to as "stabilizing braces." These devices are generally designed to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock. Though stabilizing braces are frequently advertised to wrap around a shooter's forearm to assist with one-handed firing, manufacturers often design them to resemble common shoulder stocks and market them to be used to convert pistols into shoulder-fired weapons. The result has been the widespread circumvention of Congress's longstanding requirements for the manufacture and possession of short-barreled rifles.

In 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") took action to ensure that short-barreled rifles constructed with a stabilizing brace are registered and taxed pursuant to statutory requirements. After publishing a notice of proposed rulemaking and receiving public comments, ATF promulgated a rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan.

1

31, 2023) ("Rule"). Consistent with the statutory text, the Rule clarified that the statutory definition of "rifle" can include, under certain circumstances, a weapon equipped with a stabilizing brace or similar device. And to provide the regulated community with necessary guidance, the Rule also outlined the relevant criteria that ATF considers when determining whether a particular weapon configured with a brace device is designed, made, and intended to be fired from the shoulder, such that it constitutes a "rifle" within the meaning of the NFA and the GCA.

Plaintiffs have filed the present action challenging the Rule as unlawful, but the majority of their claims fail on the face of the Complaint.[1] First, many of Plaintiffs' Administrative Procedure Act ("APA") claims provide no basis for relief. The Rule comports with the relevant statutes, and indeed, Congress empowered and obligated ATF to determine whether and when brace-equipped weapons become "rifles," as defined under federal law. Further, in promulgating the Rule, ATF complied with proper procedure, and while notice and comment was not required, the Rule is a reasonable outgrowth of ATF's proposed rule. Second, the Rule suffers from no constitutional defect. The modest registration requirements that federal law impose do not violate the Second Amendment and, in any event, the right to bear arms does not protect the use of firearm modifications to evade federal firearms laws. Likewise, as the Supreme Court held over 80 years ago, the NFA is a valid exercise of Congress's taxing power. Lastly, the Rule is not unconstitutionally vague, nor does it effect an

---

[1] Defendants move to dismiss all of Plaintiffs' claims except for their arbitrary and capricious claim under the Administrative Procedure Act.

unconstitutional taking in violation of the Fifth Amendment. The Court should therefore dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).

**BACKGROUND**

## I.     Statutory and Regulatory Background

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, the first major federal statute to regulate firearms, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *see, e.g., Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled rifles—*i.e.,* "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *U.S. v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes.").[2] The Act defines "rifle" to mean any weapon designed or redesigned, made or remade, and intended to be

---

[2] The NFA's definition of "firearm" also includes machineguns and short-barreled shotguns, as well as several items that would not be considered "firearms" in ordinary parlance, such as silencers, rockets, and grenades. 26 U.S.C. § 5845(a).

3

App.60

fired from the shoulder and designed or redesigned and made or remade
to use the energy of the explosive in a fixed cartridge to fire only a single
projectile through a rifled bore for each single pull of the trigger . . . .

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National

Firearms Registration and Transfer Record to a person entitled to possess the firearm.

*Id.* § 5841. They also are subject to making and transfer taxes, *id.* §§ 5811, 5821, and

must be approved by the Attorney General before they are made or transferred, *id.*

§§ 5812, 5822. Moreover, any person engaged in the business of importing,

manufacturing, or dealing in NFA firearms must register with the Attorney General

and pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

    **2.** In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C.

§§ 921–931, to comprehensively regulate the manufacture and distribution of firearms

and ammunition. Acknowledging the inadequacy of federal controls over "the

widespread traffic in firearms," and motivated by concerns that "the ease with which

firearms could be obtained" had "contributed significantly to the prevalence of

lawlessness and violent crime" in the country, *Huddleston v. U.S.*, 415 U.S. 814, 824

(1974) (citing Pub. L. No. 90-351, § 1201 (1968); S. Rep. No. 90-1097, at 108 (1968)),

the GCA increased federal controls for persons engaging in the business of importing,

manufacturing, or dealing in firearms.[3] *See, e.g.*, 18 U.S.C. §§ 922–923.

    Among these were specific controls on the interstate transport of "short-barreled

---

[3] The GCA defines the term "firearm" more broadly than the NFA, such that it includes, *inter alia*,
"any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the
action of an explosive" or "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

rifles" and the obligation of Federal Firearms Licensees (or "FFLs") to receive approval from the Attorney General before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's definition. *See id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, *see* 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF encourages manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the weapon or device qualifies as a "firearm" under the NFA. *See* ATF, *National Firearms Act Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G ("NFA Handbook").[4] The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later

---

[4] The Court may take judicial notice of factual information available on government websites. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II.   ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"

In the last decade, ATF has received numerous classification requests for weapons equipped with various types of brace devices. 88 Fed. Reg. at 6,482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6,518; *see also, e.g.*, ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, https://perma.cc/BK6C-BRGQ (providing visual examples of weapons configured with common brace devices). And though manufacturers have nominally claimed that brace devices are meant to attach to or stabilize against a shooter's forearm, stabilizing braces often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individual possessors to enable a shooter to shoulder a firearm. 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47. To determine whether a particular weapon equipped with a stabilizing brace falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), ATF looks to the statute to determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and therefore a "rifle" under the terms of the statute, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing heavy pistols equipped with a "stabilizing brace" (top) to firearms equipped with a commercial shoulder stock (bottom). *See* 88 Fed. Reg. at 6,494.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. *See* 88 Fed. Reg. at 6,482. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. *Id.* According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of a heavy pistol. *Id.* Based on its evaluation of the materials submitted, ATF concluded that the particular brace device, when configured with a pistol, would not convert that firearm into a weapon designed or intended to be fired from the shoulder and would not alter the weapon's classification. *Id.* at 6,483. ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of stabilizing braces of varying designs. *Id.* at 6,479. But unlike the 2012 prototype, these newer brace designs began to include characteristics common to shoulder stocks. *Id.* at 6,479; *see also, e.g.*, *id.* at 6,529

(comparing two stabilizing braces to similarly designed shoulder stocks); *id.* at 6,528 (noting that a manufacturer listed a stabilizing brace as a firearm's "stock type"); *id.* at 6,503, 6,547. Given their stock-like function and design, ATF soon became aware that some stabilizing braces were being widely marketed by manufacturers and used by individual possessors to fire weapons from the shoulder. *See, e.g.*, *id.* at 6,479, 6,503 & n.87, 6,505, 6,527, 6,546–47. Accordingly, as early as 2014, ATF had classified multiple weapons configured with different brace devices as short-barreled rifles subject to the NFA. *Id.* at 6,484.

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a firearm equipped with a brace device was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance on how a brace device might affect a weapon's classification under the NFA and the GCA. *Id.* at 6,501–02. For example, some early classification letters, as well as a 2015 Open Letter, suggested that whether a weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the stabilizing brace, as either a device assisting single-handed fire or for shoulder fire. *See, e.g.*, *id.* at 6,484, 6,487–88. ATF also occasionally focused on the brace device itself, considering whether it had been "classified as a shoulder stock," *id.* at 6,484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6,501. But during this same period, the agency also had explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6,502 n.81, and classified several brace-equipped firearms as short-barreled rifles after

considering, for example, whether the brace device served any purpose other than to extend the rearward surface to enable shouldering, *see*, *e.g.*, *id.* at 6,485, or whether the device, as configured with the firearm, created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6,489.

Recognizing the inconsistencies in its early attempts to classify these novel brace-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that "incidental" shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's incidental use of the weapon. *Id.* at 6,491. In 2018, ATF informed classification requestors that, to properly evaluate how a brace device affects a weapon's classification, the agency needs to examine the overall configuration of the weapon with the brace device attached. *Id.* at 6,492.

By mid-2020, ATF's classification letters reflected a focused analysis of the weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as instructed by the statutory definition of a "rifle." For example, in May 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 brace device. *Id.* at 6,493 (providing images of the submission). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed objective design features characteristic of weapons designed and intended to be fired from the shoulder—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the

SBA3 to extend rearward; and the firearm's length of pull, which enabled useful shoulder fire. *Id.* A month later, ATF classified another submitted heavy pistol equipped with a stabilizing brace as a short-barreled rifle after applying the same analytical framework. *Id.* at 6,493–94 (providing images of the submission compared to a rifle marketed by the same company). Notably, neither manufacturer sued to challenge these classifications.

### III.   The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had confused the regulated community. *Id.* at 6,496. Adding to the confusion, manufacturers were labeling brace devices as "ATF compliant" without having submitted that particular device for classification. *Id.* at 6,492. Even more problematic, the agency continued to observe that manufacturers were widely marketing and members of the public were widely using brace devices to create short-barreled rifles without complying with NFA requirements, *see id.*, which Congress had aimed at preventing the criminal and violent use of uniquely dangerous and concealable weapons, *see supra* at p. 3.

In March 2021, a 21-year-old individual armed with brace-equipped AR-type pistol opened fire at a supermarket in Boulder, Colorado, killing ten people, including

an on-duty police officer.[5] This shooting came on the heels of another mass shooting in Dayton, Ohio, in which a 24-year-old individual armed with a brace-equipped AR-type pistol killed nine people and injured 14 others within approximately 30 seconds from firing the first shot.[6] In both instances, the shooters reportedly used the "brace" devices attached to their rifle-variant pistols as shoulder stocks. 88 Fed. Reg. at 6,495.[7]

**2.** In light of its pre-existing concerns, as well as the real-world violent crimes evincing the exact harms that Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify how it evaluates the classifications of brace-equipped weapons. *Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to the regulations in 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the term "rifle," as used in the NFA and the GCA. *See Factoring Criteria for Firearms With Attached "Stabilizing Braces*," 86 Fed. Reg. 30,826 (June 10, 2021).[8] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a weapon submitted for classification is designed, made, and intended to be fired from the shoulder, including weapons equipped with stabilizing braces or other similar attachments. NPRM, 86 Fed. Reg. at 30,826. The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6,497.

---

[5] *See* Melissa Macaya *et al.*, 10 killed in Colorado grocery store shooting, CNN (Mar. 23, 2021), https://perma.cc/HG5S-3NAF (cited at 88 Fed. Reg. at 6,495 n.67).

[6] *See* Cameron Knight, *Dayton shooter used a modified gun that may have exploited a legal loophole*, USA Today (Aug. 6, 2019), https://perma.cc/89XK-SNVR (cited at 88 Fed. Reg. at 6,495 n.67).

[7] Since 2014, ATF has received 104 classification requests in connection with federal criminal investigations involving firearms equipped with a stabilizing brace. 88 Fed. Reg. at 6,499.

[8] In December 2020, ATF published a notice of proposed rulemaking entitled *Objective Factors for Classifying Weapons with "Stabilizing Braces,"* 85 Fed. Reg. 82,516 (Dec. 18, 2020), but withdrew the notice two weeks later, *see* 85 Fed. Reg. 86,948 (Dec. 31, 2020).

ATF announced the rule on January 13, 2023, and it was published in the Federal Register on January 31, 2023, *id.* at 6,478. The Rule, which reflects careful consideration of the voluminous comments from the public, *id.* at 6,497–6,569, contains the following key provisions:

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6,569. The amended regulations clarify that the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a stabilizing brace) that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6,511–13—are:

> (i)  whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

> (ii)  whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

> (iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) information demonstrating the likely use of the weapon in the general community.

*Id.* at 6,569–70.

*Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with stabilizing braces, including individual possessors, FFLs, and certain governmental entities. *Id.* at 6,570–71. As relevant here, an individual who was an unlicensed possessor of a brace-equipped short-barreled rifle before the Rule was published has until May 31, 2023, to come into compliance with the NFA by:

(i) filing the necessary ATF form to register the firearm in the National Firearms Registration and Transfer Record by May 31, 2023;

(ii) removing the firearm from the definition of "short-barreled rifle," 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), by either (a) removing the short barrel and attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently removing and disposing of or altering the brace device so that it cannot be reattached to the weapon;

(iii) turning the firearm into a local ATF office; or

(iv) destroying the firearm, per ATF's published instructions.

*Id.* at 6,570.

*Tax-forbearance provisions.* Under the Rule, ATF is forbearing certain NFA tax obligations for persons who possessed short-barreled rifles equipped with stabilizing

braces prior to the Rule's publication. *Id.* at 6,571. As relevant here, these individual possessors will not be subject to the $200 making tax so long as they file the necessary ATF registration form by May 31, 2023. *Id.*

*Rescission of prior classifications.* As a final matter, given that not all prior classification letters issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule rescinded all of ATF's prior classifications of firearms equipped with stabilizing braces. *Id.* at 6,480. These classifications are therefore no longer valid or authoritative. *Id.* at 6,569.[9]

## IV.    This Lawsuit

Plaintiffs—four individuals who possess at least one pistol equipped with a stabilizing brace and a firearms retailer—filed this lawsuit on February 1, 2023, claiming, *inter alia*, that the Rule is unconstitutional and otherwise violates the APA. Compl. ¶¶ 54–96, ECF No. 1.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a complaint must allege "enough facts to state a claim for relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[9]ATF also issued additional guidance in conjunction with the Rule's announcement, including (i) answers to frequently asked questions regarding the Rule, (ii) registration guidance, and (iii) a non-exhaustive list of commercially available firearms and common weapon platforms equipped with stabilizing braces that ATF has determined are short-barreled rifles under the NFA and the GCA. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://perma.cc/MRR9-ZBJ2.

(2007), which requires alleging "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (quoting *Twombly*, 550 U.S. at 556). "[L]abels and conclusions," *Twombly*, 550 U.S. at 555, "threadbare recitals of the elements of a cause of action," *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678), or "naked assertions that the defendant acted unlawfully," *Omanwa v. Catoosa Cnty.*, 711 F. App'x 959, 964 (11th Cir. 2017), are insufficient.

A court must accept as true all well-pleaded facts in the complaint, *Ziyadat v. Diamondrock Hospitality Co.*, 3 F.4th 1291, 1295 (11th Cir. 2021), but it need not accept the truth of conclusory allegations, unwarranted deductions of fact, or unreasonable inferences. *Oxford Asset Mgmt., Ltd v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2022). Nor must it accept as true legal conclusions couched as factual allegations. *Id.* If, "as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the [well-pleaded] allegations," a court must dismiss the claim. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (citation omitted).

## ARGUMENT

### I.   The Rule does not violate the APA.

#### A.   The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the statutory definition of "rifle."

Plaintiffs claim that ATF lacked authority to promulgate the Rule because the Rule "impermissibly expands" the statutory definition of "rifle" so that it is "incompatible" with the NFA and the GCA. Compl. ¶ 82. But the Rule fits squarely

within ATF's delegated authority and correctly construes the relevant statutory provisions. Plaintiffs' claim, on the other hand, rests on bare assertions that, in any event, are contrary to basic principles of statutory construction.

**1.** As an initial matter, ATF possesses clear authority to interpret provisions within the NFA and the GCA, including terms used within the statutory definition of "rifle." Congress charged the Attorney General with the NFA's "administration and enforcement," 26 U.S.C. § 7801(a)(1), (a)(2)(A), providing that the Attorney General "shall prescribe all needful rules and regulations" to that end, *id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). In turn, the Attorney General has delegated the responsibility for administering and enforcing both statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

Pursuant to that delegated authority, ATF has long promulgated rules and regulations implementing both statutory schemes. 27 C.F.R. parts 478, 479. Like any executive actor charged with enforcing a statute, the agency has found it necessary to issue rules interpreting terms used in the NFA and the GCA. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("Executive actors often must interpret" statutes "Congress has charged them with enforcing and implementing."). The agency's interpretive authority is well established. *See, e.g.*, *Mock v. Garland*, 2023 WL 2711630, at *4 (N.D. Tex. Mar. 30, 2023) (rejecting demand for preliminary injunction in similar challenge

to the Rule at issue here), *appeal filed*, No. 23-10319 (5th Cir. Mar. 31, 2023)[10]; *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019) (noting "ATF's clear authority to interpret" the NFA's definitions). Indeed, ATF has maintained regulations for decades that clarify the meaning of statutory terms that Congress did not fully define. *See* 88 Fed. Reg. at 6,500 (collecting examples). And consistent with this longstanding practice, ATF issued the Rule to clarify the meaning and proper application of another definitional phrase: "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

The need for this Rule cannot be gainsaid. 26 U.S.C. § 7805(a); *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) ("[Section 926] confers [a] measure of discretion" to ATF "to determine what regulations are in fact 'necessary.'"). Federal law regulates the possession, manufacture, and distribution of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted by Congress for their criminal utility. *Thompson/Center*, 504 U.S. at 517. A short-barreled rifle is statutorily defined as, *inter alia*, "a rifle having one or more barrels less than [16] inches in length." 18 U.S.C. § 921(a)(8); 26 U.S.C. § 5845(a)(3). Both the NFA and the GCA further defined the term "rifle" to include all weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). But Congress shed no further light on the meaning of this clause, nor did it explain how to determine if this definition is met.

---

[10] The Fifth Circuit has granted an injunction pending appeal as to the plaintiffs in *Mock*. *See Mock v. Garland*, No. 23-10319 (5th Cir.), ECF No. 52-1.

Then the stabilizing brace arrived and quickly proliferated. As explained, *supra* pp. 7–10, over the last decade, ATF has received numerous classification requests for weapons equipped with various types of brace devices, as the need for ATF to determine these weapons' classifications was clear to manufacturers from the start. While stabilizing braces are purportedly meant to assist single-handed fire by resting against a shooter's forearm, many of these devices closely resemble common shoulder stocks and incorporate design features tailored for shouldering a weapon. 88 Fed. Reg. at 6,479, 6,503, 6,528, 6,547. Indeed, when a heavy pistol is configured with a stabilizing brace, it is often hard to tell the firearm apart from weapons marketed explicitly as short-barreled rifles. *Id.* at 6,493–94, 6,529; ATF, *FINAL RULE 2021R-08F*, at 12–13, https://perma.cc/W6ZW-8FUL (providing three visual comparisons). Given their stock-like designs and function, manufacturers have designed (and even explicitly marketed) various brace devices to convert heavy pistols into shoulder-fired weapons, and individual possessors have widely used these devices for that purpose, 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47—including two individuals who recently used braced-equipped firearms to carry out mass shootings. The result has been the widespread circumvention of NFA and GCA controls.

It is against this backdrop that ATF initiated the rulemaking at issue. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). After completing the notice-and-comment process, the agency issued the Rule to amend its existing

18

App.75

regulations, 27 C.F.R. §§ 478.11, 479.11, to provide a consistent, predictable framework for applying to this class of weapons Congress's definition of "rifles," *i.e.*, weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Rule explains that a weapon equipped with a stabilizing brace may, under certain circumstances, be a "rifle" under that statutory definition. 88 Fed. Reg. at 6,569. And to provide the regulated community with necessary guidance, the Rule outlines the relevant criteria that ATF considers when determining whether a particular weapon configured with a brace device is designed, made, and intended to be fired the shoulder. *Id.* at 6,569–70. As the Rule explains, *id.* at 6,513–43, ATF's expertise and years of experience in classifying brace-equipped weapons informs these criteria. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 908 (6th Cir. 2021). The Rule therefore rests on ATF's well-established authority and is consistent with its longstanding practice of issuing rules to clarify its understanding of the meaning and proper application of statutory terms.

**2.** Still, Plaintiffs contend that the Rule is "incompatible" with the NFA and the GCA because it "impermissibly expands" the statutory definition of "rifle." Compl. ¶¶ 80–82. But Plaintiffs offer no serious interpretive analysis to support that claim, nor do they articulate any better interpretation of the relevant statutory provisions. At any rate, their claim does not comport with the statute's text or purpose or prior judicial constructions. The Rule, on the other hand, reaches the correct conclusion: that a pistol equipped with a stabilizing brace can be a "rifle," and thus a short-barreled rifle,

within the meaning of the NFA and the GCA.

Start with two points that Plaintiffs cannot reasonably dispute. *First*, a pistol can be modified into a "rifle" within the meaning of § 5845(c) and § 921(a)(7). That is clear not only from the statutory text—which delimits the definition of "rifle" based on how a "weapon" (a broad and inclusive term) is designed and intended to be fired—but also from the Supreme Court's decision in *Thompson/Center*. There, the Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm "within the 'intended to be fired from the shoulder' language contained in the [NFA's] definition of rifle." 504 U.S. at 513 n.6 (citation omitted); *accord id.* at 523 (White, J., dissenting); *id.* at 525 (Stevens, J., dissenting). Lower courts have likewise applied that same reasoning. *E.g.*, *U.S. v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971); *U.S. v. Santoro*, 242 F. App'x 627, 630 (11th Cir. 2007). As these decisions acknowledge, it is immaterial under the plain language of § 5845(c) and § 921(a)(7) whether a "rifle" is made or designed by starting with a pistol (or any other rifle-bored weapon) as a component part, so long as the ultimate "weapon" has been configured to be designed, made, and intended to be fired from the shoulder.[11]

*Second*, the fact that a weapon may be designed to *also* allow effective single-

---

[11] That is why even those weapons whose "characteristics are so different from what is commonly considered a 'rifle'" can "fit[] the letter and spirit" of the statutory definition. *E.g.*, *Kanarr Corp. v. U.S.*, 188 Ct. Cl. 1051, 1055–58 (1969) (grenade launcher); *U.S. v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (Uzis with collapsible stocks). The NFA's legislative history also supports this understanding. When Congress enacted the statutory definition of "rifle" in 1954, a House committee report confirmed that the definition was intended to replace reliance on "ordinarily accepted definitions" in determining whether a particular weapon is an NFA "rifle." H.R. Rep. No. 83-1337, at A395. ATF also has long recognized that pistols can be modified to fall within the NFA's definition of "rifle." *See, e.g.*, IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961).

handed fire is not dispositive of whether the weapon is designed, made, and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. Many litigants have argued that the definition of "rifle" should be limited only to weapons designed and intended to fire *exclusively* from the shoulder. Yet courts have roundly and rightly rejected that atextual reading of the statute. *E.g.*, *Rose*, 695 F.2d at 1357–58; *U.S. v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. U.S.*, 321 F.2d 174, 178 (8th Cir. 1963) ("That" a weapon "could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition."), *overruled on other grounds by Haynes v. U.S.*, 390 U.S. 85 (1968); *Kanarr*, 188 Ct. Cl. at 1056–57. As the Rule explains, the plain language of the statute compels the conclusion that a pistol equipped with a stabilizing brace that it is designed, made, and intended to be fired from the shoulder is a "rifle," regardless of whether it includes design features—*e.g.*, an arm slot or Velcro straps—that also might permit effective single-handed firing. 88 Fed. Reg. at 6,501. Indeed, the opposite conclusion would inject into the definition of "rifle" an "exclusive use" limitation that is not found in the statutory text. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court usually read into statutes words that aren't there.").

Accordingly, and as the Rule repeatedly explains, the focal inquiry under the statutory definition of "rifle" is whether a weapon is designed, made, and intended to be fired from the shoulder. 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). As the Rule explains, to properly apply that definition, ATF evaluates a particular weapon's objective design features, in addition to a manufacturer's description of the weapon in marketing materials and information indicating its likely use, for purposes of

determining whether the weapon is designed and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. These criteria are thus merely indicative of whether a particular weapon meets the statutory requirements of a "rifle."

And that ATF considers a weapon's objective design features to determine its design and intended use is especially sensible, particularly in this context, where the record shows that manufacturers' descriptions or labeling of brace-equipped weapons are often at odds with the weapons' design features and common use. *Id.* at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47. While a manufacturer's description of a weapon may be relevant in determining whether it is designed, made, and intended to be fired from the shoulder, relying solely on that description would (i) frustrate Congress's purpose in enacting the NFA and the GCA, (ii) lead to absurd results, and (iii) permit manufacturers to circumvent the law by nominally describing the intended use one way (as not a short-barreled rifle) and then designing and marketing the weapon as one. *Id.* at 6,544; *see also U.S. v. Hayes*, 555 U.S. 415, 426–27 (2009) (rejecting an interpretation that "would frustrate Congress' manifest purpose" and mean the statute was a dead letter in many applications). Indeed, if a weapon's classification turned entirely on the manufacturer's description, any manufacturer of a short-barreled rifle could easily skirt the NFA entirely by, *e.g.*, labeling the rifle as a non-shoulder-fired weapon, or by etching into the stock "this firearm is not to be shoulder fired." But surely, Congress did not intend the NFA to be so toothless, as the Rule explains. 88 Fed. Reg. at 6,544.

Courts have agreed in similar contexts. For example, in *Sig Sauer, Inc. v.*

*Brandon*, 826 F.3d 598 (1st Cir. 2016), the First Circuit held that ATF properly considered the objective design features of a particular product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." *Id.* at 601–02; *see also, e.g.*, *U.S. v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. Indeed, foreshadowing ATF's analysis in the Rule, the court found it "hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.* For that reason, the court noted that an objective approach to discerning intent—like ATF's approach—"is a very familiar one in the law," *id.* at 601, as recognized in analogous contexts, *e.g.*, *Posters 'N' Things, Ltd. v. U.S.*, 511 U.S. 513, 517–22 (1994) (adopting an objective construction of the phrase "primarily intended . . . for use").[12]

And, aside from a weapon's objective design features, ATF also considers other evidence of the weapon's intended use. These include, *inter alia*, the "manufacturer's own marketing materials," "indirect marketing or promotional materials" from accessory makers and sellers, and other information indicating the general

---

[12] *See also, e.g.*, *Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 (6th Cir. 2017).

App.80

community's likely use of a particular weapon, if it evinces the manufacturer's intent with regard to that weapon. 88 Fed. Reg. at 6,544. Courts have long relied on this type of evidence as well to discern intent in numerous contexts. *See, e.g.*, *Posters 'N' Things*, 511 U.S. at 521 n.11 (noting that "the likely use of customers generally" can be relevant to determining whether an item is "primarily intended" for a specific "use").

Therefore, the Rule's conclusion that a weapon equipped with a stabilizing brace is a "rifle" if its objective design features and other relevant objective evidence indicates that it is designed, made, and intended to be fired from the shoulder comports with the relevant statutory definition. Although Plaintiffs claim that the Rule "re-defines" or "expands" that definition, Compl. ¶¶ 47, 80–82, they offer no grounds for that assertion. *See Mock*, 2023 WL 2711630, at *4 (finding that the Rule challenged here "does not . . . rewrite the [statutory] definition" of "rifle," and that it is not substantially likely that the Rule exceeds ATF's statutory authority). Plaintiffs' claim that ATF exceeded its delegated authority in promulgating the Rule thus fails as a matter of law and, accordingly, should be dismissed under Rule 12(b)(6).

**B.    Notice and comment was not required, and in any case, the Rule is a logical outgrowth of the NPRM.**

Plaintiffs also contend that the Rule violates the APA because it is not a logical outgrowth of ATF's NPRM. Compl. ¶¶ 83-88; *see also* NPRM, 86 Fed. Reg. 30,826 (June 10, 2022). But the Rule poses no logical outgrowth problem, and Plaintiffs' claim should be dismissed. *See Mock*, 2023 WL 2711630, at *5.

The Rule poses no logical outgrowth problem because (1) notice and comment

was not required, and in any event, (2) the Rule is a reasonable outgrowth of ATF's proposed rule. First, ATF cannot have violated the logical outgrowth doctrine because it doesn't apply in the first instance. Plaintiffs simply assume notice and comment was required, but "[n]ot all 'rules' must be issued through the notice-and-comment process," and in particular, interpretive rules are exempt. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *id.* at 97 (citation omitted), and "explain what an agency thinks a statute or regulation actually says," *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023).

The Rule is interpretive: it merely advises the public of ATF's interpretation of the NFA and the GCA. *See Mock*, 2023 WL 2711630 at *5. The Rule repeatedly states it "does not impose any new legal obligations" and, instead, "merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes." 88 Fed. Reg. at 6,478; *id.* at 6,569 ("The final regulatory text for the definition of 'rifle' reflects the best interpretation of the relevant statutory provisions."). That ATF still gave the public "notice and opportunity to comment" to "reduce[] vagueness concerns," *id.* at 6,552, does not mean it was required to do so. And because notice and comment was unnecessary, Plaintiffs cannot show a legal violation for not following that process's specific requirements. *See Texas v. EPA*, 389 F. Supp. 3d 497, 504 (S.D. Tex. 2019) ("notice-and-comment requirement" includes "logical outgrowth" test).

Regardless, the Rule is a logical outgrowth of ATF's NPRM. The logical

outgrowth requirement is satisfied if the proposed rule "adequately frame[s] the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (citations omitted); *see also Am. Iron & Steel Inst. v. OSHA*, 182 F.3d 1261, 1276 (11th Cir. 1999). The NPRM need only "fairly apprise[] interested persons of the subjects and issues the agency is considering[,]" and need not "identify every precise proposal which [it might] ultimately adopt as a final rule." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989).

The NPRM fairly apprised the public of the subjects and issues ATF was considering. *Mock*, 2023 WL 2711630 at *5. Indeed, the NPRM and Rule both make clear that ATF contemplated and ultimately decided to amend the regulatory definition of rifle. *Compare* NPRM, 86 Fed. Reg. at 30,826 ("[DOJ] proposes amending [ATF] regulations to clarify when a rifle is 'intended to be fired from the shoulder.' [DOJ] proposes factors ATF considers when evaluating firearms equipped with a purported 'stabilizing brace' to determine whether these weapons would be considered a 'rifle' or 'short-barreled rifle' under the [GCA or NFA].") *with* 88 Fed. Reg. at 6,478 ("[DOJ] is amending the regulations . . . to clarify when a rifle is designed, made, and intended to be fired from the shoulder" and the Rule sets forth "objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes").

Further, although the Rule did not adopt the NPRM's point-based Worksheet 4999 system, the NPRM provided notice that ATF was considering a factor-based

approach and notice of those factors. The NPRM proposed amending the regulatory definition of rifle to consider "objective design features and characteristics that indicate that the firearm is designed to be fired from the shoulder[]"—an aim nearly identical to the final rule. 86 Fed. Reg. at 30,829. And the Worksheet set forth "[f]actoring [c]riteria," just like the final rule. *Id.* at 30,830. Indeed, contrary to Plaintiffs' suggestion, the Rule is not inconsistent with the NPRM, as it adopts a balancing test akin to an unweighted variation of the Worksheet's approach. *See S. Terminal Corp. v. EPA*, 504 F.2d 646, 658 (1st Cir. 1974) (upholding "substantial" changes "in character with the original scheme" that were "foreshadowed in proposals and comments" during rulemaking).

Perhaps most critically, "[a]ll of the objective design features and factors listed in the rule that indicate the weapon is designed, made, and intended to be fired from the shoulder are derived from the NPRM and proposed Worksheet 4999." 88 Fed. Reg. at 6,480; *see also id.* at 6,513; *id.* at 6,494 ("The factors discussed in the NPRM will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle.'"); *Mock*, 2023 WL 2711630 at *5 (that the Rule's criteria were derived from the NPRM was "enough [to] put the affected public on notice of the subjects and issues the Final Rule would address[]"). Indeed, ATF addressed public comments regarding the Worksheet's factors that the Rule ultimately adopted, indicating that the NPRM notified interested persons that the final rule might consider those factors. *E.g.*, 88 Fed. Reg. at 6,514–21 (weight and length comments); *id.* at 6,521–31, 6,537–41 (rear surface area comments); *id.* at 6,533–37 (length of pull

comments); *id.* at 6,541–43 (sights and scope comments); *see United Steelworkers of Am. v. Schuylkill Metals Corp.*, 828 F.2d 314, 318 (5th Cir. 1987) (nature of comments received and responses to comments supported NPRM was adequately descriptive of relevant issues). Moreover, the changes between the NPRM and the Rule evince a careful process based on the comments received, not a logical outgrowth problem. ATF weighed comments "regarding the complexity in understanding the proposed Worksheet 4999 and [its] methodology," and decided "not [to] adopt" the Worksheet; instead, "based on the comments," ATF "took the relevant criteria discussed in the NPRM" and "incorporated them into the rule's revised definitions of rifle." 88 Fed. Reg. at 6,480.[13] Thus, the Rule satisfies the logical outgrowth requirement.

## II.   The NFA and Rule are constitutional.

### A.   Rule does not infringe Second Amendment rights.

The Rule does not violate the Second Amendment for several reasons. *First*, "stabilizing braces" are not "bearable arms," and thus Plaintiffs lack a Second Amendment right to use them. *Second*, the NFA's basic registration requirements do not implicate the right to bear arms. *Third*, short-barreled rifles are dangerous and unusual weapons that do not enjoy Second Amendment protections. *And fourth*, even if the Rule and the NFA implicated the right to bear arms, they are supported by a robust history and tradition of firearm regulations.

---

[13] Contrary to Plaintiffs' suggestion, the Rule does not purport to classify any weapon, and the fact the NPRM provided examples of brace-equipped weapons that would not constitute SBRs does not change that the Rule's aim mirrors and its factors derive from the NPRM. Compl. ¶¶ 87-88. This is sufficient for purposes of the logical outgrowth doctrine.

1.  *Firearm braces are not bearable arms protected by the Second Amendment.*

Under *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Second Amendment extends only to "instruments that constitute bearable arms[.]" *Id.* at 582; *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). Indeed, "[a]n instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an 'Arm.'" *U.S. v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (cleaned up); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022). Consistent with this requirement, *Heller* explained that the historical understanding of the term "arm" covers "[w]eapons of offence or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581.

Because the Second Amendment protects only the right to use "bearable arms," laws that regulate the use of firearm "accessories" or "attachments" do not generally impinge on that right. For instance, the NFA requires registration and payment of a $200 tax—the same requirements for a short-barreled rifle—when making a firearm equipped with a "silencer."[14] Courts have uniformly held that because a silencer is an accessory, "it can't be a 'bearable arm' protected by the Second Amendment." *Cox*, 906 F.3d at 1186; *accord U.S. v. Saleem*, ---F. Supp. 3d---, 2023 WL 2334417, at *11 n.9 (W.D.N.C. Mar. 2, 2023); *U.S. v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec.

---

[14] "Silencer" is defined as, *inter alia*, "any device for silencing, muffling, or diminishing the report of a portable firearm[.]" 18 U.S.C. § 921(a)(25).

14, 2020).[15] Indeed, "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm," and "a firearm remains an effective weapon without a silencer" attached. *U.S. v. Hasson*, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019) (collecting cases). Stabilizing braces fall outside the scope of the Second Amendment for the same reasons.

Indeed, Plaintiffs repeatedly concede that stabilizing braces are merely "accessories installed on firearms." Compl. ¶ 24; *id.* ¶ 57 ("Pistol braces are commonly owned firearm accessories that firearms are commonly sold with[.]"); *id.* ¶ 64 (arguing that regulations should not be based on "the presence of an accessory"). The parties thus appear to agree that braces are not weapons or arms and serve no useful purpose except as attachments to firearms.

While individuals may wish to use a brace to "improve the usage of a firearm," the firearms at issue remain effective without any brace attached. *See Hasson*, 2019 WL 4573424, at *5. Attaching a firearm accessory, such as a brace, is thus "not protected by the Second Amendment." *See U.S. v. Royce*, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023) (holding use of silencer attachments do not implicate the Second Amendment). Plaintiff's Second Amendment claim fails for this reason alone.

    2.   *Registration of short-barreled rifles does not implicate the Second Amendment.*

---

[15] While the Eleventh Circuit has questioned, without deciding, "whether silencers are 'Arms' for Second Amendment purposes." *U.S. v. Bolatete*, 977 F.3d 1022, 1036 (11th Cir. 2020).

The Rule does not ban any firearms; rather the NFA (and thus the Rule) permits possession of short-barreled rifles upon registration with, and approval by, ATF. Although Plaintiffs raise a Second Amendment claim, Plaintiffs appear to concede that they may lawfully possess their firearms if they submit an application to ATF and receive approval. *See* Compl. ¶ 40. And because Plaintiffs appear to have possessed their firearms before the Rule's effective date, assuming timely registration, they are exempt from any tax concerning possession. *See* 88 Fed. Reg. at 6,481.

Insofar as Plaintiffs suggest that the burdens of registration impinge their Second Amendment rights, that argument is meritless. Routine firearm registration procedures, like those required here, do not offend the right to bear arms. Requirements that are part and parcel of the NFA (*e.g.*, being "photographed and fingerprinted") implicate no legally protected interest, but are "merely 'additional costs and logistical hurdles' that all citizens" must bear "under a government." *Bezet v. U.S.*, 714 F. App'x 336, 340 (5th Cir. 2017); *accord Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012) (finding no injury from "additional costs and logistical hurdles" in purchasing handguns, and distinguishing laws imposing "minor inconveniences" from those effecting "an absolute deprivation" of the right to bear arms).

Indeed, Justice Kavanaugh reiterated in *Bruen* that 43 states employ concealed-carry licensing regimes that may demand "objective licensing requirements," like "fingerprinting, a background check, a mental health records check," none of which violates the Second Amendment. 142 S. Ct. at 2162 (Kavanaugh, J., concurring). And the Court took pains to note this point, as well. *Id.* at 2138 n.9 (explaining that

App.88

"nothing in our analysis should be interpreted to suggest the unconstitutionality" of these licensing regimes). Likewise, the NFA's registration procedures (*e.g.*, fingerprinting and background checks) pose no constitutional problem under *Bruen*. *See*, *e.g., Saleem*, 2023 WL 2334417, at *11 n.9 (noting that "the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible"); *Or. Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *15 (D. Or. Dec. 6, 2022) (upholding under *Bruen* a state firearms permit requirement that includes a "background check, fingerprinting, a mental health check," etc.).

Nor can Plaintiffs show the extraordinary circumstances left open by *Bruen*, in which otherwise constitutional licensing may still infringe the Second Amendment because of "lengthy wait times" or "exorbitant fees" that effectively "deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. The time required for registration here is irrelevant to Plaintiffs' claim, because if they submit applications on or before May 31, 2023, they may retain possession of their firearms until they receive ATF's response. 88 Fed. Reg. at 6,559. Moreover, the Rule imposes no tax on Plaintiffs' possession of their firearms if they timely file their applications.

Finally, to the extent Plaintiffs argue that regulations governing travel with short-barreled rifles offend the Second Amendment, Compl. ¶ 65, those arguments are similarly unsuccessful. Plaintiffs claim that it "can take months," for ATF to respond to a request to transport NFA-regulated firearms between states, *id.* ¶ 50, but in fact the average processing time for such requests is just 14 days. *See* ATF, *Current Processing Times*, https://perma.cc/8VW8-CCDZ (providing average processing time for Form

5320.20). Plaintiffs cannot plausibly show this process involves such an "exorbitant" wait time that it potentially infringes their Second Amendment rights.

For all these reasons, Plaintiffs fail to demonstrate that registration or other NFA requirements offend the Second Amendment.

3. *Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment.*

The Rule does not implicate the Second Amendment for another reason: there is no right to bear dangerous and unusual arms like short-barreled rifles. Lower courts have uniformly held that short-barreled rifles constitute dangerous and unusual weapons. *See*, *e.g.*, *Royce*, 2023 WL 2163677, at *3 (short-barrel rifles are "'dangerous and unusual' weapons that are easily concealable and thus not protected by the Second Amendment"); *U.S. v. Rush*, 2023 WL 403774, at *3 (S.D. Ill. Jan. 25, 2023) (similar). The Court should conclude the same.

While the Eleventh Circuit has not directly addressed when a certain firearm is "dangerous and unusual,"[16] the analysis of other circuits compels the conclusion that the Second Amendment does not protect short-barreled rifles. For instance, the Fifth Circuit in *Hollis* looked to cases holding that unlawful possession of a machinegun is a crime of violence for purposes of a sentence enhancement. 827 F.3d at 449; *see also U.S. v. Hall*, 714 F.3d 1270, 1274 (11th Cir. 2013) (holding possession of short-barreled

---

[16] The Eleventh Circuit addressed this issue only in the context of upholding a conviction for possession of unregistered "pipe bombs," which are also "firearms" under the NFA, noting that the Second Amendment permits prohibitions on "the carrying of dangerous and unusual weapons." *U.S. v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009).

shotgun is a "crime of violence" under sentencing guidelines). The court also relied on

decisions holding that machineguns are dangerous weapons outside the Second

Amendment's ambit. *Hollis*, 827 F.3d at 448. Likewise, courts uniformly hold that the

inherent dangerousness of short-barreled rifles places them beyond constitutional

protection. *E.g.*, *Cox*, 906 F.3d at 1185; 88 Fed. Reg. at 6,499 (short-barreled rifles "are

dangerous and unusual due to both their concealability and their heightened ability to

cause damage—a function of the projectile design, caliber, and propellant powder used

in the ammunition and the ability to shoulder the firearm for better accuracy").[17]

*Hollis* also analyzed what it means for a firearm to be "unusual." On this score,

the court looked to Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S.

411 (2016), which suggested that the evaluation involves, at the very least, looking to

the "absolute number" of weapons at issue "*plus*" the number of states where the

firearm "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50. Here, even assuming

that there are now approximately 3.6 million short-barreled rifles in the United States

(641,000 previously registered short-barreled rifles and 3 million with "stabilizing

braces"), that falls far short of the numbers in *Hollis*. 827 F.3d at 449–50 (comparing

numbers of machineguns to "50 million large-capacity magazines" in use, or the

"more than 8 million AR- and AK-platform semi-automatic rifles").

Moreover, *Hollis* also recognized that "[p]ercentage analysis may also be

relevant," in evaluating the relevant proportion of firearms. *Id*. at 450. Conservatively

---

[17] *E.g.*, *U.S. v. Gilbert,* 286 F. App'x 383, 386 (9th Cir. 2008); *U.S. v. Gonzalez*, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011); *U.S. v. Majid*, 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010).

App.91

estimating that there are 400 million civilian-owned firearms in the United States, the number of short-barreled rifles is less than one percent of this amount.[18] Where, as here, the relative number and percentage of firearms at issue is "quite low," *Hollis*, 827 F.3d at 450, there is little question that the weapon at issue is unusual.

Additionally, in his *Caetano* concurrence "Justice Alito did not think the absolute number by itself was sufficient" to demonstrate that a weapon was not dangerous and unusual. *Hollis*, 827 F.3d at 450. Rather, Justice Alito looked to the number of states where the weapon at issue could be "lawfully possessed." *Caetano*, 577 U.S. at 420. This evaluation requires looking to states that entirely ban a firearm and states that ban them unless possessed legally "under federal law." *Hollis*, 827 F.3d at 450. With 34 states prohibiting machinegun possession, the court found this to be further support that machineguns are unusual. *Id*. There are a similar number of state laws concerning possession of short-barreled rifles. At least six states ban them entirely, and 24 states ban them unless NFA registered.[19] Like in *Hollis*, these laws

---

[18] Washington Post, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership*, https://perma.cc/LNE7-8TZQ. The number is likely far higher than 400 million, as consumers have purchased nearly 20 million firearms *per year* in recent years. Forbes, *U.S. Bought Almost 20 Million Guns Last Year—Second-Highest Year On Record*, https://perma.cc/TVS8-NNVW.

[19] *See* Cal. Penal Code § 16590; D.C. Code Ann. § 7-2502.02; Haw. Rev. Stat. Ann. § 134-8.; N.J. Stat. Ann. § 2C:39-3(b), § 2C:39-1(o); N.Y. Penal Law § 265.00(3)(c), (d), § 265.01-b; 11 R.I. Gen. Laws Ann. § 11-47-8(b); Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann. § 16-11-122, § 16-11-121(4); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); S.C. Code Ann. § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

further show that short-barreled rifles are dangerous and unusual. Consequently, such firearms "do not receive Second Amendment protection," *Hollis*, 827 F.3d at 451.

### 4. *Historical tradition of regulation supports the Rule and the NFA.*

While the Rule does not implicate the Second Amendment, even if it did, the Rule and the NFA are constitutional because they rest upon centuries of similar taxation and registration requirements. Where a regulation affects the Second Amendment, the Government may justify it "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation" by pointing to "a well-established and representative historical *analogue*[.]" *Bruen*, 142 S. Ct. at 2130, 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar"—*i.e.*, they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132–33. A "historical *twin*" is not required. *Id.* at 2133. Accordingly, Plaintiffs err in suggesting the Government must locate a Founding era record of regulating short-barreled rifles. Compl. ¶¶ 62–65. Indeed, historical analysis can be "nuanced," particularly in cases implicating "dramatic technological changes," where "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied" those living in 1791 or 1868. *Bruen*, 142 S. Ct. at 2132.

From colonial times, state and local governments have routinely exercised their authority to regulate the possession and manufacture of firearms, through taxation, registration, licensing, and similar requirements. Colonial and early state governments regularly sought to gather information regarding firearm ownership in their

jurisdiction. As early as 1631, Virginia required a regular survey of people in the colony and "also of arms and munition," and door-to-door surveys of firearms were authorized in Rhode Island in 1667, South Carolina in 1747, and New Jersey in 1781.[20] Similarly, militia members in Massachusetts (1775) were required to have their firearms inspected, with an official record documenting all such inspections, and New York (1778) imposed similar requirements.[21] In 1805, Massachusetts required that all musket and pistol barrels manufactured in the state and offered for sale be "proved" (inspected and marked by designated individuals) upon payment of a fee, to insure their safe condition, and Maine enacted similar requirements in 1821.[22] Certain states, such as Massachusetts (1651, 1809), Connecticut (1775), and New Hampshire (1820), also required licenses or inspection to export or sell gunpowder (akin to modern ammunition).[23] South Carolina authorized the issuance of licenses for the sale of pistols (1890).[24] And personal firearm licenses for sporting purposes were required in

---

[20] Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175; *Records of the Colony of Rhode Island and Providence Plantations, In New England*, 2:196 (John Russell Bartlett, ed., Providence: A. Crawford Greene & Brother vol. 2, 1857); "An Act for the better regulating of the Militia of this Province," 1747, McCord, *Statutes at Large*, 9:647; Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39, 43. *See also* Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161-62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).
[21] 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65.
[22] Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 259-61 (1807); Laws of the State of Maine 546 (1830).
[23] Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, 199 (1823); 15 The Public Records of the Colony of Connecticut 191 (1890); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).
[24] An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this State, § 1, 1890 S.C. Acts 653. Arkansas (1881) prohibited the sale or exchange of most pistols. Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)). Other states also enacted prohibitions or other restrictions on the carrying of pistols. *See* Act

37

App.94

Hawaii (1870) and Wyoming (1899).[25] Moreover, as the Eleventh Circuit recently recognized in upholding a Florida state law barring those under 21 from buying firearms, "Alabama and Tennessee generally prohibited selling, loaning, or even giving handguns and other handheld arms to 18-to-20-year-olds in the years leading up to the Fourteenth Amendment's ratification." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1326, 1333 (11th Cir. 2023) (listing other similar laws).

Further, while individual Plaintiffs are exempt from the NFA's tax, it is supported by multiple historical statutes. In 1759, for instance, New Hampshire required that certain ships pay a tax of money or gunpowder.[26] Taxes on firearms specifically were also common through the 19th century. Indeed, taxes were specifically levied on pistols, and in certain cases other firearms, in Alabama (1867), Mississippi (1844, 1867), North Carolina (1857), and Georgia (1866).[27]

Taken together, these laws reflect an unbroken historical tradition of firearm regulation "relevantly similar" to that required by the NFA. *Bruen*, 142 S. Ct. at 2132–33. Like colonial and state laws in the 17th, 18th, and 19th centuries, the NFA and its

---

of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231.

[25] An Act to License the Carrying of Fowling Pieces and other Fire-Arms, 1870 Haw. Sess. Laws 26, §§ 1-2; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

[26] An Act About Powder Money, 1759-1776 N.H. Laws 63; Pennsylvania similarly imposed a taxation, testing, and grading regime for all gunpowder to be sold in Philadelphia. *See* The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911).

[27] Joseph Abram Walker, The Revised Code of Alabama 169 § 10, (Reid & Screws, State Printers, 1867); Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59; Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34; County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28.

corresponding regulations seek to raise revenue through taxation, regulate but not prohibit firearm ownership, and gather information on firearms and their owners in a given jurisdiction. Thus, any modest burden imposed by the NFA's regulations is "comparable" and "comparably justified" to these numerous historical laws.

**B.      The NFA is a constitutional exercise of Congress's taxing power.**

Next, Plaintiffs' Taxing and Spending Clause claim is foreclosed by binding precedent. *See* Compl. ¶¶ 69-76. The Supreme Court upheld the NFA as a valid exercise of Congress's taxing authority more than 80 years ago, *Sozinsky v. U.S.*, 300 U.S. 506, 514 (1937), and more recently, the Eleventh Circuit has held the same. *See U.S. v. Spoerke*, 568 F.3d 1236, 1245 (11th Cir. 2009) ("Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons."); *see also Bolatete*, 977 F.3d at 1031 ("The [NFA], and the criminal penalty for violating it, are grounded in Congress' power to tax.").

Plaintiffs primarily contend that the NFA unconstitutionally imposes a penalty, not a tax, or alternatively, that the NFA's taxing requirement was passed with a "prohibitory purpose." Compl. ¶¶ 71–72, 75–76 (citing *NFIB v. Sebelius*, 567 U.S. 519, 564 (2012)). But Plaintiffs' main case, *Sebelius*, expressly describes NFA taxes on firearms as "obviously regulatory," as opposed to impermissible penalties, and favorably describes *Sozinsky*. 567 U.S. at 567. Moreover, both before and after *Sebelius*, courts have recognized that the NFA's enforcement mechanisms—such as the required registration of firearms and criminalization of possession of unregistered firearms—make it more likely that appropriate taxes will be paid and thus do not

constitute impermissible penalties. *U.S. v. Boggess*, 511 F. Supp. 3d 735, 742 (S.D.W.V. 2021); *Spoerke*, 568 F.3d at 1246. Because the NFA's enforcement mechanisms are rationally related to the taxing power and revenue generation, they are a constitutional exercise of Congress's authority, and not an impermissible penalty. *Spoerke*, 568 F.3d at 1245 ("[T]he registration requirement . . . is part of the web of regulation aiding enforcement of the transfer tax provision in [the Act] and is plainly constitutional." (citation omitted)); *Boggess*, 511 F. Supp. 3d at 742.

Plaintiffs suggest this analysis somehow changes because of ATF's exercise of discretion in the Rule *not* to collect the taxes typically required for NFA firearms for qualifying brace-equipped weapons manufactured or transferred prior to the Rule's publication date. *See* Compl. ¶¶ 74, 76; 88 Fed. Reg. at 6,481. But the power to tax includes the power to forgive taxes, *see Int'l Harvester Co. v. Wisc. Dep't of Tax'n*, 322 U.S. 435, 441 (1944) ("power to tax . . . includes the power to postpone the tax"), and ATF has enforcement discretion under the NFA. And in any event, even if the Rule foregoes retroactive taxes, it still aids revenue-raising purposes: weapons manufactured or transferred *after* the Rule's publication date, which pursuant to the Rule's criteria are NFA weapons, will be subject to NFA making and transfer taxes.

### C.   Plaintiffs' vagueness claim fails as a matter of law.

Plaintiffs also allege the Rule is unconstitutionally vague in violation of the Fifth Amendment. Compl. ¶ 95. Not so. As an initial matter, where "a vagueness challenge does not involve the First Amendment, the analysis must be applied to the facts of the case." *U.S. v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010); *accord U.S. v. Mazurie*,

419 U.S. 544, 550 (1975). Therefore, Plaintiffs' argument fails, if for no other reason, because they have brought facial vagueness challenge to the Rule in the abstract, as opposed to an as-applied challenge to the facts of their case.

Regardless, the Rule is not unconstitutionally vague. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted); *accord U.S. v. Ruggiero*, 791 F.3d 1281, 1290-91 (11th Cir. 2015).

The Rule provides regulated parties with ample opportunity to understand ATF's view of what the NFA requires and prohibits. *See Mock*, 2023 WL 2711630 at *7 (Rule's criteria track statutory definition and Rule is "comprehensible enough to put a person of ordinary intelligence on notice that their weapon may be subject to federal firearms laws"). Indeed, the Rule is clearer and provides *more* notice than ATF's previous classification system to which Plaintiffs would have ATF revert if their claims were to succeed. Prior to the Rule, ATF had not uniformly classified brace-equipped weapons or even adopted a framework for classifying such weapons; instead, ATF issued varied classification determinations for particular weapons, classifying some as short-barreled rifles and others as not. *Supra* pp. 6–9. By contrast, the Rule adopts a consistent, predictable framework for classification: ATF first considers whether a weapon provides surface area allowing it to be shoulder fired, and then weighs six additional factors to determine whether the weapon is designed, made, and

intended to be fired from the shoulder; it also specifies four options for compliance by a specific date. *Supra* pp. 12–14. And an individual may "request a classification determination from ATF for additional clarity." 88 Fed. Reg. at 6,552; *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 498 (1982) (relaxing vagueness test when party may clarify a regulation's meaning "by its own inquiry"). Simply put, ATF has gone beyond what the Fifth Amendment requires to provide fair notice.

**D.    The Rule does not violate the Takings Clause.**

Plaintiffs appear to claim that the Rule violates the APA, 5 U.S.C. § 706(2)(B), because it offends the Fifth Amendment's Just Compensation Clause, which requires the government to pay just compensation when it takes private property for public use, U.S. Const., amend. V; *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537–40 (2005) (The Fifth Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." (citation omitted)). But that claim should be dismissed for at least two reasons.

*First*, Plaintiffs claim is foreclosed by *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). There, the Supreme Court explained that the proper remedy for a just-compensation claim is just that—just compensation—which must be sought from the federal government under the Tucker Act or Little Tucker Act. *Id.* at 2175–79; *see also* 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). Those statutes establish a comprehensive scheme for seeking just compensation from the federal government for an alleged taking and waive the United States' sovereign immunity for such claims. *See, e.g.*, *Preseault v. ICC*, 494 U.S. 1, 11–12 (1990). And where (as here) "the availability of the Tucker Act" and

42

App.99

Little Tucker Act would "guarantee[] an adequate remedy" if a taking were to occur, *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 107 (1974), other remedies will be unavailable in federal court, *see Knick*, 139 S. Ct. at 2175, 79.

Yet here, Plaintiffs have alleged their just-compensation claim under the APA—*not* the Tucker Act or Little Tucker Act—and seek only declaratory and injunctive relief and that the Rule be "set aside" under 5 U.S.C. § 706(2)—*not* just compensation. *See* Compl., Prayer for Relief. But as *Knick* makes clear, federal courts will not grant equitable relief or "set aside agency actions as unconstitutional" under the Just Compensation Clause "as long as just compensation remedies" are available for any uncompensated taking of personal property, as they are against the federal government under the Tucker Act and Little Tucker Act. 139 S. Ct. at 2179; *see also Ruckleshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use . . . when a suit for compensation can be brought against the sovereign subsequent to the taking."). Accordingly, there is no relief that this Court could grant Plaintiffs on their just-compensation claim.

*Second*, even setting aside that threshold issue, Plaintiffs have failed as a matter of law to allege a "taking" within the meaning of the Fifth Amendment. Plaintiffs just-compensation claim rests on the allegation that the Rule "works an unconstitutional taking" by allegedly "recommend[ing] the destruction of personal property." Compl. ¶¶ 95–96. As a factual matter, Plaintiffs' allegation is contradicted by the Rule they challenge. *See Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009). Contrary to their assertions, the Rule does not recommend destruction of any property, but instead

simply explains that a possessor of a brace-equipped short-barreled rifle may voluntarily destroy the firearm or the brace device as one of several options to comply with the NFA. *See* 88 Fed. Reg. at 6,570. Other options include, *inter alia*, registration of the firearm or re-barreling the firearm with a 16-inch or longer barrel.

That range of options "can hardly be called a taking." *See Ruckelshaus*, 467 U.S. at 1007. Government action must "legally compel[]" an obligation affecting property for it "to give rise to a taking." *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993); *accord, e.g.*, *Va. Hosp. & Healthcare Ass'n v. Roberts*, 2023 WL 3132005, at *23 (E.D. Va. Apr. 27, 2023); *James v. Global Tel*Link Corp.*, 2020 WL 998858, at *3 (D.N.J. Mar. 2, 2020) ("'Taken,'" as used in the Fifth Amendment, "implies legal compulsion."); *cf. Ruckelshaus*, 467 U.S. at 1007 (voluntary relinquishment of property as condition of registration under federal statute was not a taking). Because the Rule provides possessors with a number of options to comply with the NFA's requirements, several of which do not involve the destruction of personal property, there is no legal compulsion supporting Plaintiffs' just-compensation claim.[28] *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 124 (3d Cir. 2018) (rejecting takings claim challenging firearms regulation that provided alternative compliance options, many of which did not result in a taking), *abrogated on other grounds*; *Rupp v. Becerra*, 2018 WL 2138452, at *8 (C.D. Cal. May 9, 2018) (same). Plaintiffs' failure to allege a

---

[28] Even where (unlike here) regulations *prohibited* the possession of personal property, courts have rejected takings claims challenging those regulations. *See, e.g.*, *McCutchen v. U.S.*, 14 F.4th 1355, 1363–68 (Fed. Cir. 2021); *Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 364–67 (4th Cir. 2020).

44

taking also forecloses their claim. *See Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1093 (9th Cir. 2015).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims.

Dated: May 24, 2023         Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Taylor Pitz*
TAYLOR PITZ (CA Bar No. 332080)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
MICHAEL DREZNER (VA Bar No. 83836)
FAITH E. LOWRY (TX Bar No. 24099560)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-5200
Email: taylor.n.pitz@usdoj.gov

*Attorneys for Defendants*

## **LOCAL RULE 3.01(g) CERTIFICATION**

Defendants certify that they conferred with Plaintiffs regarding the filing of this motion. The parties conferenced by telephone and discussed the arguments put forth, but they were unable to reach a resolution as to all or part of this motion.

*/s/ Taylor Pitz*
TAYLOR PITZ
Trial Attorney
U.S. Department of Justice

## **CERTIFICATE OF SERVICE**

On May 24, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Middle District of Florida, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Taylor Pitz*
TAYLOR PITZ
Trial Attorney
U.S. Department of Justice

46

1    IN THE UNITED STATES DISTRICT COURT
     MIDDLE DISTRICT OF FLORIDA
2    TAMPA DIVISION

3

4    JOSIAH COLON, et al.,            )
                                      )
5              Plaintiffs,            )
                                      )
6                                     )  Case No.
           vs.                        )  8:23-CV-00223-MSS-MRM
7                                     )
                                      )
8    BUREAU OF ALCOHOL, TOBACCO,      )
     FIREARMS AND EXPLOSIVES, et al., )
9                                     )
               Defendants.            )
10

11

12   _____

13              MOTION HEARING
     BEFORE THE HONORABLE MARY S. SCRIVEN
14      UNITED STATES DISTRICT JUDGE

15            JULY 13, 2023
                10:02 A.M.
16            TAMPA, FLORIDA
     _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
22   _____

23        DAVID J. COLLIER, RMR, CRR
          FEDERAL OFFICIAL COURT REPORTER
24      801 NORTH FLORIDA AVENUE, 7TH FLOOR
             TAMPA, FLORIDA  33602
25

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:

 4

 5           Matthew Larosiere

 6           6964 Houlton Circle

 7           Lake Worth, Florida  33467

 8           (561) 452-7575

 9

10   FOR THE DEFENDANTS:

11

12           Taylor Pitz

13           Michael Drezner

14           Department of Justice - Civil Division

15           1100 L Street NW

16           Washington, D.C.  20005

17           (202) 305-5200

18

19

20

21

22

23

24

25
```

App.105

```
 1                    P R O C E E D I N G S

 2                    - - - o0o - - -

 3           THE COURT:  Good morning.  Call the case, please.

 4           COURTROOM DEPUTY:  Good morning.  We are together in

 5   Case 23-CV-223, Colon, et al. versus Bureau of Alcohol,

 6   Tobacco, Firearms and Explosives, et al.

 7           If counsel could please identify themselves,

 8   beginning with the plaintiffs.

 9           MR. LAROSIERE:  Your Honor, Matthew Larosiere for the

10   plaintiffs.

11           THE COURT:  Good morning.

12           MR. LAROSIERE:  Good morning.

13           THE COURT:  And with you at counsel table is who?

14           MR. LAROSIERE:  My paralegal, Samantha Katzenberger.

15           THE COURT:  Good morning.

16           And for the defense?

17           MS. PITZ:  Good morning, Your Honor.  Taylor Pitz for

18   defendants.

19           THE COURT:  I can't hear you.

20           MS. PITZ:  Good morning.  Taylor Pitz for the

21   defendants.

22           THE COURT:  Good morning.

23           And with you at counsel table?

24           MR. DREZNER:  And Michael Drezner, Your Honor.

25           THE COURT:  Good morning.
```

App.106

1          All right.  We're here for the purpose of addressing

2    the question of this motion for preliminary injunctive relief

3    sought by the plaintiffs in the case.

4          Over the course of time the Court has attempted to

5    really find out who is making a claim and why for injunctive

6    relief.  I have managed to get in from the plaintiffs' side

7    affidavits from certain of the plaintiffs that sort of resolve

8    their status.  I'm still curious about Second Amendment

9    Armory's status and its principal's status insofar as the SAF

10   injunction is concerned and insofar as, for the corporation's

11   rights, its possession of the challenged weapons or its prior

12   possession or its intent to possess the challenged devices, so

13   could we start there.

14          MR. LAROSIERE:  Yes, Your Honor.  May it please the

15   Court.

16          The interesting thing about Plaintiff Second

17   Amendment Armory is that it also represents the equities and

18   interests of its customers, and I agree with Your Honor that --

19   plaintiffs are confused.  Where it seems clear to plaintiffs

20   that at the present moment Second Amendment Armory attempted to

21   come into compliance by, as it said in its affidavit, removing

22   the braces from any firearms that it had in its possession

23   which had those braces affixed beforehand, it appears the

24   Government's response is to say that it thinks it may be able

25   to still prosecute for a constructive possession of regulated

```
 1   articles.
 2           Frankly, that kind of hands plaintiffs the most
 3   aggressive interpretation that it could seek, is that in fact
 4   Second Amendment Armory is still under a real credible threat
 5   of irreparable harm, despite its removal of the articles from
 6   the braces; and furthermore all of its customers which had
 7   purchased these firearms in the intervening decade of
 8   reasonable reliance upon defendants, we're not aware of their
 9   compliance; and that factors into why we have asked for
10   nationwide or at the very, very minimum statewide relief.
11   Its customers ought be able to rely on that --
12           THE COURT:  What authority do you have that the
13   seller of a weapon can stand to support the rights of its
14   previous purchasers or its expected purchases of weapons in the
15   context of a Second Amendment claim?
16           MR. LAROSIERE:  Well, in the very limited context of
17   the post-*Bruen* world, we do look to *Mock v. Garland*, as we've
18   discussed quite heavily, which does specifically give
19   protection to all of the customers and their potential
20   customers of the business defendants in the Second Amendment
21   Foundation case.  Similarly, customers of the business
22   defendants were -- their rights were rightly asserted through
23   the business entity.  It is indeed a novel --
24           THE COURT:  The Fifth Circuit doesn't offer any
25   reasoning for that, it simply issues a standdown injunction
```

App.108

1    pending the resolution of the case, so in a post-*Bruen* world,

2    post-*Mott*, unpublished, non-binding, limited injunction, under

3    what authority does a corporate entity that is not selling the

4    offending items stand in the shoes of its customers in regard

5    to those items?

6            MR. LAROSIERE:  Your Honor, I think with respect to

7    those previous customers, those previous sales, it has been

8    held that -- I don't have the case cite in front of me, I'm

9    happy to provide it to Your Honor later on, that a later damage

10   to business goodwill, et cetera, from, "hey, I purchased this

11   product, you indicated it was okay," relying on the Government,

12   again, reflects poorly on that business.

13           Furthermore, we --

14           THE COURT:  So you're relying on a potential

15   reputational interest of Second Amendment Armory in regard to a

16   statute that wasn't in effect at the time, or regulation or

17   interpretation or whatever you want to call it that wasn't in

18   effect at the time of the sale, someone is going to hold that

19   against Second Amendment Armory?

20           MR. LAROSIERE:  That is one theory, Your Honor.

21           THE COURT:  Do you have a plausible theory?

22           MR. LAROSIERE:  The Second Amendment does protect and

23   it has been found in several Circuit Courts of Appeal that it

24   does protect a right to sell and acquire firearms.

25           THE COURT:  By an individual.

```
 1            MR. LAROSIERE:  By an individual, and therefore all
 2     of those --
 3            THE COURT:  Were those individuals corporate
 4     individuals in those cases or were they individuals?
 5            MR. LAROSIERE:  I do believe there were -- there were
 6     cases specifically protecting the right to sell.
 7            THE COURT:  By an individual or by a corporation?
 8            MR. LAROSIERE:  By a corporation.  And so
 9     I understand I am arguing for a merger of different theories
10     here.  I do fully understand that.  I don't believe that there
11     is a case that directly points to the conclusion I'm drawing,
12     but I think it's a fairly fair inference to say if the sale of
13     these arms was protected, the institutional association between
14     business and client falls under that penumbral right.
15            THE COURT:  Well, we're going away from penumbral
16     rights, the last I checked, in the Supreme Court.
17            MR. LAROSIERE:  Yes.  Bad choice of words.  Falls
18     under that clearly enumerated right, and it's clearly related
19     because the ability -- keep and bear, that's the plain text of
20     the Second Amendment, and it would be difficult to bear
21     something without the ability to acquire it.  I think it's a
22     necessary outflow that there are certain protected acquisition
23     interests as well as privacy interests that flow from the
24     purchase of these firearms, and in fact that's reflected in the
25     U.S. Code, where the Government is forbidden from keeping a
```

App.110

```
 1   record of all firearms transactions, so I think that pretty

 2   clearly shows a historical tradition of, one, respecting the

 3   sale of common firearms, and, two, the related right to privacy

 4   in that exercise of a fundamental right, Your Honor.

 5            THE COURT:  And if Second Amendment Armory doesn't

 6   have a right that's protected or that is being infringed, then

 7   I think the only other person I am principally concerned about

 8   is the principal of Second Amendment Armory, and is his name

 9   Martin?

10            MR. LAROSIERE:  Yes, Your Honor.  Will --

11            THE COURT:  I beg your pardon?

12            MR. LAROSIERE:  Ted William Martin.  Yeah, his last

13   name is Martin.

14            THE COURT:  Well, he's your client.  What is his

15   name?

16            MR. LAROSIERE:  Yeah, last name is Martin.

17            THE COURT:  Right.  Martin is asserting his claim,

18   but he hasn't really told me his status vis-à-vis SAF, and it

19   appears to be purposeful, and I can't tell.

20            MR. LAROSIERE:  I don't think that was purposeful.

21   I --

22            THE COURT:  Is he a member of SAF?

23            MR. LAROSIERE:  I'm not sure.  It is hard to

24   determine sometimes, but I think it's --

25            THE COURT:  It's hard for him to determine whether he
```

App.111

1    joined SAF?

2          MR. LAROSIERE:  Whether one -- because a lot of these

3    organizations don't have like membership cards and membership

4    is triggered by a $15 donation, so there's a suspicion that he

5    is, but we didn't want to assert that to the Court.

6          THE COURT:  I don't understand what you mean by

7    there's a suspicion about whether your client sent $15 to the

8    Second Amendment Foundation.

9          MR. LAROSIERE:  Yes, Your Honor.  We're not exactly

10   aware of whether Mr. Martin himself is a member.

11         THE COURT:  Why doesn't he know?

12         MR. LAROSIERE:  Again, because oftentimes, as I

13   understand it, Your Honor, these memberships can come about

14   from Facebook drives or what have you that is triggered by a

15   $15 donation, and when an individual says they're not sure,

16   I -- and, furthermore, I don't believe Mr. Martin has

17   specifically indicated that he possessed a braced weapon at

18   this time.  I do believe that he -- as he said, in his

19   possession and in the shop's pos -- so all of those firearms

20   have had the braces removed, in any event, and yet the

21   Government still -- which we assert is an attempt at

22   compliance, which shows the depth of vagueness and wild

23   inequity inherent in the Government's --

24         THE COURT:  Well, people are the source of lawsuits,

25   theories or not, and I need to know who is the plaintiff that

App.112

```
 1    I have to be concerned about and whose rights I have to be
 2    concerned about protecting, not ultimately but on an expedited
 3    basis with the issuance of extraordinary relief, and insofar as
 4    I can tell, all your clients are protected by the Fifth Circuit
 5    injunction so far.  Martin doesn't want to say but probably is
 6    also.  We don't know, I guess.  And so if that injunction is in
 7    place and is going to be in place until the Fifth Circuit rules
 8    on this very weighty question, what is the imminent and
 9    irreparable harm your clients will face if this Court doesn't
10    issue another injunction on top of the Fifth Circuit
11    injunction?
12            MR. LAROSIERE:  Yes, Your Honor.  I understand.  And
13    there is case law showing that the fact that other injunctions
14    exist in other courts outside of this jurisdiction does not
15    count against a grant of injunction here because the plaintiffs
16    here are -- at any point, without any action or inaction from
17    these plaintiffs, that injunction could be dissolved, and that
18    could happen tomorrow.
19            THE COURT:  And tomorrow we can come back in here and
20    have this argument.
21            MR. LAROSIERE:  But during that intervening time they
22    would face that -- the problem is, one, they've disclosed the
23    status to the Government; two, the Government has indicated
24    that even where those people are clearly protected by the
25    injunction, the Government didn't admit that they were safe in
```

App.113

```
 1   any way.  The Government asserted that it isn't sure whether --

 2          THE COURT:  Are those cases that you're relying on

 3   cases with nationwide injunctions governing an entire group of

 4   people with whom your client is associated and thus falls under

 5   the protection of?

 6          MR. LAROSIERE:  So this was specifically -- in those

 7   cases, no, they were actually similar, where here there was not

 8   a nationwide injunction, there is --

 9          THE COURT:  I'm sorry?

10          MR. LAROSIERE:  There is no nationwide injunction

11   here in the Fifth Circuit.

12          THE COURT:  There is a nationwide injunction in the

13   Fifth Circuit to the extent that the folks are members of the

14   SAF, as I read the injunction fairly.  I assume the Government

15   doesn't intend to enforce this law against members of the

16   Second Amendment Foundation, wherever they might exist.

17   Am I wrong about that?

18          MS. PITZ:  No.  You're absolutely right, Your Honor.

19          THE COURT:  Okay.  So the SAF people are protected,

20   all of your people are SAF members, we're not sure about

21   Mr. Martin, but he suspects he might be, and so insofar as that

22   injunction sits over to protect the rights of your clients,

23   unless and until it's dissolved by the Fifth Circuit, why do we

24   need a second injunction to protect them?

25          MR. LAROSIERE:  For one, because, again, I do believe
```

App.114

```
1    that that case law shows that there is no points to be taken
2    away from our award for objection.  The question is --
3                THE COURT:  No points to be taken away from what?
4                MR. LAROSIERE:  Your Honor is very aware of the
5    factors regarding motions for preliminary injunction.  I won't
6    waste your time by --
7                THE COURT:  I just didn't understand what you said
8    because you trailed off at the end of your sentence.
9                MR. LAROSIERE:  The case law, Your Honor --
10               THE COURT:  You said there are no points to be taken
11   away from our --
12               MR. LAROSIERE:  The eminency, by the existence of an
13   injunction in another court, especially -- I can understand if
14   there was an injunction as to the particular client, but the
15   clients' interests are here in the Middle District.
16               THE COURT:  Well, the clients' interests are to bear
17   these types of arms, and the Fifth Circuit, which is a spot
18   above my pay grade, has said the Government cannot enforce this
19   provision against them until it lifts its injunction, and
20   I suspect, as the Government acknowledges here, it's not going
21   to, and your clients are telling me they are all members of the
22   SAF, then they are protected.  So that is the biggest hurdle,
23   is the available proof of irreparable harm, and that burden
24   falls on plaintiff.
25               MR. LAROSIERE:  Well, with respect to Mr. Martin, we
```

App.115

```
 1   have no evidence that he's a member of these organizations.
 2   That was the answer that we got.  And so -- and again --
 3            THE COURT:  That is the answer that you got from him?
 4            MR. LAROSIERE:  Yes, Your Honor.
 5            THE COURT:  Is he doesn't know?
 6            MR. LAROSIERE:  Yes, Your Honor.
 7            THE COURT:  Because he doesn't remember whether he
 8   sent a check or a donation to the SAF?
 9            MR. LAROSIERE:  The way some of these -- I understand
10   that --
11            THE COURT:  Yes or no.  He can't remember?
12            MR. LAROSIERE:  That sounds -- that sounds correct,
13   Your Honor.
14            THE COURT:  I don't understand what you mean when you
15   say "that sounds correct."  I can only ask you --
16            MR. LAROSIERE:  Right.
17            THE COURT:  -- as a person who has had a conversation
18   with Mr. Martin whether he sent a check to the SAF.  And you're
19   telling me he doesn't know?
20            MR. LAROSIERE:  Yes, Your Honor.  And I understand
21   how that might sound, given -- Your Honor might not be aware
22   how these organizations do their memberships.  Like I said,
23   they -- there are many bizarre ways that they collect members,
24   and I think that leads to, frankly, why we shouldn't be resting
25   on this Fifth Circuit injunction, which, frankly, makes this a
```

App.116

1    pay-to-play regime in the exercise of a fundamental right.

2            My client can't prove that he's a member of the SAF.

3    Now the Government is aware of -- despite my client's attempt

4    to comply, the Government is still saying that they may

5    prosecute him for constructive possession of an SBR, so I think

6    at the very, very, very, very minimum we need an injunction as

7    to the individual client there to protect him from that very

8    real threat.  And, again, that is -- that leads into some of

9    the other factors and, frankly, into our likelihood of success

10   on the merits, but I do think it's necessary to prevent harm as

11   to Mr. Martin, Your Honor.

12           THE COURT:  Does the Government know whether

13   Mr. Martin is a member of the SAF?

14           MS. PITZ:  No, we do not.

15           THE COURT:  And if the Government doesn't know and if

16   the injunction insofar as these plaintiffs are concerned only

17   covers members of the SAF, in addition to the plaintiffs in the

18   Texas case, then does the Court need to be concerned about

19   Mr. Martin's rights being infringed in this interim period?

20           MS. PITZ:  Respectfully, Your Honor, the Court does

21   not need to be worried at this stage.  It is plaintiffs' burden

22   to demonstrate that they are likely to suffer irreparable harm,

23   and plaintiffs' have failed to provide sufficient facts from

24   which we could make any sort of determination as to whether or

25   not that plaintiff is in possession -- in constructive

App.117

1    possession of short-barreled rifles.

2             THE COURT:  Well, I'm not asking about that piece.

3    My question is about his coverage under the prior injunction.

4             MS. PITZ:  Well, even assuming that plaintiff is not

5    covered by the prior injunction --

6             THE COURT:  Well, I don't want you to assume that for

7    purposes of my question.  I want you to answer my question, if

8    we assume that he is not covered by the injunction, does the

9    injunction provide any cover for him?

10            MS. PITZ:  No, it does not.

11            THE COURT:  So then we do have to reach the merits of

12   this case to address the question of the violation of his

13   Second Amendment rights?

14            MS. PITZ:  We would at least need to turn to the

15   merits of whether or not plaintiffs have demonstrated

16   irreparable harm.  I think that question has been presented

17   wholly apart from the existence of the Fifth Circuit

18   injunction, and, once again, I would reiterate that on the

19   facts before the Court plaintiffs have failed to make that

20   showing.

21            THE COURT:  All right.  Let me hear from you on the

22   question of irreparable harm, assuming that Mr. Martin is not a

23   member of the SAF.

24            MR. LAROSIERE:  Yes, Your Honor.

25            Irreparable harm -- this is why the Second Amendment

App.118

```
 1    allows us -- under Bruen makes this so clean.  If we have a
 2    likelihood of success on a Second Amendment challenge, we've
 3    established irreparable harm right there.  A right delayed or
 4    infringed for even a moment is irreparable harm, and it's a
 5    clean and easily-applied framework.  The simple question is --
 6              THE COURT:  You may use the podium if you prefer.
 7              MR. LAROSIERE:  Yes, Your Honor.
 8              The simple question is is the Government targeting
 9    conduct targeted by the plain text of the Second Amendment, and
10    it obviously is, the keeping and bearing of an arm.  The
11    Government attempts to escape Second Amendment analysis in
12    two ways which are unsupportable.  First, it argues that these
13    are not an arm by arguing out of both sides of their mouth, on
14    the one hand saying we're only regulating firearms with
15    attached pistol braces --
16              THE COURT:  Let's slow down --
17              MR. LAROSIERE:  Okay.
18              THE COURT:  -- just a little bit to the first point.
19              Does Mr. Martin have such an arm, has he ever had
20    such an arm, and do I have any evidence in front of me he has
21    any intent to have such an arm?
22              MR. LAROSIERE:  Well, yes, Your Honor, the affidavit
23    that he had in his as well as the shop's possession, because
24    he's the owner of the shop, these firearms, and the fact that
25    he removed the brace, if Your Honor thinks that defeats the
```

App.119

```
 1    question, it directly contends with the Government's position,

 2    whose interpretation is what we're fighting here.  So there is

 3    evidence before the Court that Mr. Martin and, frankly, Second

 4    Amendment Armory, possessed these items that the Government is

 5    threatening enforcement of, and --

 6              THE COURT:  Not to make such a fine distinction, but

 7    do these weapons belong to Second Amendment Armory or do they

 8    belong to Mr. Martin?

 9              MR. LAROSIERE:  Your Honor, I'm not sure.  It's a --

10    it's -- as I understand, this is a privately-held business.

11    You could argue that all of its personal property is owned --

12    personal property -- all of the business property is owned by

13    him.  I am aware that -- I think we would rest on the affidavit

14    itself, which says that he has in his own possession, right,

15    firearms which previously had these braces and which are just

16    separated, and then we go to the Government saying that's

17    regulable.  So I think it's handled on the face of the

18    affidavit.

19              THE COURT:  All right.

20              MR. LAROSIERE:  Shall I proceed?

21              THE COURT:  You may.

22              MR. LAROSIERE:  So in *Bruen* the Supreme Court

23    eliminated a multistep framework for Second Amendment analysis

24    which the Government is here trying to resurrect.  "It's not an

25    arm" argument is unsupportable, it draws analysis from a case
```

App.120

1    involving suppressors, which is an outlier case, and also

2    which -- suppressors are separately defined as their own

3    firearms under the act, so it's completely inapplicable.

4          And then the other case it points to saying

5    pipe bombs -- we're not arguing about pipe bombs here, we're

6    arguing about ordinary firearms, which were held by in the

7    Government's estimation 3 million Americans, and in the

8    Congressional Research Service's estimation over 10 million,

9    which is multiple, multiple times, in fact an exponent more

10   than were found to be in common lawful use in *Caetano*, which

11   was only a quarter million weapons, so the "not an arm"

12   argument, it's just a nonstarter.  They are out of one side of

13   their mouth saying "we are regulating firearms with attached

14   stabilizing braces" and out of the other side saying, "oh,

15   we're just regulating an accessory."

16          Well, it doesn't work like that, because on the one

17   hand the text of the rule is very clear, on the other hand even

18   to the extent that they are arguing, oh, well, you can do some

19   unknown modification of the firearm in order to keep it, well,

20   that exact argument was shot down in *Heller*.  New York,

21   fascinatingly, here attempted the exact opposite distinction

22   when defending its handgun ban, saying, oh, well, you can just

23   put a stock and a 16-inch barrel on your handgun, right,

24   flipping the roles here, and that is -- and you'll be just fine

25   and you won't be prevented from keeping it operable in the

App.121

```
1    home, and the Supreme Court explicitly said no, the
2    availability of other arms in other configurations is not a
3    defense to a Second Amendment analysis.  So that simply fails
4    there, the attachment theory.
5            Furthermore, to the extent the Government is
6    attempting to rest its head on dangerous and unusual, again,
7    number one, it's a conjunctive text, it's not disjunctive, so
8    the simple fact that in Caetano a quarter million stun guns
9    were found to be in common lawful use, here the Government's
10   estimate is 3 million, so it's at least common, and to the
11   extent that the Government argues that it's dangerous
12   generally, it's a weapon, they are dangerous, right?  So
13   dangerous and unusual, when it was first brought up by the
14   Supreme Court in Heller, was not a blank check to say anything
15   that the Government can articulate is rare or in some way
16   unique is regulable.  In fact, what the Supreme Court said was,
17   taking a step back, statutes regulating the carriage of
18   dangerous and unusual arms, should those be Constitutional, the
19   historical justifications will emerge in future litigation.
20           Here the Government has attempted to bring up
21   historical justifications, which are under Bruen clearly
22   exclusively its burden, and it was articulated in Bruen that it
23   is a very substantial burden that must be carefully
24   scrutinized, how the analogous regulations asserted by the
25   Government regulate the keeping and bearing of firearms,
```

1    specifically the right to defend oneself through a firearm and
2    why they were done.
3           The Government here points to Colonial era militia
4    enabling statutes, which went door to door checking muskets.
5    It's very clear why that was done.  It was so that they could
6    fight at a moment's notice and to be sure that they could use
7    community ammunition reserves.  If you actually look to those
8    cited statutes, they go to check whether the caliber of the
9    musket or what have you, rifle in the later statutes, was
10   compatible.  The result there was not to confiscate
11   particularly interesting or what have you firearms, but to
12   ensure that a firearm existed.  In fact, the result of failure
13   of that statute was the provision of a firearm, another gun,
14   not ten years in jail.  The how and why there is completely
15   inapplicable.
16          Insofar as the Government refers to statutes
17   involving proof houses, requiring proofing of firearms, that
18   was done to prevent the sale of dangerous firearms to the user,
19   firearms that would blow the hand off of a user, so they would
20   ensure that the firearm could function with the caliber that it
21   was said to function with.  Nowhere near criminal consequences,
22   nowhere near an analysis and confiscation potentially or
23   destruction of a protected firearm.
24          These are simply not historically analogous.  In no
25   way are they historically analogous to the complaint of conduct

App.123

1    here, which is if you possess this firearm, which we admit

2    there are millions of which in circulation, you go to prison

3    unless you pay us a special tax, and if you pay us a special

4    tax you can't freely alienate it, you need our permission to

5    alienate it.  By the way --

6              COURT REPORTER:  Counsel, I need you to slow down a

7    little and speak clearly into the microphone.  I couldn't

8    understand the last thing you said.

9              THE COURT:  Even if you pay us a fee --

10             MR. LAROSIERE:  Even if you do pay us that fee, you

11   now can no longer freely alienate the item, you cannot travel

12   interstate with the item.  If your spouse or significant other

13   is in possession of that item without you physically being

14   present, there are felonious consequences.

15             Again, there is no historical analogue to the

16   treatment of commonly available firearms, especially not to the

17   extent that the Government has admitted that these are

18   available, to felonious consequences and what amounts to

19   outright prohibition.  By the Government's own estimation, only

20   some 100,000 people of the Government's estimated 3 million

21   affected population did actually even attempt to register.

22             So, again, this is a wildly problematic issue which

23   threatens massive criminal consequences for the simple

24   peaceable possession of a firearm, which is a protected

25   instrument.

```
 1              THE COURT:  Before the weapons that Mr. Martin owned
 2     were affixed to a brace, what was their status?
 3              MR. LAROSIERE:  As I understand, the firearms came
 4     equipped with braces, and those were sold and transferred as
 5     pistols.
 6              THE COURT:  The firearm was sold and transferred as a
 7     pistol with the brace affixed to it?
 8              MR. LAROSIERE:  Correct, as was the encouraged
 9     practice by Government defendants to specific firearms.
10              THE COURT:  And when the brace was removed from the
11     weapon in response to the new regulation, what happened to the
12     brace?
13              MR. LAROSIERE:  As I understand, it was stored
14     separately.
15              THE COURT:  But not destroyed?
16              MR. LAROSIERE:  No, Your Honor.
17              THE COURT:  And not rendered incapable of being
18     reaffixed?
19              MR. LAROSIERE:  No, Your Honor.  And, frankly,
20     plaintiffs aren't aware of how that can be done without
21     substantially damaging the firearm.
22              THE COURT:  The firearm or the brace?
23              MR. LAROSIERE:  The firearm.  Because the rule says
24     either destruction of the brace or modification of the firearm
25     to no longer accept the brace.  Well, with AR-15s, which are
```

App.125

```
 1    the subject of all of our plaintiffs but one, the firearms --
 2    the brace attaches to the buffer assembly, which is an integral
 3    mechanical component.  Destruction or cutting or modification
 4    thereof would result in a nonfunctional firearm.
 5              THE COURT:  Do you have a photograph of the firearm
 6    with a brace and a firearm without a brace?
 7              MR. LAROSIERE:  I do not have that with me,
 8    Your Honor.
 9              THE COURT:  All right.  Let me hear from the
10    Government on the irreparable harm piece.
11              MR. LAROSIERE:  Thank you kindly, Your Honor.
12              THE COURT:  Yes.
13              MS. PITZ:  Good morning, Your Honor.
14              On the irreparable harm, we would underscore once
15    again the Wreal versus Amazon case in the Eleventh Circuit,
16    which states clearly that a delay of even a few months is
17    sufficient to militate against a finding of irreparable harm.
18    Here plaintiffs were clearly on notice of the proposed rule.
19    They filed the Complaint the day after the rule was published.
20              THE COURT:  I'm not moved by that argument because
21    they filed before the implementation of the rule and they were
22    protected by the filing in Texas on their behalf under the SAF,
23    at least as it relates to some of the plaintiffs, and I suspect
24    Mr. Martin as well, and the rule didn't get implemented until
25    May -- what was the date?
```

```
 1              MS. PITZ:  It was effective immediately, but it did
 2     not go into effect, as Your Honor suggests, until May 31st,
 3     2023.
 4              THE COURT:  Did they file before the effective date?
 5              MS. PITZ:  They did, one week --
 6              THE COURT:  All right.
 7              MS. PITZ:  -- prior to the effective date.
 8              THE COURT:  I'm not sure that that theory protects
 9     from a finding of irreparable harm, especially for the -- what
10     the *Bruen* Court has now said is one of the highest protected
11     Constitutional rights.  So what is your next argument?
12              MS. PITZ:  Even so, Your Honor, any harm is still
13     self-inflicted at this point, which cases within this district
14     have held is insufficient to constitute irreparable injury to
15     support a preliminary injunction.  Plaintiffs' had a 120 day
16     compliance period to comply with the rule, and still during
17     that time they did not --
18              THE COURT:  Well, self-inflicted means if you agree
19     to allow us to abridge your Second Amendment rights then we
20     won't come after you, and if you don't agree, we will?  How
21     is that self-inflicted rather than Government-imposed?  Because
22     you still have to give up your claimed Second Amendment rights
23     in order to not self-inflict the Government's imposed
24     parameters.
25              MS. PITZ:  Your Honor, I would respond that --
```

App.127

```
 1          THE COURT:  Just like a First Amendment right, it's
 2   self-inflicted if you choose to speak when the Government has
 3   told you you cannot.  And if the Government's telling you
 4   you cannot in whatever circumstance might exist is
 5   unconstitutional, it's hardly a defense to say, well, you
 6   shouldn't have said anything.
 7          MS. PITZ:  Our response, I suppose, would then just
 8   be to turn to the merits and argue that the Second Amendment is
 9   not implicated in the sale or possession of brace-equipped
10   firearms.
11          THE COURT:  So those are the only two irreparable
12   harm arguments you make, is they waited too long and they
13   should just give up their arms until the Court determines that
14   they can bear them?
15          MS. PITZ:  Those are two -- those are two of our
16   arguments.  Additionally, I would note -- I would reiterate
17   plaintiffs' burden to show irreparable harm here.  Plaintiffs
18   have had multiple opportunities to present the Court with
19   sufficient facts to really understand the firearms they're in
20   possession of, what information -- what has been done to any
21   braces they are in possession of, and still --
22          THE COURT:  Well, they've told me now they've stored
23   the braces.  They haven't destroyed the weapons or altered the
24   weapons to make them incompatible with the braces because they
25   claim they don't know how, and the regulation doesn't expressly
```

```
 1    state how they are to do that.  So I guess you do need to turn
 2    to the merits of your claim that this is not a Second Amendment
 3    violation, and in that regard, contrary to the findings of the
 4    District Court in Texas, it would appear that this burden, even
 5    on a preliminary injunction motion, lies with the Government
 6    and not with the plaintiffs if the Government bears the burden
 7    of proof on the ultimate claim.  And so let me hear from the
 8    Government, since it is the Government's burden, on why this
 9    claim isn't viable as against the assertion that the
10    Government's conduct infringes the right to bear braced items,
11    which the Government has now by its regulation defined as
12    rifles.
13            MS. PITZ:  Yes, Your Honor.
14            The Second Amendment is not implicated here, as our
15    brief indicates, for three separate reasons.  And I would note,
16    just in response to plaintiffs' counsel's argument, that these
17    are arguments made in the alternative, so they need not be
18    completely reconciled with one another, but we would suggest
19    the Court consider each separately and determine what makes the
20    most sense to Your Honor in how she thinks about how braces are
21    configured with firearms.
22            THE COURT:  But you kind of have to accept the
23    reality of how it got here.  You can't say if you -- on the one
24    hand let's treat it this way, and on the other hand let's treat
25    it this other way, but don't consider the two together because
```

App.129

1    logically together they may be incongruous.

2           So let me hear what your three arguments are and then

3    I'll decide whether they are incompatible with each other in

4    light of the Government's conduct.

5           MS. PITZ:  Yes, ma'am.

6           First, stabilizing braces are not bearable arms

7    protected by the Second Amendment under *Heller*.  They are akin

8    to -- Courts have uniformly held that because instruments like

9    silencers are accessories, they are not directly protected by

10   the Second Amendment.

11          THE COURT:  But braces standing alone aren't being

12   regulated, are they?

13          MS. PITZ:  They are not.

14          THE COURT:  And so the argument that braces are

15   accessories and therefore the regulation of braces doesn't

16   infringe the Second Amendment assumes that you're regulating

17   standalone braces, which you are not.  You're only regulating

18   these if they are attached to a short-barreled rifle, a

19   sawed-off shotgun or a pistol, in which case they are now a

20   firearm interpreted as, defined as a rifle.

21          And so, standing alone, I think I agree with you that

22   if you told Mr. Martin he can't own a brace sitting in his

23   apartment on a shelf to look at because he thinks braces are

24   pretty, then that probably isn't a Second Amendment violation,

25   but that's not what you're saying.  What the Government is

1  saying is you can't have a brace attached to a short rifle to
2  avoid the implications of possession of short rifles for
3  registration purposes.  Isn't that right?
4        MS. PITZ:  Your Honor, what I would clarify is just
5  that the Government -- or perhaps it's better framed as
6  plaintiffs are indicating that the Second Amendment right
7  implicates their ability to attach the brace to a pistol.
8  Pistols are -- the Government does not purport to regulate
9  pistols through this rule as they exist independent of braces,
10 it's only once the brace is attached.  And, once again, the
11 brace itself has no separate function, it has no independent
12 ability to cause harm.
13       THE COURT:  But you're not telling them they can't
14 attach the brace to a pistol or a short rifle, you're telling
15 them they have to detach it from a pistol or a short rifle or
16 be in violation and then subsequently can't attach them to new
17 weapons that they might possess.  So there are two
18 prohibitions, and arguably a third, that is, if you still kept
19 it with you and then you now have your old rifle back, you're
20 still in violation because now you have a rifle made from a
21 short -- a weapon made from a rifle, and so you can't have that
22 either.  So there are lots of things you cannot have, the only
23 one of which that you're not regulating is that you can have a
24 standalone brace sitting in your house not bothering anybody.
25 That's the only thing that you are not regulating, is the

```
1    ownership of a brace that has never previously been attached to
2    a weapon sitting in your house, and no one is complaining about
3    that.  There's no plaintiff here saying, "I want to buy a brace
4    and put it in my house and put it on a shelf and look at it and
5    the Government won't let me."  No one is making that argument.
6           So the argument the plaintiffs are making -- the
7    arguments they're making are that, one, we want to keep our
8    braces attached to our short -- previously short rifles, and we
9    want to be able to purchase said braced weapons in the future,
10   and then they have all their regulatory -- they don't want to
11   report them, that's another issue, but with respect to the
12   possession, this is not just a standalone, unregulated brace,
13   and the only way you even get to regulate it is if it is a
14   firearm, otherwise it's outside the parameters of the NFA and
15   the GCA anyway.  So what are you doing regulating nonfirearm
16   braces in the first place, if that's all you're doing?
17          MS. PITZ:  I take your point, Your Honor, and if you
18   prefer to see the regulation at issue addressing both the
19   attachment, the brace, and the firearm in combination as one
20   entity, I think our latter two arguments speak to that.
21          The NFA does not ban the sale or possession of
22   brace-equipped pistols, even if they're determined to be
23   short-barreled rifles, it only subjects them to the additional
24   regulatory requirements of the NFA.  Those requirements do not
25   implicate the Second Amendment.
```

```
1              THE COURT:  So if you have a pistol, an original
2    pistol that has a brace, your contention is this regulation
3    only requires registration and disclosure?
4              MS. PITZ:  Yes, ma'am.
5              THE COURT:  And you can keep your brace and you can
6    buy one in the future, a braced pistol?
7              MS. PITZ:  Yes, ma'am.
8              THE COURT:  And then with respect to sawed-off
9    shotguns and short rifles, what does the regulation prohibit?
10             MS. PITZ:  The regulation -- the rule only addresses
11   stabilizing braces as attached to a firearm when -- under the
12   factors the rule sets forth, it indicates that the weapon is
13   designed or intended to be fired from the shoulder.  That's the
14   statutory inquiry that brings any weapon under the regulatory
15   requirements of the NFA.
16             THE COURT:  Well, I'm a little confused.  What if a
17   pistol is intended to be fired from the shoulder with the
18   attached brace, is it then within the parameters or not?
19             MS. PITZ:  Assuming that under the factors the rule
20   sets forth that ATF would conclude that it is intended and
21   designed to be fired from the shoulder, then, yes, that pistol
22   would be considered a short-barreled rifle subject to the NFA's
23   registration requirements.
24             THE COURT:  Well, you have to help me here, because
25   we're under preliminary injunction, and you're telling me
```

App.133

```
 1    assume this, assume that.  You have the regulation.  You
 2    promulgated the regulation.  Tell me what the regulation says
 3    is prohibited.
 4          You initially told me pistols were fine, and now
 5    you're telling me pistols are not fine if the pistol has a
 6    brace and the point of attaching the brace is to fire it from
 7    the shoulder.  What would be another purpose of attaching a
 8    brace to a pistol?
 9          MS. PITZ:  Well, as some of the prior examples cited
10    in the rule initially -- initial designs of stabilizing braces
11    were supposedly allowed to facilitate single-handled firing, as
12    pistols are traditionally and ordinarily fired just with
13    single-handed firing.  So the regulation was put into place to
14    clarify that when, instead, a brace doesn't facilitate
15    single -- stabilized single-handed firing but instead remakes
16    the weapon to facilitate firing from the shoulder, that is the
17    statutory definition of what a rifle is.  When a weapon is
18    designed and intended to be fired from the shoulder, that is
19    what the NFA says is a rifle.
20          THE COURT:  And so if it is a rifle and it has been
21    reconfigured to fire it from the shoulder, whether it was a
22    pistol or a short-barreled rifle before or a sawed-off shotgun
23    before, it is all regulated?
24          MS. PITZ:  That is correct, although I would note
25    that prior to the existence of the rule the NFA itself
```

```
 1   specifically regulates short-barreled rifles and short-barreled
 2   shotguns.  Instead pistols had previously been outside that
 3   kind of regulatory umbrella, and now it's only with the
 4   addition of a stabilizing brace that it has really transformed
 5   the function or rather how the weapon is fired such that it
 6   comes within the NFA's parameters.
 7            THE COURT:  Beyond registration requirements, what
 8   prohibitions does the rule establish in the possession of or
 9   the subsequent acquisition of such attached weapons?
10            MS. PITZ:  The rule itself does not impose any
11   prohibitions.  The rule itself just indicates that this is how
12   ATF moving forward is going to determine what type of firearm a
13   braced pistol is.  It sets forth factors the agency will look
14   for in properly classifying such weapons, and it amends the
15   regulatory definition, but the legal obligations, as you
16   suggest, the prohibition, the taxing requirement, the
17   registration requirement, those requirements flow directly from
18   the NFA itself.
19            This rule simply is stating and clarifying for the
20   public how ATF is applying the NFA as to these somewhat
21   newly-developed, increasingly popular pistols equipped with
22   stabilizing braces.
23            THE COURT:  But by interpreting or expanding the
24   definition of rifle to include these braces or braced weapons
25   to be subject to regulatory oversight or ATF prohibition,
```

App.135

```
 1    doesn't the rule have that effect?  Because if you sat silent,
 2    like you were before January, we wouldn't be here, because
 3    people would still be circumventing the ATF and the NFA
 4    regulatory scheme by extending the length of their
 5    short-barreled weapons, right?
 6              MS. PITZ:  Well, Your Honor, prior to the existence
 7    of the rule ATF had classified some firearms equipped with
 8    stabilizing braces as short-barreled rifles subject to the NFA.
 9    It had just done so inconsistently.  Prior to the rule there
10    had been a series of inconsistent classification
11    determinations, so instead of ATF, you know, going through
12    notice and comment or issuing something in the Federal
13    Register, instead ATF was kind of operating on a case-by-case
14    basis of a manufacturer submitting a particular firearm
15    combined with a particular brace to the ATF for classification.
16    And so ATF had issued classification orders, and some of those
17    had determined that those weapons were short-barreled rifles
18    subject to the NFA, but some didn't, so this rule simply seeks
19    to clarify what the agency's approach is going to be moving
20    forward in a sort of cohesive way that provides notice to the
21    regulated community.
22              THE COURT:  So was ATF operating outside its
23    authority in the prior circumstances when it was making these
24    case-by-case decisions, or was it acting within its authority?
25              MS. PITZ:  No, it was acting within its authority to
```

App.136

1    classify weapons, Your Honor.  It was just simply, for better

2    or for worse, wavering between different considerations in

3    coming to classification determinations.

4         THE COURT:  Are you here suggesting that the

5    implementation of this thing, whatever it is, a rule or an

6    interpretation of an existing rule, doesn't impact the right of

7    individuals to possess braced weapons?

8         MS. PITZ:  Your Honor, the rule itself simply is

9    amending the statutory definition and explaining the factors

10   that ATF will consider in making specific classification

11   determinations moving forward.  It doesn't per se specify

12   whether or not a particular firearm and particular brace

13   combination itself is a short-barreled rifle.  We would submit

14   that the rule itself does not do that; however, in full

15   recognition of that, of course, as a result of the rule

16   ATF will be making such classification determinations, but ATF

17   would submit that those determinations would properly be

18   challenged on their own, on the merits of whether or not,

19   you know, the application of the rule's factors aligns with the

20   statutory inquiry of whether or not a weapon is designed and

21   intended to be fired from the shoulder.

22        THE COURT:  So when the rule says "Persons in

23   possession of short-barreled rifles equipped with a stabilizing

24   brace device have until May 31, 2023 to come into compliance

25   with the NFA's requirements," it doesn't really mean that, it

App.137

1    just means you can do whatever you want to do, we don't know

2    what the ATF is going to do with you, do whatever you want to

3    do?

4            MS. PITZ:  I take your point, Your Honor.  That point

5    is clear, the rule sets forth clear means of compliance with

6    the rule, but --

7            THE COURT:  Not only clear means of compliance with

8    the rule, but a direct mandate to come into compliance with the

9    rule.  It doesn't -- it's not optional.  It doesn't say do or

10   don't, left up to you, we're not going to do anything if you

11   don't.  It says if you don't do this then you're going to face

12   penalties.

13           MS. PITZ:  Yes, but I would just reiterate that those

14   penalties all flow directly from the NFA itself, and so the

15   rule is just explaining how ATF will apply the NFA going

16   forward.

17           THE COURT:  So if the Court finds that the rule means

18   what it says, that you cannot any longer possess these items

19   without being in compliance, "compliance" I think means to

20   register them or segregate them and destroy the compatibility

21   of them with each other by, according to the plaintiff -- and I

22   didn't see that nuance, I'll go back and look -- changing the

23   weapon, not changing the brace, and also not acquiring any new

24   ones and also not giving the old ones to anyone without also

25   registering that transaction, that that rule doesn't abridge

App.138

1   the right to bear those items as arms in that fashion?

2           MS. PITZ:  Your Honor, I would again just reiterate

3   that even the rule, although it sets forth a uniform approach

4   to classification, does not ban all braces, it simply sets

5   forth -- or braces equipped on particular firearms, it just

6   sets forth how ATF is going to classify these weapons in the

7   future.  If such a weapon is classified as a short-barreled

8   rifle, then it falls within the NFA's existing prohibitions, or

9   additional regulatory requirements, excuse me, which unless

10  Your Honor would like to continue on this point, I would like

11  to just reiterate the Government's position that the NFA's

12  registration requirements do not implicate the Second

13  Amendment.

14          THE COURT:  Does the rule prohibit a person from

15  continuing to possess the weapons or acquire new weapons with

16  braces attached?

17          MS. PITZ:  If I understand Your Honor's question

18  correctly, no, it does not directly prohibit any weapon or the

19  acquisition of any weapon.  The NFA is what sets forth the

20  prohibition on unregistered firearms.

21          THE COURT:  So the rule doesn't say that you cannot

22  acquire a weapon post the May date that has a brace attached to

23  it that would ordinarily be a short rifle or sawed-off shotgun?

24          MS. PITZ:  I believe that would be determined by the

25  facts of the particular circumstance.  Certainly moving

1    forward, no, it just simply indicates that where braces and

2    braced-equipped pistols fall within the NFA, they're just

3    required to be registered with -- presented to the NFA, and

4    then there may -- they're subject to additional regulatory

5    controls, essentially, Your Honor, but they're not -- they're

6    not prohibited moving forward, and --

7            THE COURT:  Well, I need to pull the rule up.

8            Can you pull the rule up that you're talking about

9    that doesn't require the person to remove the brace and doesn't

10   prohibit the person from getting a new such equipped weapon?

11           MS. PITZ:  Your Honor, I would direct you to

12   88 Federal Register 6570, where it says that persons in

13   possession of short-barreled rifles equipped with a stabilizing

14   brace have until May 31st, 2023 to come into compliance with

15   the NFA's requirements.  So certainly the rule is directing

16   people how to comply with the statutory requirements, but the

17   Government's position is that the substantive legal

18   registration requirements, those all flow from the NFA and not

19   directly from the rule.

20           THE COURT:  But previously there was no such rule,

21   and so to the extent that the ATF was taking that position

22   under the NFA, the ATF was doing it on its own volition, and

23   now there is an express rule that says you must be in

24   compliance, and so any defense a person would have had to

25   ignorance, to that's not what the NFA says, those defenses are

1 gone, because the rule now makes it clear that you have to be

2 in compliance or face the consequences, up to and including

3 criminal penalties.

4   MS. PITZ:  I believe that's correct, Your Honor, but

5 I would add that prior to the promulgation of the rule ATF had

6 classified certain combinations of braces and pistols as

7 firearms, and so it's not -- this is not the first time that

8 individuals are being subjected to legal obligations and legal

9 consequences for being in possession of these weapons.  The

10 rule is just the first time ATF has sought to undertake a

11 comprehensive methodology in how it makes those determinations.

12   THE COURT:  So the Government's position here is that

13 this rule does not prohibit the possession of these weapons

14 beyond what was already prohibited by the NFA?

15   MS. PITZ:  Correct.

16   THE COURT:  How can you say that with the specific

17 provisions of this rule being so clearly spelled out in the

18 final rule?  And why were you doing all of this if you weren't

19 intending to inform the public of what they could or could not

20 do?

21   I'm trying to pull the final rule summary.

22 One second.

23   MS. PITZ:  Your Honor, if it's helpful --

24   THE COURT:  One second.

25   MS. PITZ:  -- I would just cite to page 4 of our

```
 1   motion to dismiss, which sets forth the statutory provisions at
 2   issue here, which specifies that short-barreled rifles must be
 3   registered in the National Firearms Registration and Transfer
 4   Record to a person entitled to possess that firearm, they're
 5   also subject to making transfer taxes and must be approved by
 6   the Attorney General before they are made or transferred, and
 7   further any person engaged in the business of importing,
 8   manufacturing or dealing in NFA firearms must register with the
 9   Attorney General.  Those requirements are all flowing directly
10   from the NFA itself, and we would --
11         THE COURT:  What about the provision that -- under
12   the rule that requires them to remove the short barrel and
13   attach a 16-inch or longer rifle barrel to the firearm,
14   removing it from the scope of the NFA, that's not in the rule,
15   that's in the NFA itself?
16         MS. PITZ:  That's not, Your Honor.  That is in the
17   rule itself.
18         THE COURT:  "Permanently removing and disposing of or
19   altering the stabilizing brace such that it cannot be
20   reattached, thereby removing the weapon from regulation as a
21   firearm under the NFA," that's not in the rule, that's in the
22   NFA?
23         MS. PITZ:  We would highlight that that's simply one
24   option for compliance that the rule sets forth, but these are
25   just merely options for compliance to ensure that regulated
```

App.142

1    parties know what they need to do to comply with the

2    requirements of the NFA, assuming that individuals are in

3    possession of brace-equipped weapons that would be considered

4    short-barreled rifles subject to the NFA.

5         And we would just reiterate that these -- the

6    registration requirements that the NFA sets forth, such as --

7    comparable Courts have deemed such requirements, such as being

8    photographed and fingerprinted, do not harm any legally

9    protected interests and are just merely additional costs and

10   logistical hurdles that all citizens bear as ancillary living

11   under a Government.  Likewise, in *Bruen,* Justice Kavanaugh's

12   concurrence reiterated that 43 states employ concealed carry

13   licensing regimes that may demand similar regulatory

14   requirements, such as fingerprinting, a background check, a

15   mental health records check, and training in firearms handling

16   and in laws regarding the use of force, among other possible

17   requirements, and that this indicates that the Second Amendment

18   is not implicated by the NFA's regulatory requirements as they

19   exist.

20        Moreover, since *Bruen* other District Courts have

21   determined that the NFA's registration and taxation

22   requirements are of the type the Supreme Court in *Bruen*

23   determined were permissible.

24        Likewise, another District Court considering a

25   similar challenge to the rule separately determined that the

App.143

1   Second Amendment does not prohibit the imposition or reasonable

2   licensing regimes commonly associated with firearms ownership.

3   THE COURT:  Do you have any historical data that

4   establishes the 18th Century practice of prohibiting the

5   possession of braced pistols or braced short rifles or

6   sawed-off shotguns?

7   MS. PITZ:  Your Honor, once again I would reiterate

8   that neither the rule nor the NFA prohibits the possession of

9   these weapons, it simply subjects them to additional regulatory

10   requirements.  I believe our brief cites to comparable regimes

11   for inspection, for licensing, and for taxation.  I believe

12   this taxation example specifically applied to pistols.  Those

13   are set forth --

14   THE COURT:  Counsel suggests, and I haven't looked at

15   this history, that some of the history you've cited is history

16   intended to inspect to ensure that the militia is fully armed

17   and that the weapons aren't dangerous, such that they would

18   explode and hurt someone, not for the purpose of ensuring that

19   they are not in possession of things they're not supposed to be

20   in possession of.  Is that inaccurate, accurate, or do you

21   know?

22   MS. PITZ:  I do not know, Your Honor.  Counsel's

23   papers did not set forth specific critiques, they summarily

24   alleged that the rules that we had set forth were not

25   analogous, and I would --

App.144

1          THE COURT:  It's your burden though, right, on this

2    preliminary injunction to tell me the analogous law.  It's not

3    their burden to tell me what's not analogous.

4          MS. PITZ:  That's correct, Your Honor.  We would

5    submit that the regulations we've provided are sufficiently

6    analogous for purposes --

7          THE COURT:  Did you talk to a historian, or did you

8    just go to a website somewhere to see what searches were or

9    weren't permitted back in, what is this, 1789 or 1829 or

10   whenever these cases are?  Let me see.  1667, 1775, 1809, 1651.

11         Did a historian go back and look at the nature of

12   these door-to-door surveys and the purpose of them, or did you

13   just find that this activity occurred back then?

14         MR. DREZNER:  Your Honor, I could speak to that very

15   briefly.

16         THE COURT:  Yes, sir.

17         MR. DREZNER:  Just because I had the honor of doing

18   some of this historical research throughout these cases.

19         We did a fairly comprehensive dive into the

20   historical record trying to locate laws that were analogous to

21   the NFA's regulatory regime in a number of different ways, and

22   while the historical record is obviously challenging to mine

23   from a sort of issue of first impression, we believe that what

24   we uncovered, even in this fairly expedited timeframe, more

25   than sufficiently covers each aspect of the NFA's regime, and

App.145

```
 1   so, you know, plaintiff tries to pick apart each separate
 2   strand --
 3              THE COURT:  My question was quite straightforward.
 4              MR. DREZNER:  I hope I answered it.  Thank you,
 5   Your Honor.
 6              THE COURT:  You did not.
 7         The question is:  In pulling these instances of
 8   surveys and inspections of weapons that you identify in your
 9   briefing, did you go behind the surveys that occurred to
10   ascertain the purpose of the surveys, or is plaintiffs' counsel
11   right that these surveys were really intended to ensure that
12   the militia was fully armed, and in some cases they would give
13   people weapons if they didn't have any, and they were to ensure
14   that the weapons were not defective, not to limit the types of
15   weapons or control the types of weapons that people could
16   possess?
17              MS. PITZ:  So we certainly read the statutory context
18   in which these laws arose and attempted to understand the
19   overall purpose and intent behind these laws, and certainly
20   I would -- I would concede that in some instances these laws
21   were meant to ensure the populace was armed, but the impact
22   upon the populace, which was a survey and understanding of
23   which members of the community owned which firearms so that
24   information could be centrally logged and controlled by the
25   Government, both at a local and state level, that's very
```

1    similar to the exact type of impact that we're seeing here.

2    No more, no less.

3              THE COURT:  Did the consequence of this inspection

4    yield any punitive measure for possession of the types of

5    weapons that were identified in the survey?  Was there a fee

6    associated with it?  What happened in these scenarios?  Or did

7    they just go down with their paper and quill and write down who

8    had a weapon and say, well, the people on Sycamore Street don't

9    have enough, let's take them some more?

10             MR. DREZNER:  I think certainly in some instances the

11   goal was to provide further weapons.  However, I would simply

12   point the Court back -- the analysis in *Bruen* isn't to ask

13   whether there were similar consequences associated with

14   historical laws.  The question I think the Court asked is

15   is there a historical tradition of sufficiently analogous

16   regulatory measures that we can point to to say this falls

17   within the ambit of the Second Amendment.

18             THE COURT:  And analogous becomes the question,

19   right?  What is sufficiently analogous?  And an analogy has to

20   draw across the field of the behavior, and so if the analogy

21   is, yes, they went and did surveys, but they gave people

22   weapons who didn't have weapons, an analogy to a regulatory

23   regime that says if you have this type of weapon we're going to

24   take it from you unless you do X, Y or Z, or if you have this

25   type of weapon you can either register it with us or destroy it

App.147

```
1    so that it cannot ever be used this way again, that's a
2    different and not quite analogous scenario, wouldn't you agree?
3              MR. DREZNER:  I would point to two things,
4    Your Honor.  First, the proceeding issue that's being raised by
5    all this, as my co-counsel pointed out, this is not something
6    the rule is implying, so to the extent that plaintiff is
7    challenging these regulatory measures, he's not challenging the
8    rule, he's challenging the entire structure of the NFA.  So if
9    the argument here is that these types of taxation and
10   registration requirements are unconstitutional, then they would
11   be unconstitutional as to any firearm, they could not be
12   imposed as to sawed-off shotguns, machine guns or any other
13   type of dangerous weapon regulated by the NFA.  That's the
14   general argument.
15             Now, to Your Honor's more specific question,
16   certainly in some of these cases the penalties or the
17   consequences were very different, but I think it's almost
18   extraordinary the way that we were able to find strands of
19   regulations that reflect almost each aspect of the NFA here.
20   There are taxation requirements, there are survey requirements,
21   there are licensing and other regulatory requirements dating as
22   far back as the Virginia Colonies, and so if the plaintiff --
23             THE COURT:  Well, is there a regulation that says
24   after May 31, 2023, or 1776, you can no longer protect your
25   weapon from the implications of a subsequent penal measure?
```

App.148

```
 1              MR. DREZNER:  Is Your Honor asking, and I apologize,
 2    is there a historical law that imposes a penalty for failing to
 3    comply with some sort of regulatory measure on that firearm?
 4              THE COURT:  Including the confiscation of or the
 5    destruction of the weapon as the penalty.
 6              MR. DREZNER:  So certainly I would point to several
 7    of the taxation laws that we point to where numerous states
 8    imposed specific tax amounts on pistols and other types of
 9    firearms, and I don't have the exact penalties associated with
10    that offhand, but I'm fairly confident there was either a
11    monetary or confiscatory penalty associated with those laws.
12              THE COURT:  You're confident based on what?
13              MR. DREZNER:  These were taxation requirements, so
14    I'm not sure how a citizen could escape these requirements
15    without some type of penalty being threatened in response.
16              We're happy to provide supplemental briefing if this
17    is a point of interest to Your Honor.
18              But, again, I would point back to the language of
19    *Bruen* which says that the Government need not come up with a
20    historical twin, which is essentially what I think plaintiff is
21    asking for, that we find some sort of 17th Century law talking
22    about confiscating braced firearms.  That's not the requirement
23    of *Bruen*.  *Bruen* says, as Your Honor notes, sufficiently
24    analogous, and it's certainly sufficiently analogous to note
25    that there were laws on taxation, laws on inspection, laws on
```

1    licensing, again, which underpin not this rule, which is

2    supposedly the point of this case, but underpin the entire

3    scheme of the NFA.

4         THE COURT:  Well, I cannot get a straight answer from

5    the Government about what happens after May 31, 2023 if a

6    person has not come into compliance.

7         MS. PITZ:  At that point if the person has not come

8    into compliance they are -- unless protected by an existing

9    injunction, they are vulnerable to consequences, but those

10   consequences are under the NFA.  They're subject to an

11   enforcement action in the event that ATF becomes aware that

12   they're --

13        THE COURT:  Can they any longer possess their weapons

14   the way they were previously configured?

15        MS. PITZ:  Not without registration, Your Honor.

16        THE COURT:  Can they even register those same weapons

17   post-May 31, 2023 to come into compliance?

18        MS. PITZ:  I would also clarify my previous point and

19   say they must either register or modify the weapon.  So,

20   for example, you could add a longer barrel onto an existing

21   weapon such that it would remain outside the NFA, that would be

22   one option; or, of course, as you're well familiar, remove the

23   brace, modify the brace.

24        After --

25        THE COURT:  Modify the brace or modify the weapon?

1  Because plaintiff said you have to modify the weapon, not the
2  brace, under the rule.
3          MS. PITZ:  I believe that it is modification of the
4  brace, but I would want to quickly refer to the text of the
5  rule to confirm that.
6          I think regardless, and I would agree with plaintiff,
7  the point is just so that they cannot be readily reattached,
8  whether that's a modification on the part of the firearm or the
9  brace.  What matters is --
10         THE COURT:  Can they do any of that if they haven't
11  done it by May 31, 2023?
12         MS. PITZ:  I don't believe there is anything that
13  would prohibit someone from modifying their firearm, but after
14  May 31st, 2023, as the rule is written, those weapons are no
15  longer able to be registered.
16         THE COURT:  And therefore no longer able to be used.
17         MS. PITZ:  Correct.
18         THE COURT:  They need to be destroyed.
19         MS. PITZ:  They need to be destroyed or modified such
20  that they do not come within the parameters of the NFA.
21         THE COURT:  Well, can they even now be modified after
22  May 31, 2023?
23         MS. PITZ:  Yes.
24         THE COURT:  And be in compliance?
25         MS. PITZ:  If they are modified such that they fall

App.151

```
 1    outside without -- outside the ambit of the NFA.

 2               THE COURT:  So the deadline is meaningless?

 3               MS. PITZ:  The deadline is meaningful insofar as it

 4    provided a 120 day compliance period where people were able to

 5    submit registration forms tax-free, just so that they were

 6    un -- would not need to worry about this, would not need to

 7    modify their firearms, would not need to destroy their

 8    firearms, that was -- that deadline was relevant for the

 9    registration period.

10               THE COURT:  I am not trying to drill you or grill

11    you, but if I had a weapon, or Mr. Martin has a weapon, and he

12    never -- he ignored the regulation, kept the weapon just as it

13    was, and you learned that after the injunction -- well, he's

14    maybe not even covered by the injunction.  You learned that

15    about him, and he said, oh, I'm sorry, I'll fix it now, I know

16    I missed the deadline by -- now it's July, I know I missed the

17    deadline and I had since January to get started, I'm sorry.

18    Can he rectify that under the rule as currently written and

19    keep his weapon in his possession in the form that it

20    previously existed?

21               MS. PITZ:  I don't believe so, Your Honor.  The rule

22    is clear, it set forth compliance options, and it gave

23    individuals a period of time to come into compliance with the

24    rule.  That said, I would reiterate that plaintiffs' have been

25    very withholding of specific facts, and it is their burden for
```

App.152

```
 1    irreparable harm or on the merits to carry their burden to show

 2    that that would be the situation presented here precisely.  We

 3    don't -- we don't know the exact state of plaintiffs' weapons,

 4    and they haven't shown any information to demonstrate that ATF

 5    has an imminent enforcement action or anything like that

 6    pending.  The Government is not aware of any imminent

 7    enforcement proceedings of those kinds.

 8           THE COURT:  And if he has taken the brace off but has

 9    not modified the weapon or the brace to render it

10    non-reattachable, he's still not in compliance?

11           MS. PITZ:  He's not in full compliance.  That said,

12    that issue kind of falls within the Thompson Center case that's

13    cited in our brief, which goes to what is constructive

14    possession of a firearm, and that can be a very fact-specific

15    circumstance.  The rule is just setting forth the clearcut

16    compliance options that will certainly push everyone outside

17    the ambit of the NFA.  That said, for any type of enforcement

18    proceeding, of course it would be the Government's burden to

19    show that the statutory inquiry or the statutory demands for

20    that enforcement proceedings are met, so they would have to

21    demonstrate by contrast, you know, this plaintiff was in

22    constructive possession, which would require significantly more

23    facts.  So it would be our position at this point that any

24    claims that that is likely for purposes of issuing a

25    preliminary injunction is incredibly speculative.
```

```
 1                THE COURT:  Any rebuttal from the plaintiff, brief?

 2                MR. LAROSIERE:  Just briefly, Your Honor.

 3                I just have three points.  I'm sorry to the

 4     court reporter.  I've let my caffeine wear off.

 5                One major issue that the Government repeatedly

 6     addressed was that -- was kind of putting it off on the NFA,

 7     saying no, this is just us saying how it's going to go in the

 8     future.  What they're missing here is a critical component

 9     which is essential to our both likelihood of success and

10     irreparable harm, and that is the retroactivity --

11                THE COURT:  That is what?

12                MR. LAROSIERE:  The retroactivity, retroactivity of

13     the rule.  They are applying it retroactively, and, again,

14     that's relevant for a tax clause analysis, this Court not reach

15     that, I think the Second Amendment properly covers that, and to

16     the extent the Government cites Bruen for approving NFA

17     regulations by referencing shall issue concealed permit

18     requirements, the discretionary manner of those compliance was

19     the core of the Bruen issue, and I would just like to point out

20     that the Government has repeatedly maintained -- defendants

21     here have repeatedly maintained absolute unfettered discretion

22     in NFA applications and registration, and I would just like to

23     highlight the importance that I think it's very emergent as to

24     Plaintiffs Martin and Second Amendment Armory, because, again,

25     they are effectively one and the same, that the Government has
```

```
 1    more or less threatened enforcement by saying "we think you may
 2    be in possession of short-barreled rifles constructively," and
 3    they cite Thompson Center in support of themselves, which
 4    I find odd, because the core holding of Thompson Center, as I
 5    understand it, was as long as there is some plausible legal
 6    configuration from the parts, then it cannot be a NFA
 7    violation, and they won on that theory.  The Government doesn't
 8    dispute that you can have the pistol, so having the pistol,
 9    having -- and not attaching the brace, because the Government,
10    again, says they're not regulating just the brace themselves,
11    I don't think they can have both sides of that, or both halfs
12    of that cake.
13            So that's all I have.  Thank you so much for the
14    Court's time.
15            THE COURT:  The plaintiff doesn't raise any -- make
16    any argument concerning the Government's exceeding the
17    authority of the APA in the issuance of the final rule.  Did
18    you intend to stand down from that argument in light of the
19    motion to dismiss, or is that still a central focus of the
20    plaintiffs' contentions?
21            MR. LAROSIERE:  Your Honor, no, we do not stand down
22    from that, and it is pled in the alternative.  The central
23    focus is the Second Amendment analysis, but -- which is invoked
24    vis-à-vis the APA as well.
25            THE COURT:  What is the irreparable harm in the
```

App.155

```
1    Government's alleged failure to follow the APA parameters?

2              MR. LAROSIERE:  It tracks very closely because the

3    result is a -- I have my notes on that bit.

4              THE COURT:  It's not a Constitutional deprivation.

5              MR. LAROSIERE:  So it is a substantive rule making

6    though, and so it does result in a effectively legislative

7    result which would otherwise not be permissible, and so the

8    same harms get avoided, and one of the harms being a violation

9    of right, which is actionable under the APA, Your Honor.

10             THE COURT:  In the sense that is the contention, that

11   the Government exceeded its rule making authority and really

12   passed an amended statute?

13             MR. LAROSIERE:  Yes, Your Honor.

14             THE COURT:  Does the Government have a response to

15   that contention?

16             MR. LAROSIERE:  Oh.

17             THE COURT:  Yes, sir.

18             MR. LAROSIERE:  If I may, and in the alternative, as

19   we asserted, that the final rule is not a logical outgrowth and

20   thus it violated the APA, the final rule is not a logical

21   outgrowth of the proposed rule.

22             THE COURT:  How does the Government respond to that?

23             MS. PITZ:  The Government's response is just that

24   statutory violations are insufficient for irreparable harm, and

25   we've opposed plaintiffs' arguments on the merits of their APA
```

App.156

1    cases, or their APA claims.

2         THE COURT:  And several times, Counsel, the Court

3    raised concerns about the Government's argument and you say

4    "point taken" and then you move to another argument.  By

5    "point taken" do you mean "we yield on that"?  I don't

6    understand what that means.

7         MS. PITZ:  I apologize, Your Honor.  That just is my

8    frame of speech for "I mean no disrespect."  We do not concede

9    any of the points.

10        THE COURT:  So you continue to maintain that the

11   regulation of braces is -- as stabilizing braces is apart from

12   and disassociated with the regulation of the weapons attached

13   to said braces?

14        MS. PITZ:  Yes, for purposes of Second Amendment.

15        THE COURT:  Why?

16        MS. PITZ:  We maintain that braces are -- I'm sorry,

17   Your Honor.  Would you be able to repeat your question?

18        THE COURT:  Why?

19        MS. PITZ:  We maintain --

20        THE COURT:  Well, your ventriloquist said to say yes

21   to that question.  If he wants to argue it, he can.

22        MS. PITZ:  I'm sorry, Your Honor.  I'm not sure

23   I understood your original point.

24        THE COURT:  The original question is you're

25   contending that this brace is regulated or interpreted quite

App.157

1   apart from the brace as attached to a weapon, and therefore it

2   doesn't implicate the Second Amendment rights to bear arms with

3   the brace attached to it, and I said how is the brace being

4   regulated separate and apart from the weapon, and you maintain

5   that you're making that argument, and I said why.

6           MS. PITZ:  Your Honor, the rule regulates when a

7   brace and a pistol are combined such that they remake a firearm

8   such that it is designed and intended to be fired from the

9   shoulder, which is the statutory inquiry under the NFA.

10          THE COURT:  And so it is no longer a standalone brace

11  that's being regulated, it's a brace attached to a weapon,

12  making the weapon now a regulated weapon.

13          MS. PITZ:  That's correct.

14          THE COURT:  And again I say:  How is that a separate

15  regulation of the brace outside of its status as a rifle?

16          MS. PITZ:  The rule does not purport to regulate the

17  brace on its own and apart from how it operates in conjunction

18  with a firearm.

19          THE COURT:  All right.  Anything else from the

20  plaintiff or the defense?

21          MR. LAROSIERE:  Just noting that we never brought up

22  some of the other claims raised in the PI, but we -- the

23  plaintiff stands on the motion --

24          THE COURT:  What claims are you talking about?

25          MR. LAROSIERE:  It's the tax and spend clause.

App.158

1   We already discussed APA.  And to the -- to the -- to the

2   extent relevant, stands on the other positions made in the

3   motion as to scope of the injunction, et cetera, but nothing

4   aside from that, Your Honor.

5           THE COURT:  Nothing other than that.

6           I need for Mr. Martin to file an affidavit with the

7   Court under oath as to whether he is or is not a member of the

8   Second Amendment Foundation, to include whether he did or did

9   not pay a fee or a payment or a donation that would bring him

10  within the ambit of the SAF; and I may require the defense to

11  brief more thoroughly the question of the corporation's

12  standing to assert a Second Amendment claim where it does not

13  sell the allegedly infringing items, and I will send out an

14  order if I wish for that additional briefing shortly.

15          Anything else from the plaintiff or the defense?

16          MR. LAROSIERE:  A timeline for that.

17          THE COURT:  I'll give it to you in the order.

18          MR. LAROSIERE:  Thank you, Your Honor.  Nothing

19  further.

20          MS. PITZ:  Nothing further.

21          THE COURT:  How often are you in contact with him?

22  How easy is it for you to contact him?

23          MR. LAROSIERE:  I expect to go there after --

24  immediately after these proceedings and discuss --

25          THE COURT:  So a week would be sufficient?

```
 1          MR. LAROSIERE:  Yes, Your Honor.  However, given the
 2    nature of these proceedings, I think some intermediate relief
 3    to protect my client before, again, he --
 4          THE COURT:  Your client waited until when he waited
 5    til to get his relief, so I'm not going to be pushed by that
 6    procrastination.  How long will it take him -- he can tell me
 7    tomorrow if he wants.  I'm giving you how much time I think you
 8    might reasonably need to turn in the affidavit.
 9          MR. LAROSIERE:  Oh.  No.  Yes, Your Honor.  Within
10    ten calendar days would be fine.
11          THE COURT:  So why does he need ten calendar days if
12    he's in an all-fired hurry to get some relief?
13          MR. LAROSIERE:  Just in case I couldn't reach him.
14    I just wouldn't want to put myself in a position where --
15          THE COURT:  Five days.
16          MR. LAROSIERE:  Five calendar days?
17          THE COURT:  Five calendar days to turn in an
18    affidavit, one sentence if he needs to, that says "I am not a
19    member of the SAF and I have never sent any money to them," or
20    "I am a member of the SAF and have made numerous donations to
21    them."  That you can do, you can write it on your way over
22    there on your phone and have him sign it when you get there.
23          MR. LAROSIERE:  Understood, Your Honor.
24          The one issue there is could we potentially file that
25    under seal just to -- because this is the one client that,
```

```
1    again, has no shield of protection?

2             THE COURT:  No, you cannot file it under seal,

3    because that's his principal basis for asserting irreparable

4    harm, and the Government has to be able to counter that, and if

5    he says "I am not a member and therefore I am imminently

6    subject to enforcement," then the Government would have to

7    concede, to the extent that it is seeking enforcement, that

8    that is a problem.

9             MR. LAROSIERE:  Understood, Your Honor.

10            THE COURT:  All right.  Thank you.  We're dismissed.

11                      - - - - -

12            (Proceedings concluded at 11:36 a.m.)

13                      - - - - -

14

15

16

17

18

19

20

21

22

23

24

25
```

App.161

```
 1                    C E R T I F I C A T E

 2

 3          This is to certify that the foregoing transcript of

 4   proceedings taken in a motion hearing in the United States

 5   District Court is a true and accurate transcript of the

 6   proceedings taken by me in machine shorthand and transcribed by

 7   computer under my supervision, this the 28th day of July, 2023.

 8

 9

10                                  /S/ DAVID J. COLLIER

11

12                                  DAVID J. COLLIER

13                                  OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25
```

App.162

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOSIAH COLON, BRANDON
KLING, ERIC MELE, WILLIAM
MARTIN, and 2ND AMENDMENT
ARMORY,

        **Plaintiffs,**

v.                            **Case No: 8:23-cv-223-MSS-UAM**

BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND
EXPLOSIVES, STEVEN
DETTELBACH, UNITED STATES
DEPARTMENT OF JUSTICE, and
MERRICK B. GARLAND,

        **Defendants.**

_____

### ORDER

**THIS MATTER** is before the Court for consideration of Plaintiffs' Motion for

Preliminary Injunction, (Dkt. 21), and the responsive briefing in opposition thereto.

(Dkts. 26 and 36) Upon consideration of all relevant filings, case law, and being

otherwise fully advised, Plaintiffs' Motion for Preliminary Injunction is **GRANTED**

**in PART** and **DENIED in PART**.

### I.    INTRODUCTION

#### A. Statutory/Regulatory Background

The National Firearms Act of 1934 ("NFA"), as amended 26 U.S.C. § 5801 et

seq., was enacted "[t]o provide for the taxation of manufacturers, importers, and

dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulation interstate transportation thereof." National Firearms Act, Pub. L. No. 73-474, 48 Stat. 1236 (1934).

The NFA "regulates [certain] firearms . . . and requires the taxation and registration of [regulated] firearms by manufacturers, possessors, transferors, dealers, importers, and sellers." United States v. Spoerke, 568 F.3d 1236, 1245 (11th Cir. 2009); (Dkt. 1 at ¶ 18). The NFA identifies eight categories of "firearms" that fall within its purview, those categories are:

> (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device.

26 U.S.C. § 5845(a).

"Neither pistols nor rifles with barrels 16 inches long or longer are firearms within the NFA definition, but rifles with barrels less than 16 inches long, known as short-barreled rifles, are." § 5845(a)(3). See United States v. Thompson/Ctr. Arms Co., 504 U.S. 505, 507 (1992). Relevant here is the NFA's definition of "rifle" which is a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily

restored to fire a fixed cartridge." 26 U.S.C. § 5845(c). [1] It is therefore widely accepted that the NFA regulates "short-barreled rifles"[2] ("SBRs") and "short-barreled shotguns" ("SBSG") also known as "sawed-off shotguns."[3]

The NFA requires registration of SBSGs and SBRs in the National Firearms Registration and Transfer record. See 26 U.S.C. § 5841. The NFA imposes a $200 making tax for each NFA firearm made, 26 U.S.C. § 5821, and a $200 transfer tax for each NFA firearm transferred that is not within the "any other weapon" category. 26 U.S.C. § 5811. Importers, manufacturers, and dealers who deal in NFA firearms must pay a "special (occupational) tax" annually. § 5801. Any person who violates the NFA may be "fined not more than $10,000, or be imprisoned not more than ten years, or both." § 5871.

The Gun Control Act of 1968 ("GCA"), as amended 18 U.S.C. § 921 et seq., was enacted to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence[.]" Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213. The GCA defines "firearm" as "(A) any weapon (including a starter

---

[1] "The NFA defines a 'rifle' and a 'shotgun' as a 'weapon designed or redesigned, made or remade, and intended to be fired from the shoulder.'" (Dkt. 1 at ¶ 21)

[2] When the NFA references "a rifle having a barrel or barrels of less than 16 inches in length" or "weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length[,]" this means short-barreled rifle. See Thompson/Ctr., 504 U.S. at 507.

[3] When the NFA references "a shotgun having a barrel or barrels of less than 18 inches in length" or "weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length [,]" this means short-barreled shotgun or sawed-off shotgun. See United States v. McGill, 618 F.3d 1273, 1275 (11th Cir. 2010) ("[T]he National Firearms Act ("NFA"), regulates a narrow class of weapons, termed "firearms," that includes short-barreled shotguns, machine guns, grenades, bombs, and explosives."); see also United States v. Owens, 447 F.3d 1345, 1347 (11th Cir. 2006) (referring to the term "sawed-off shotguns" as used in opinions from the Fourth and Seventh Circuit courts of appeal).

gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3). The GCA also defines the terms "rifle" and "short-barreled rifle" expressly. Under the GCA, a "rifle" is "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger." § 921(a)(7). Under the GCA, an "SBR" is "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." § 921(a)(8).

The GCA defines a "handgun" as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and any combination of parts from which a firearm described in subparagraph (A) can be assembled." § 921(a)(30). Neither the NFA nor the GCA defines the term "pistol." Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") regulations however define "pistol" as a:

> weapon originally designed, made, and intended to fire a projectile (bullet) from one or more barrels when held in one hand, and having (a) a chamber(s) as an integral part(s) of, or permanently aligned with, the bore(s); and (b) a short stock designed to be gripped by one hand and at an angle to and extending below the line of the bore(s).

See 27 C.F.R. § 479.11.

"ATF permits—but does not require—gun makers to seek classification letters from ATF prior to manufacturing a gun."[4] See <u>Sig Sauer, Inc. v. Brandon</u>, 826 F.3d 598, 599 (1st Cir. 2016); <u>see also</u> 27 C.F.R. § 479.102(c) ("The Director may issue a determination (classification) to a person whether an item, including a kit, is a firearm"). On November 8, 2012, ATF received its first request for a classification letter related to a brace-equipped pistol.[5] On November 26, 2012, ATF through its Firearms Technology Branch ("<u>FTB</u>") concluded the "submitted forearm brace, when attached to a firearm does not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm."[6] From 2014 to 2017, ATF issued various open letters that contradict private classification letters concerning the appropriate classification of braced pistols (hereinafter, "<u>brace-equipped pistols</u>"). (Dkt. 22)

### 1. The Proposed Rule

Concerned with the inconsistent guidance that had been provided, ATF determined to undertake a formal review of its regulations.[7] Thus, on June 10, 2021, ATF issued a notice of proposed rulemaking ("<u>NPRM</u>") to seek notice and comment

---

[4] The Court takes judicial notice of ATF's National Firearms Act Handbook, which can be accessed at https://perma.cc/P3NL-G35G. See e.g., Am. Fed'n of Gov't Emp., Local 1858 v. Callaway, 398 F. Supp. 176, 195 (N.D. Ala. 1975) (taking judicial notice of facts when evaluating a motion for preliminary injunction).

[5] <u>See</u> Factoring Criteria for Firearms With Attached "Stabilizing Braces", 86 Fed. Reg. 30,826-01, at *30,827, 2021 WL 2352274 (June 10, 2021) [hereinafter, cited as "<u>NPRM</u>"].

[6] <u>See</u> Letter from John R. Spencer, Chief, Firearms Technology Branch to Alex Bosco (Nov. 26, 2012), available at https://www.atf.gov/resource-center/docs/foia/impact-laws-footnote-11-2015-atf-open-letter/download.

[7] ATF also expressed concerns with the proliferation of these weapons and their alleged use in shootings, including mass shootings. Plaintiffs counter that assertion by highlighting that ATF identified only two instances in which brace-equipped pistols were used in mass shootings.

on factors that ATF planned to consider "when evaluating firearms equipped with a purported 'stabilizing brace'" to determine whether those firearms are "subject to regulation under the . . . NFA." See NPRM, 86 Fed. Reg. 30,826-01, 2021 WL 2352274 (June 10, 2021). The factors were combined into what the NPRM identified as ATF Worksheet 4999. See id. ATF Worksheet 4999 proposed a point system in which ATF would assign a weighted value "to various characteristics of the fully assembled firearm as configured when submitted for classification." Id. at *30,829. ATF Worksheet 4999 featured three sections with varying characteristics to evaluate firearms, those sections are Section I – Prerequisites (assessment of weight and length), Section II – Accessory Characteristics, and Section III – Weapon Configuration. Id.

The NPRM explained that a firearm would be assigned 0 to 4 points in Sections II and III.[8] Id. Firearms that accumulated fewer than 4 points in both sections, Section II and Section III, would be determined not generally "designed to be fired from the shoulder"; therefore, those firearms would not constitute SBSGs or SBRs, "unless there [was] evidence that the manufacturer or maker expressly intended to design the weapon to be fired from the shoulder." Id. Firearms that accumulated "4 points or

---

[8] The NPRM explained that 0-4 point were to be assigned as follows:
  • 1 point: Minor Indicator (the weapon could be fired from the shoulder)
  • 2 points: Moderate Indicator (the weapon may be designed and intended to be fired from the shoulder)
  • 3 points: Strong Indicator (the weapon is likely designed and intended to be fired from the shoulder)
  • 4 points: Decisive Indicator (the weapon is designed and intended to be fired from the shoulder)
See 86 Fed. Reg. 30,826-01, at *30,829.

more in Section II or Section III [would] be determined to be designed and intended to be fired from the shoulder" and any such firearm would therefore be classified as an SBSG or SBR regulated by the NFA. Id.

In the NPRM, ATF evaluated three firearms using the worksheet. Id. at *30,835-43. One of the firearms evaluated was, "an AR-type firearm J with the SBA3 accessory" and a picture of that firearm is included below:



Id. at *30,839. ATF determined the firearm pictured above would constitute an "SBR" according to ATF Worksheet 4999 for two reasons:  (1) the firearm is a suitable host for a "stabilizing brace" because it weighs "89 ounces and have an overall length of 25⅛ inches" and (2) the firearm scored 8 points in Section II based on the shoulder stock (1 point), rearward attachment (3 points), adjustable design (2 points), and flaps on the "Cuff-type" design (2 points). Id. at *30,840.

2. The Final Rule

On January 31, 2023, ATF published its Final Rule that abandoned the worksheet and point system, explaining that its decision was made, "[a]fter careful consideration of the comments received regarding the complexity in understanding the proposed Worksheet 4999 and the methodology used in the Worksheet to evaluate firearms equipped with a 'brace' device." See Factoring Criteria for Firearms With Attached "Stabilizing Braces", 88 Fed Reg. 6,478-01, 2023 WL 1102552 (Jan. 31, 2023) [hereinafter, "Final Rule"]. The Final Rule did not adopt some key aspects of the approach proposed in the NPRM, specifically the Worksheet 4999 and its point system. Id. The Final Rule specifically provided:

> [ATF] amends the definition of "rifle" . . . to expressly state that the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" includes a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as listed in the amended regulations and described in this preamble, indicate that the weapon is designed, made, and intended to be fired from the shoulder. The other factors are:
>
> (1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
>
> (2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;
>
> (3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

Final Rule, 88 Fed Reg. 6,478-01, at *6,480.

ATF explained that the Final Rule's definition of "rifle" was "the best interpretation of the statute, and it [was] immediately effective." Id.  ATF also explained that "because prior ATF classifications of firearms equipped with a 'brace' device did not all employ this correct understanding of the statutory terms, all such prior classifications are no longer valid as of January 31, 2023."[9] Id. As a result, the Final Rule offered unlicensed possessors five (5) options for compliance by May 31, 2023:[10]

1. Remove the short barrel and attach a 16-inch or longer rifled barrel to the firearm, thus removing it from the scope of the NFA.

2. Submit through the eForms system an Application to Make and Register a Firearm, ATF Form 1 ("E-Form 1") by May 31, 2023.[FN174] The possessor may adopt the markings on the firearm for purposes of the E-Form 1 if the firearm is marked in accordance with 27 CFR 478.92 and 479.102. If the firearm does not have the markings under 27 CFR 478.92 and 479.102, then the individual must mark the firearm as required. Proof of submission of the E-Form 1 should be maintained by all possessors. To transfer an affected firearm to another individual after the

___

[9] January 31, 2023, where used in this Order refers to the Effective date of the Final Rule.
[10] May 31, 2023, where used in this Order refers to the Compliance date of the Final Rule.

date this rule is published, it must be registered in the NFRTR, and the individual must submit and receive approval on an Application for Tax Paid Transfer and Registration of Firearm, ATF Form 4; otherwise, the transfer is a violation of the NFA. See 26 U.S.C. 5861(e).

3. Permanently remove and dispose of, or alter, the "stabilizing brace" such that it cannot be reattached, thereby removing the weapon from regulation as a "firearm" under the NFA. The Department recognizes that the removal of a "stabilizing brace" from a firearm that was originally received as a "short-barreled rifle" results in the production of a "weapon made from a rifle," as defined by the NFA. However, the Department in its enforcement discretion will allow persons to reconfigure the firearm to a pistol by May 31, 2023 and will not require the registration of these firearms as a "weapon made from a rifle."

4. Turn the firearm into your local ATF office.

5. Destroy the firearm. ATF will publish information regarding proper destruction on its website, www.atf.gov.

Federal Firearms Licensed ("FFL") Manufacturers and Importers were given the same five options. Id.

### B. Procedural History

Plaintiffs Josiah Colon, Brandon Kling, Eric David Mele, Ted William Martin, and 2nd Amendment Armory (collectively, "Plaintiffs") commenced this action on February 1, 2023, against the United States Department of Justice, Merrick Garland as Attorney General of the United States, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and Steven Dettelbach as Director of the ATF (collectively, "Defendants"). (Dkt. 1) Plaintiffs' Complaint asserts three claims against the Defendants for alleged violations of the Second Amendment (Count I), Taxing and

Spending Clause (Count II), and Administrative Procedure Act (Count III). (Id.) On May 24, 2023, Plaintiffs moved for a preliminary injunction. (Dkt. 24)

On June 8, 2023, the Court held a status conference to determine the Parties' positions on Plaintiffs' motion. (Dkt. 27) The Court set the preliminary injunction hearing for July 13, 2023, and it ordered Plaintiffs to file attestations detailing their efforts at compliance with the Final Rule. (Dkt. 28) On July 13, 2023, this Court heard arguments from the Parties on the motion for preliminary injunction. (Dkt. 37) At the preliminary injunction hearing, the Court directed Plaintiff Ted Martin to file an affidavit stating his membership status vis-à-vis the Second Amendment Foundation. On July 27, 2023, the Court ordered supplemental briefing as to Plaintiff 2nd Amendment Armory's standing to assert a Second Amendment claim. (Dkt. 39). This matter is now ripe for consideration.

### C. Factual Background

Plaintiff Josiah Colon is a resident of the State of Florida, and he owns a Palmetto State Armory AK-P GF3 with an attached stabilizing brace. (Dkt. 1 at ¶ 4) Plaintiff Brandon Kling is a resident of the State of Florida, and he owns two AR-style pistols with attached, stabilizing braces that he built. (Id. at ¶ 5) Plaintiff Eric Mele is a resident of the State of Florida, and he owns an AR-type pistol with an attached stabilizing brace. (Id. at ¶ 6) Plaintiff Ted Martin is a resident of the State of Florida, and he owns firearms with attached stabilizing braces. (Id. at ¶ 7) Plaintiff Ted Martin is the owner of Plaintiff 2nd Amendment Armory, a Florida business entity engaged in the business of selling firearms parts and accessories. (Id. at ¶¶ 7 and 8) The

Individual Plaintiffs allege that they depend on their firearms for defense, and they allege the Final Rule impedes their ability to possess, to alienate, and to travel with their firearms. (Id. at ¶ 4-7) Individual Plaintiffs Colon and Mele are members of Second Amendment Foundation. (Dkt. 30) Plaintiff Kling refuses to identify the gun rights group that he is a member of, but he claims protection under an existing injunction. [11] (Id.) Plaintiffs Colon, Kling, and Mele have made no modifications to their firearms since this action began. (Dkts. 30 and 33)

Plaintiff 2nd Amendment Armory is an LLC organized under the laws of Florida. Plaintiff Martin alleges that he owns 2nd Amendment Armory. Plaintiff Martin is not a member of Second Amendment Foundation. (Dkt. 38) Plaintiff 2nd Amendment Armory also owned pistols with attached stabilizing braces in its inventory. (Id.) Plaintiff Martin owns stabilizing braces, but he alleges he has removed the braces from firearms in his and 2nd Amendment Armory's possession. (Dkt. 32) Plaintiff 2nd Amendment Armory alleges its inventory is affected by the Final Rule. (Dkt. 1 at ¶ 8)

## II.    LEGAL STANDARD

Movants are entitled to entry of a preliminary injunction if they can establish "(1) [that they] have a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened

---

[11] On June 16, 2023, the Court directed Plaintiff Kling to file a copy of the injunction that he believed protected him against enforcement of the Final Rule. Plaintiff Kling filed copies of the injunctions entered in three separate cases. (Dkt. 33)

injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." Chavez v. Fla. SP Warden, 742 F.3d 1267, 1271 (11th Cir. 2014) (citation omitted). A preliminary injunction is "an extraordinary remedy, [so] its grant is the exception rather than the rule[.]" United States v. Lambert, 695 F.2d 536, 539 (11th Cir. 1983) (citing Texas v. Seatrain Int'l, S.A., 518 F.2d 175, 179 (5th Cir. 1975)).

A "federal district court may issue a nationwide, or 'universal,' injunction 'in appropriate circumstances." Florida v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1281 (11th Cir. 2021). Such an order is not required where a more narrow order would afford relief to the litigants before the Court. See, e.g., AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1549 (11th Cir. 1986) (reversing and remanding to the district court to tailor a narrower order). In considering a request to enjoin a national rule or policy, a court may consider a host of factors specific to the case that include: (1) the extent "necessary to provide complete relief to the plaintiffs"; (2) the extent necessary "to protect similarly situated nonparties"; (3) the avoidance of "'chaos and confusion' [caused by] a patchwork of injunctions"; (4) the geographic dispersion of the plaintiffs; (5) the extent to which immigration law is implicated; and (6) "when certain types of unconstitutionality are found." Id. at 1282 (citations omitted). The "district court should thoroughly analyze the extent of relief necessary to protect the plaintiffs from harm, taking care that the remedy issued is not 'more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" Georgia v. President of the United States, 46 F.4th 1283, 1306 (11th Cir. 2022) (citation omitted).

The central focus is "whether a nationwide injunction is necessary to offer full relief to the plaintiffs." Id. Ultimately, the scope of injunctive relief is dictated by the extent of the violation established and is guided by the Court's discretion. Id.

## III.    DISCUSSION

### A. Standing

To demonstrate standing, a party must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998). While a complaint may set "forth facts from which we could imagine an injury sufficient to satisfy Article III's standing requirements, [a court] should not speculate concerning the existence of standing, nor should [a court] imagine or piece together an injury sufficient to give [a] plaintiff standing when it has demonstrated none." Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n, 226 F.3d 1226, 1229-30 (11th Cir. 2000).

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 474 (1982). Relevant here, is the prudential principle that a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights

or interests of third parties." <u>CAMP Legal Def. Fund, Inc. v. City of Atlanta</u>, 451 F.3d 1257, 1270 (11th Cir. 2006). The doctrine of *jus tertii* serves as one of the many exceptions to the prudential prohibition against third-party standing. "In a *jus tertii* case, a litigant is permitted to challenge the enforcement of a statute against himself and also assert that the legal duties imposed on the litigant operate to violate third parties' rights." <u>Mata Chorwadi, Inc. v. City of Boynton Beach</u>, 66 F.4th 1259, 1265 (11th Cir. 2023).

In considering a motion for a preliminary injunction, a district court should assess standing according to the sufficiency of the allegations within the pleadings. <u>Church v. City of Huntsville</u>, 30 F.3d 1332, 1336 (11th Cir. 1994) ("It might well be unfair, however, to impose a standing burden beyond the sufficiency of the allegations of the pleadings on a plaintiff seeking a preliminary injunction, unless the defendant puts the plaintiff on notice that standing is contested."). When a district court considers facts that were not alleged in the complaint, the Eleventh Circuit has recognized that the complaint is then treated as having been amended to conform to the evidence. <u>See</u> <u>id.</u> ("plaintiffs' standing should be judged on the sufficiency of the allegations of the complaint, with any preliminary hearing evidence favorable to the plaintiffs on standing treated as additional allegations of the complaint."); <u>Cone Corp. v. Fla. Dep't of Transp.</u>, 921 F.2d 1190, 1206 n.50 (11th Cir. 1991) ("If [the district court] considers facts not disclosed in the complaint, the court, in effect, treats the complaint as having been amended to conform to the evidence.") (citation omitted). If standing is raised by a court *sua sponte*, the court must give the parties a chance to provide evidence to

support standing to comply with "elementary principles of procedural fairness." <u>See</u> <u>Alabama Legis. Black Caucus v. Alabama</u>, 575 U.S. 254, 271 (2015); <u>City of Miami</u> <u>Gardens v. Wells Fargo & Co.</u>, 956 F.3d 1319, 1320 (11th Cir. 2020).

## 1. <u>Individual Plaintiffs</u>

The Court finds the Individual Plaintiffs have sufficiently alleged standing to assert their claims at this time. The Individual Plaintiffs allege they "own firearms that ATF contends are regulable as SBRs." (Dkt. 1 at ¶ ¶ 4-7 and 35) The Individual Plaintiffs allege they "depend on their affected firearms for lawful purposes" such as self-defense, target shooting, and other activities. (<u>Id.</u> at ¶ 37) The Individual Plaintiffs also allege the Final Rule harms them in four ways. First, the Final Rule impedes the Individual Plaintiffs' ability to travel with their affected firearms without permission from the federal government. (<u>Id.</u> at ¶ 38) Second, the Final Rule impedes the Individual Plaintiffs' ability to use their affected firearms because these Plaintiffs would now be subject to the NFA and the GCA's registration and reporting provisions for SBRs and SBSGs. (<u>Id.</u> at ¶ 39) Third, the Final Rule impedes the Individual Plaintiffs' ability to keep their affected firearms without facing criminal consequences. (<u>Id.</u> at ¶ 40) Fourth, the Final Rule impedes the Individual Plaintiffs' ability to dispose of their affected firearms. (<u>Id.</u> at ¶ 42)

Because the Final Rule imposed a compliance date of May 31, 2023, the Court finds the Individual Plaintiffs have alleged standing because there is a "real and immediate threat of future injury." <u>See</u>, <u>e.g.</u>, <u>Eternal Word Television Network, Inc.</u> <u>v. Sebelius</u>, 935 F. Supp. 2d 1196, 1214 (N.D. Ala. 2013). The Final Rule was

promulgated by and will be enforced by the Defendants, so the Individual Plaintiffs' injuries are directly traceable to the Defendants' conduct. <u>See West Virginia v. Treasury</u>, 59 F.4th 1124, 1138 (11th Cir. 2023) (finding the traceability element was satisfied when the plaintiffs challenged a tax offset provision in the American Rescue Plan Act). Finally, this Court finds that the Individual Plaintiffs' injuries are likely to be redressed if they are successful on their motion. <u>See</u>, <u>e.g.</u>, <u>Harrell v. The Fla. Bar</u>, 608 F.3d 1241, 1257 (11th Cir. 2010) ("As for the redressability prong, if the challenged rules are stricken as unconstitutional, [plaintiff] simply need not contend with them any longer."). The Individual Plaintiffs have therefore shown standing to pursue their claims.

### 2.  2nd Amendment Armory

The Court likewise finds 2nd Amendment Armory has alleged standing to assert a Second Amendment claim at this time. Defendants contend Plaintiff 2nd Amendment Armory has failed to allege standing in its corporate form, citing <u>Teixeira v. County of Alameda</u>, 873 F.3d 670, 682 (9th Cir. 2017). Defendants also argue that 2nd Amendment Armory failed to allege third-party standing because the Complaint does not mention "customer" or otherwise satisfy the third-party standing rules. Plaintiffs respond, contending that the Complaint contains sufficient allegations to invoke 2nd Amendment Armory's individual and third-party standing under <u>Maryland Shall Issue, Inc. v. Hogan</u>, 971 F.3d 199, 214 (4th Cir. 2020).

Here, 2nd Amendment Armory has alleged it will suffer an economic injury. (Dkt. 1 at ¶ 41) 2nd Amendment Armory's injury may ultimately be sufficient to confer

standing in its own right; however, it is uncertain whether an economic injury is a sufficient basis for 2nd Amendment Armory to assert a constitutional claim under Article III. On this record, however, 2nd Amendment Armory purports to represent the interest of its customers not members of the LLC. Thus, the Court need not tread into uncharted waters to decide whether a corporation has standing to assert its own Second Amendment claim because a more easily discernible rubric for standing, *jus tertii* standing, is available to 2nd Amendment Armory.

### a. Jus Tertii Standing

A corporation may be conferred j*us tertii* standing "when (1) the plaintiff seeking to assert [a] third party's rights has otherwise suffered an injury-in-fact, (2) the relationship between the plaintiff and the third party is such that the plaintiff is nearly as effective a proponent of the third party's right as the third party itself, and (3) there is some obstacle to the third party asserting the right." <u>Region 8</u>, 993 F.2d at 809. The Supreme Court observed in <u>Craig v. Boren</u>, that a vendor suffers a concrete injury sufficient for *jus tertii* standing where the vendor is "obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of [their] buyer's market, or to disobey the statutory command and suffer ... sanctions." 429 U.S. 190, 193-95 (1976).[12]

---

[12] <u>See</u> <u>Williams v. Pryor</u>, 220 F. Supp. 2d 1257, 1267-73 (N.D. Ala. 2002) (finding the "vendor plaintiffs . . . have demonstrated that they have standing to pursue their constitutional challenge against defendant—both independently and on behalf of third party purchasers of sexual devices."), <u>rev'd on other grounds sub. nom.</u> <u>Williams v. Att'y Gen. of Ala.</u>, 378 F.3d 1232, 1234 n.3 (11th Cir. 2004) ("The district court properly concluded that vendors and users have shown a high probability of suffering a legally cognizable injury as [a] result of the statute and thus have demonstrated standing, and we adopt its analysis in this regard").

The second prong for *jus tertii* standing is a "causal connection between the litigant's injury and the violation of the third parties' constitutional rights." See Mata Chorwadi, Inc., 66 F.4th at 1266. The Supreme Court explained that "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." Craig, 429 U.S. at 195; Young Apartments, Inc. v. Town of Jupiter, FL, 529 F.3d 1027, 1041 (11th Cir. 2008) ("One exception to [the prudential] rule [that forbids third-party standing], however, allows businesses to advocate, on behalf of their clients and customers, against discriminatory actions that interfere with that business relationship."). The last prong requires either (1) an allegation of difficulty if not impossibility for affected persons to present their grievance before any court, See Young, 529 F.3d at 1043, or (2) dilution or infringement of a third party's rights if the surrogate litigant is not allowed to proceed. See Harris v. Evans, 20 F.3d 1118, 1124 (11th Cir. 1994).

Here, this Court is presented with the scenario anticipated by Justice Thomas in his dissent in June Med. Servs. L. L. C. v. Russo, 140 S. Ct. 2103, 2142 n.1 (2020) ("But it is fair to wonder whether gun vendors could expect to receive the same privilege if they seek to vindicate the Second Amendment rights of their customers."). Concerning the first prong, the Court finds Plaintiffs have sufficiently alleged injury-in-fact on behalf of 2nd Amendment Armory. Plaintiffs claim in their supplemental briefing on standing that 2nd Amendment Armory has "sold, and wishes to continue selling the affected products" – brace-equipped firearms. (Dkt. 43 at 4) This allegation

shows that 2nd Amendment Armory's harm is imminent and is not merely hypothetical. Cf. Aaron Priv. Clinic Mgmt. LLC v. Berry, 912 F.3d 1330, 1337–38 (11th Cir. 2019) ("Although the complaint alleges that Aaron aspired to open a methadone clinic someday, it offers no facts suggesting that the "someday" was imminent or that Aaron had any concrete plan in place for bringing its clinic into operation."). Also, the Complaint and Plaintiffs' moving papers allege that 2nd Amendment Armory's inventory is considered regulable under the Final Rule. (Dkt. 1 at ¶ 36 and Dkt. 21 at 13) At this stage, these allegations are sufficient to plausibly suggest that 2nd Amendment Armory faces direct economic injury through the constriction of its buyer's market, injury amounting to loss of inventory if it complies with the Final Rule, and sanctions for disobeying the Final Rule. See Craig, 429 U.S. at 195; Williams, 220 F. Supp. 2d at 1267-73.

Concerning the second prong, the Court finds Plaintiffs have sufficiently alleged a causal connection between 2nd Amendment Armory's injury and its customers' constitutional rights. The Complaint alleges firearms sellers are targeted by ATF's promulgation of a Final Rule that reclassifies all brace-equipped firearms irrespective of who owns them. (Dkt. 1 at ¶ 53) Plaintiffs' supplemental briefing on standing argues 2nd Amendment Armory "has a close relationship" with its customers because a customer's right to keep and acquire firearms affected by the Final Rule is inextricably bound up with Plaintiffs' right to sell and support them. (Dkt. 43 at 8-9) For example, after the Compliance Date, 2nd Amendment Armory's past customers are prevented from returning unregistered brace-equipped firearms to 2nd Amendment Armory or

getting unregistered brace-equipped firearms serviced by 2nd Amendment Armory. (Id. at 7)

The Eleventh Circuit has repeatedly recognized a vendor's "ability to advocate, on behalf of their clients and customers, against discriminatory actions that interfere with that business relationship." See Young, 529 F.3d at 1041 (citing Craig, 429 U.S. at 195, 197); see also Mata, 66 F.4th at 1265 (same). The Final Rule in this case is an interesting provision because it targets both the possession of brace-equipped firearms and the sale of such, which is distinguishable from most *jus tertii* cases. Thus, it could provide an avenue for a direct challenge by vendors. That said, the Final Rule nonetheless imposes a duty on 2nd Amendment Armory, and 2nd Amendment Armory's compliance with the Final Rule would directly affect its customers' Second Amendment rights. Therefore, Plaintiffs have sufficiently alleged a causal connection that satisfies the rule from Craig and the Eleventh Circuit's interpretation of Craig as stated in Mata.

Concerning the third and final prong, the Court finds Plaintiffs have sufficiently alleged hindrance to a third party asserting its rights. Plaintiffs' supplemental briefing on standing argues 2nd Amendment Armory's customers have privacy concerns surrounding firearm ownership and they have a justifiable fear of Defendants' retribution, both of which hinder customers from bringing suit. (Dkt. 43 at 9-10) Plaintiffs also explain that an "individual's status as a firearms owner is a sensitive issue of personal privacy, and especially concerning where the government threatens severe consequences for possessing an affected firearm." (Id. at 10)

Courts have regularly found privacy to be a legitimate hindrance sufficient to confer *jus tertii* standing in cases involving citizenship concerns, medical procedures, and contraceptives. For example, in <u>Young</u>, the Eleventh Circuit found *jus tertii* standing without a single allegation in the complaint that specifically named a resident because "some of the immigrants living in Jupiter may fear drawing attention to the immigration status of themselves or their neighbors." 529 F.3d at 1044. The Supreme Court has also conferred *jus tertii* standing to a physicians in abortion rights challenges. <u>Singleton v. Wulff</u>, 428 U.S. 106, 117-18 (1976); <u>Planned Parenthood Ass'n of Atlanta Area, Inc. v. Miller</u>, 934 F.2d 1462, 1465 (11th Cir. 1991). The Supreme Court later extended its reasoning in those cases to contraceptive vendors because "potential purchasers may be chilled from . . . assertion (of their own rights) by a desire to protect the very privacy (they seek to vindicate) from the publicity of a court suit." <u>Carey v. Population Servs., Int'l</u>, 431 U.S. 678, 684 n.4 (1977). The Supreme Court has been forgiving with the hindrance element where "it is credibly alleged that the statute at issue here may materially impair the ability of third persons [(criminal defendants with nonforfeitable assets)] to exercise their constitutional rights." <u>Caplin & Drysdale, Chartered v. United States</u>, 491 U.S. 617, 624 n.3 (1989).

Here, 2nd Amendment Armory's past customers face new registration requirements under the Final Rule that, if not adhered to, will result in criminal and or monetary penalties. (Dkt. 1 at ¶ 2) Plaintiffs also claim in their supplemental briefing on standing that 2nd Amendment Armory's future customers face a credible threat of prosecution for being on either side of a transaction involving a newly made or

unregistered brace-equipped firearm. (Dkt. 43 at 3) At this preliminary stage, the Court finds that 2nd Amendment Armory is uniquely positioned to litigate these claims to prevent threatened sanctions from the ATF against future customers and to afford privacy to past and future customers from the publicity of a court suit. See Carey, 431 U.S. at 684 n.4; Young, 529 F.3d at 1044; Caplin, 491 U.S. at 624 n.3.

## B. Preliminary Injunction

Plaintiffs are also able to satisfy the prerequisites for the entry of a preliminary injunction. First, when a plaintiff brings multiple claims, reviewing courts regularly evaluate the preliminary injunction factors for each claim asserted. See, e.g., Gen. Motors Corp. v. Phat Cat Carts, Inc., 504 F. Supp. 2d 1278, 1280 (M.D. Fla. 2006) (adopting the report and recommendations that evaluated three claims); accord Freedom Med., Inc. v. Sewpersaud, 469 F. Supp. 3d 1269 (M.D. Fla. 2020); N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1217 (11th Cir. 2008). Here, Plaintiffs assert one statutory and two constitutional claims for which preliminary injunctive relief is sought. (Dkt. 21) The Court begins its analysis with Plaintiffs' APA claim because Plaintiffs have alleged the Final Rule "impermissibly" classifies certain weapons as "rifles" which may result in those weapons falling either within ATF's regulatory authority or within the plain text of the Second Amendment.

### 1. Likelihood of Success on the Merits

The first factor, a substantial likelihood of success on the merits, is considered the most critical factor in the merits analysis of this motion. Barber v. Governor of Alabama, 73 F.4th 1306, 1318 (11th Cir. 2023) (citation omitted). A court need not

consider the remaining preliminary injunction factors, where the first factor fails. Id. (citing Grayson v. Warden, Comm'r, Alabama Doc, 869 F.3d 1204, 1239 n.89 (11th Cir. 2017) (evaluating a prisoner's motion for stay of execution and concluding that "it was unnecessary for the Court to determine whether Brooks satisfied the second, third or fourth factors in the four-part test for granting a stay.")); see, e.g., Alabama Libertarian Party v. Alabama Pub. Television, 227 F. Supp. 2d 1213, 1220 (M.D. Ala. 2002). "Although the initial burden of persuasion [in a preliminary injunction hearing] is on the moving party, the ultimate burden is on the party who would have the burden at trial." FF Cosms. FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017). Here, the ultimate burden lies with the Defendants.

### a. Administrative Procedure Act Claim

The Administrative Procedure Act ("APA") permits judicial review of agency decisions. Sierra Club v. Van Antwerp, 526 F.3d 1353, 1359 (11th Cir. 2008). A reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be:

> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> **(B)** contrary to constitutional right, power, privilege, or immunity;
> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> **(D)** without observance of procedure required by law;
> **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

Plaintiffs contend that the Final Rule violates the APA because the Final Rule is: (1) inconsistent with the relevant statutes; (2) not the result of Defendants following procedure, (3) arbitrary, capricious, and contrary to law; (4) contrary to the rights of Americans; and (5) not a logical outgrowth of the initial proposed rule. (Dkt. 21) Plaintiffs' papers and their representations at the hearing center on the fifth argument. Thus, the Court begins its inquiry with Plaintiffs' fifth point.

### i.    Violation of Statutory Procedure

Plaintiffs argue the Final Rule should be set aside because the Final Rule is not a logical outgrowth of the NPRM. (Dkt. 21 at 11-13) Put another way, Plaintiffs contend the Final Rule violates the APA's statutory notice requirement, rendering the Final Rule itself unlawful. Defendants argue the Final Rule does not violate the APA's notice requirements for two reasons. (Dkt. 22 at 24) First, Defendants argue the Final Rule is exempt from notice and comment because it is an interpretive rule. (Id. at 25) Second, Defendants contend even if the Final Rule required notice and comment, the Final Rule is a reasonable outgrowth of the NPRM for which there was sufficient notice and a reasonable opportunity for comment. (Id. at 26-28)

"The APA requires that agencies publish notice of their proposed rulemaking and afford the public an opportunity to comment." Miami-Dade Cnty. v. EPA, 529 F.3d 1049, 1058 (11th Cir. 2008) (citing 5 U.S.C. § 553(b)-(c). To show this requirement has been met as to the final iteration of the rule, the final rule must be "a 'logical outgrowth' of the rule it originally proposed." See id. "[N]otice and comment

rulemaking is not required when an agency issues an 'interpretive rule.'" <u>Warshauer</u> <u>v. Solis</u>, 577 F.3d 1330, 1337 (11th Cir. 2009). Substantive rules have the "force and effect of law," while interpretive rules are those that merely advise the public of the agency's construction of the statutes and rules that it administers. <u>See</u> <u>Azar v. Allina</u> <u>Health Servs.</u>, 139 S. Ct. 1804, 1811 (2019). The Eleventh Circuit adopted the D.C. Circuit's test for "interpretive rules" which states:

> First, although not dispositive, the agency's characterization of the rule is relevant to the determination. *Id.* Second, "[a]n interpretative rule simply states what the administrative agency thinks the statute means, and only 'reminds affected parties of existing duties.' On the other hand, if by its action the agency intends to create new *law, rights or duties*, the rule is properly considered to be a legislative rule.

<u>Warshauer</u>, 577 F.3d at 1337 (emphasis added). The Eleventh Circuit has stated the difference between a legislative rule and a general policy statement depends on whether "the agency action establishes a binding norm." <u>Ryder Truck Lines, Inc. v.</u> <u>United States</u>, 716 F.2d 1369, 1377 (11th Cir. 1983). A binding norm is one "affecting individual rights and obligations." <u>Chrysler Corp. v. Brown</u>, 441 U.S. 281, 302 (1979).

In this case, Defendants have characterized the Final Rule as interpretive in their moving papers and the Final Rule itself. <u>See</u> 88 Fed. Reg. 6,478-01, at *6,478. Defendants contend that ATF promulgated the Final Rule to give its "best *interpretation* of the relevant statutory provisions" and any obligations flowing from ATF's new interpretation are preexisting obligations under the NFA and the GCA. (Dkt. 22 at 25) (emphasis added) At this preliminary stage, the record does not support a finding that the Final Rule is interpretive for the reasons stated below, but

specifically, Defendants' argument fails at the second step of the assessment outlined in <u>Warshauer</u>.

Before the Effective Date and the Enforcement Date, brace-equipped pistol owners were unencumbered by the NFA or GCA, and they had no duty or legal obligation to register, transfer, surrender, alter, or destroy their firearms. After the Enforcement date, brace-equipped pistol owners and retailers of such modified weapons now have legal duties to comply with or risk criminal and monetary penalties. <u>See</u> Final Rule, 88 Fed. Reg. 6,478-01, at *6,480 ("While firearms equipped with 'stabilizing braces' or other rearward attachments may be submitted to ATF for a new classification determination, a majority of the existing firearms equipped with a 'stabilizing brace' are likely to be classified as 'rifles' because they are configured for shoulder fire based on the factors described in this rule."). The Final Rule imposes associated duties: it expressly commands owners or possessors of "short-barreled rifles equipped with a "stabilizing brace device" to comply with preexisting NFA registration requirements by May 31, 2023. It imposes punishment and penalties flowing directly from the Final Rule, i.e., a brace-equipped pistol owner's failure to register his or her firearm as a "rifle" will result in criminal and monetary penalties. This is far from a reminder because these owners or possessors previously had no NFA-related obligations.[13]

---

[13] Defense Counsel acknowledged at the hearing on Plaintiffs' motion that the Final Rule "sets forth clear means of compliance[.]" <u>See</u> Tr. 35:4-6.

The Final Rule also supersedes all prior "ATF classifications involving 'stabilizing brace' attachments for firearms" as of the Effective Date. See 88 Fed. Reg. 6,478-01, at *6,569. Based on this statement of supremacy, the Final Rule, in its application, imposes future burdens on possession of a "brace-equipped pistol" because possession of these pistols virtually always constitutes possession of a "rifle." As a result, the Final Rule criminalizes possession of brace-equipped pistols purchased or owned before the Final Rule was promulgated if they are possessed after the Enforcement date. Therefore, the future effect and the nature of the Final Rule support a finding that the Final Rule is legislative rather than interpretive.

The Final Rule further commands obedience by the Compliance Date and offers a tax shield to those who comply. These provisions in the Final Rule, without evidence to contradict their meaning, support Plaintiffs' position that the Final Rule will likely be found to be "force or effect of law" because the deadlines imposed therein are not tentative recommendations or suggested guidelines. See e.g., State v. Becerra, 544 F. Supp. 3d 1241, 1289 (M.D. Fla. 2021) (finding the "conditional sailing order serves as neither a tentative recommendation nor a suggested guideline nor a declaratory "final disposition"; the conditional sailing order carries the force of law and bears all of the qualities of a legislative rule."). This preliminary finding is bolstered by Defense Counsel's representations at the hearing that, after the Enforcement date, no one can own these weapons as previously configured without registration. (See Tr. 47:13-15; 48:10-20) While the text of the Final Rule states it did not intend to create any new

obligations or duties, Plaintiffs have shown that the Final Rule creates new obligations and duties, thus the Final Rule is likely legislative based on the present record.

The Parties also dispute whether the Final Rule is the logical outgrowth of the NPRM.[14] Statutory notice requirements can ensure: (1) "agency regulations are tested via exposure to diverse public comment, (2) [ ] fairness to affected parties, and (3) affected parties [have] an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." Miami-Dade, 529 F.3d at 1058. "A rule is deemed a logical outgrowth if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." Ne. Maryland Waste Disposal Auth. v. E.P.A., 358 F.3d 936, 952 (D.C. Cir. 2004). "Agency notice must describe the range of alternatives being considered with reasonable specificity." Georgia v. Wheeler, 418 F. Supp. 3d 1336, 1373 (S.D. Ga. 2019) (quoting Small Refiner Lead Phase-Down Task Force v. E.P.A., 705 F.2d 506, 549 (D.C. Cir. 1983)). "Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decision making." Id.

The Court has created a chart to best illustrate its consideration of the NPRM against the Final Rule.

| NPRM | FINAL RULE |
|---|---|
| **Description**: ATF is proposing to amend the definition of "rifle" in 27 CFR 478.11 and 479.11, respectively, by adding a | **Description**: The rule provides an amendment to the definition of "rifle" in §§ 478.11 and 479.11. In issuing this final |

---

[14] The Parties concede that a notice and comment period occurred for the promulgation of the Final Rule, so the Court directs its analysis to the logical outgrowth arguments only.

sentence at the end of each definition. The new sentence would clarify that the term "rifle" includes any weapon with a rifled barrel and equipped with [FN15] an attached "stabilizing brace" that has objective design features and characteristics that indicate that the firearm is designed to be fired from the shoulder, as indicated on ATF Worksheet 4999.

rule, the Department has revised the proposed regulatory text in the NPRM to account for the comments received. The rule does not adopt the Worksheet 4999 as proposed in the NPRM. The rule does, however, adopt from the NPRM and proposed Worksheet 4999 several of the objective design features that indicate a firearm is designed, made, and intended to be fired from the shoulder and incorporates those features into the definition of "rifle." The final regulatory text for the definition of "rifle" reflects the best interpretation of the relevant statutory provisions. All previous ATF classifications involving "stabilizing brace" attachments for firearms are superseded as of May 31, 2023. As such, they are no longer valid or authoritative, and cannot be relied upon. However, firearms with such attachments may be submitted to ATF for re-classification.

**Determination Procedure**: ATF proposes to use ATF Worksheet 4999 to determine if a firearm is designed and intended to be fired from the shoulder. ATF will use a four-point system, in which it will assign anywhere from 1 to 4 points in three sections to determine if the firearm is regulatable. One point is a minor indicator the weapon could be fired from the shoulder. Two points is a moderate indicator the weapon may be designed and intended to be fired from the shoulder. Three points is a strong indicator the weapon is likely designed and intended to be fired from the shoulder. Four points is a decisive indicator the weapon is designed and intended to be fired from the shoulder. If the total point value of the firearm submitted is equal to or greater than 4— in either Section II or III—then the

**Determination Procedure**: ATF will examine six factors to determine whether a weapon is designed, made, and intended to be fired from the shoulder. Those factors are:

(i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component, or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

| | |
|---|---|
| firearm, with the attached "stabilizing brace," will be determined to be "designed or redesigned, made or remade, and intended to be fired from the shoulder," or a "rifle" under the GCA and NFA. | (iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed; |
| (1): **Prerequisites**. FATD will first examine the submitted sample's weapon weight and overall length. | (iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations; |
| (2) **Accessory Characteristics**. If the submitted firearm sample meets the prerequisites of weighing at least 64 ounces and having an overall length between 12 and 26 inches, FATD will analyze the accessory's design, rear surface area, adjustability, and stabilizing support. | (v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and |
| (3) **Weapon Configuration**. FATD will evaluate the entire weapon including how the "stabilizing brace" is mounted to the firearm as well as the effectiveness of the brace in single-handed firing as opposed to firing from the shoulder by considering: length of pull, attachment method, stabilizing brace modifications and configuration, and peripheral accessories. | (vi) information demonstrating the likely use of the weapon in the general community. |
| **Prerequisites – Weight and Length**. | **Factor 1 – Weight and Length**. |
| (a) *Weapon Weight*. Weapon weight is a key prerequisite in determining whether a "stabilizing brace" is appropriately used on a weapon. Firearms weighing less than 64 ounces/4 pounds (weighed with unloaded magazine and accessories removed) are not considered weapons suitable for use with a "stabilizing brace" accessory because they are more easily held and fired with one hand without the need for a "stabilizing brace." | ATF will measure the weight and length of the firearm while it is equipped with the "stabilizing brace" affixed to it. If the weight or length of the firearm in question is consistent with the weight or length of similarly designed rifles, then this would be an indicator that shoulder firing the weapon provides stabilization and is beneficial in firing the weapon, and thus that the firearm is designed, made, and intended to be used this way. |
| (b) *Overall Length*. The overall length of a weapon is relevant in classifying it as a | |

| | |
|---|---|
| "rifle" or a "pistol" because, as a firearm becomes excessive in length, it is increasingly difficult to fire with one hand. Firearms possessing an overall length between 12 and 26 inches may be considered pistols for which a "stabilizing brace" could reasonably be attached to support one-handed fire. Firearms with an overall length of less than 12 inches are considered too short to indicate any need for a "stabilizing brace." Conversely, firearms exceeding 26 inches in overall length are impractical and inaccurate to fire one-handed, even with a "stabilizing brace," due to imbalance of the weapon. | |
| **Accessory Characteristics – 4 Prongs**. If the submitted firearm sample meets the prerequisites of weighing at least 64 ounces and having an overall length between 12 and 26 inches, FATD will analyze various attachment characteristics, including: *Accessory Design*. The design of the accessory when attached is a factor in determining whether the item is actually a "stabilizing brace" or is intended to be utilized as a stock, making the firearm designed to be fired from the shoulder. the more features a purported "stabilizing brace" has in common with known shoulder stock designs, the more points it will accumulate. "Stabilizing braces" that are not based on any known shoulder stock design will accrue zero points. "Stabilizing braces" that incorporate one or more shoulder stock design features (e.g., adjustment levers or features that allow for the length of the device to be varied in a manner similar to an adjustable shoulder stock, sling mounts, or hardened surfaces) will | **Factor 2 – Length of Pull**. ATF will examine the firearm for characteristics (e.g., length of pull) consistent with whether a firearm is designed, made, and intended to be fired from the shoulder. Whether there is an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method is considered when examining a firearm's length of pull to determine if the firearm is designed, made, and intended to be fired from the shoulder. First, for devices with fixed material or a device in a fixed position on the rear of the firearm, the length of pull of a firearm would be measured from the device's fixed position to the center of the trigger. This is the position by which an individual may shoulder the firearm. Second, for devices that are not fixed and instead have a mechanism to lock into place in various locations along a buffer tube or receiver extension, ATF would measure length of pull with the device in the rearmost locked position. Finally, for a |

accrue 1 point. Lastly, "stabilizing braces" that are modified versions of known shoulder stock designs will accrue 2 points.

*Rear Surface Area*. Rear surface area is a design characteristic referring to the area on the rear of the purported "stabilizing brace." Clearly, larger, more substantial "stabilizing braces" may have more surface area in which to shoulder a firearm. However, while smaller, less substantial "stabilizing brace" designs may have reduced surface area, this shouldering area may still be similar to known shoulder stock designs upon which they are based. A "stabilizing brace" accessory that is designed with only a minimal rear surface area (e.g., a "fin-type") with which a weapon could possibly be shouldered will accrue 1 point. A "stabilizing brace" accessory that is designed with a rear surface area sufficient to shoulder the firearm, or approximating the rear surface of known shoulder stocks, which allows shouldering the firearm, will accrue 2 points. Finally, a "stabilizing brace" accessory that features material clearly designed to increase rear surface area to facilitate shoulder firing will accrue 3 points.

*Adjustability*. While adjustability, in and of itself, is not determinative of a "stabilizing brace's" design function on a firearm, it remains a significant indicator that the device is designed and intended to be shouldered. Weapons that do not incorporate an adjustable "stabilizing brace" will accrue zero points, while "stabilizing brace" designs that are adjustable will accrue 2 points.

firearm that includes a device that is movable but cannot be affixed into various positions along the buffer tube or receiver extension, length of pull would be measured with the device collapsed.

*Stabilizing Support*. Stabilizing support is a vital characteristic because it provides evidence to evaluate the purported purpose of the attached device, which is to provide shooters with forearm support for firing large, heavy handguns. It is therefore important for ATF to consider the various "stabilizing brace" designs and the forearm support they provide. ATF has categorized these different "stabilizing brace" designs into three broad categories: Counterbalance, "Fin-type", and "Cuff-type."

(a) **Counterbalance** designs utilize the weight of the weapon as a lever to push the "stabilizing brace" into the forearm and provide stability for firing. This feature presents some evidence that a firearm equipped with a Counterbalance "stabilizing brace" is intended to be fired from the shoulder and therefore will accrue 1 point.

(b) "Fin-type" designs incorporate a thin "blade" designed to rest against the shooter's arm, and feature a minimal, thin rear surface area. "Fin-type" accessories that do not incorporate an arm strap of suitable length or functionality will accrue 2 points, while those that incorporate an arm strap long enough to secure a person's forearm consistent with the purported intent will not accrue any points (zero).

(c) "Cuff-type" designs are by far the most prevalent of all "stabilizing

| | |
|---|---|
| braces," consisting of over two dozen different unique designs. Therefore, a "cuff-type" "stabilizing brace" that fully wraps around the shooter's forearm (e.g., SB15/SBX-K) will not accrue any points (zero). "Cuff-type" "stabilizing braces" that partially wrap around the shooter's forearm (e.g., SOB/SB-Mini) will accrue 1 point. Finally, those "stabilizing braces" incorporating arm flaps that do not wrap around the shooter's forearm (e.g., SBA3/SB-PDW), thereby providing no arm support, will accrue 2 points. Any "stabilizing brace" that is configured as a "split-stock" (e.g., SBT/FS1913) will accrue 3 points. | |
| **Weapon Configuration** – ATF will evaluate the entire weapon including how the "stabilizing brace" is mounted to the firearm as well as the effectiveness of the brace in single-handed firing as opposed to firing from the shoulder. This will involve a consideration of:<br><br>_Length of Pull_. Length of pull is a common measurement of firearms that describes the distance between the trigger and the center of the shoulder stock. Firearms with "stabilizing braces" that incorporate a length of pull of less than 10 inches will not accrue any points (zero). However, a length of pull that is between 10 but under 11 inches will accrue 1 point, while 11 but under 12 inches will accrue 2 points, 12 but under 13 inches will accrue 3 points, and a length of pull of 13 inches or more will accrue 4 points as this is a | **Factor 3 – Sights and Scopes** ATF intends to examine the sights or scope on a submitted firearm sample as compared to those sights or scopes featured on a rifle to determine whether the sights or scope on the firearm being evaluated must be shouldered to use the sights or scope as designed. The alignment of sights and optics is an important feature of a weapon designed, made, and intended to be fired from the shoulder. Back-up or flip-up sights that can only be effectively used when the firearm is shouldered are an indicator that a firearm is designed, made, and intended to be fired from the shoulder. Similarly, the presence of a reflex sight with flip-to-the-side magnifier that has limited eye relief (i.e., the sight is unusable unless aimed and fired from the shoulder) is a design incorporated on |

App.197

standard length of pull for rifles and is a decisive indicator that the firearm is intended to be fired from the shoulder. P. 10

*Attachment Method*. A "stabilizing brace's" attachment method often provides critical insight as to how a firearm is intended to be used. Use of an AR-type pistol buffer tube with adjustment notches, an adjustable rifle buffer tube, or an adjustable PDW-type guide rail, will accrue 1 point as each indicates the ability to adjust the "stabilizing brace." An extended AR-type pistol buffer tube (greater than 6½ inches), folding adaptors, and the use of "spacers" will accrue 2 points. Additionally, a shoulder stock that has been modified to incorporate a "stabilizing brace," or any attachment method that results in an unusable aimpoint when the "stabilizing brace" is attached is also a strong indicator the weapon is actually intended to be shoulder-fired and will accrue 3 points.

*Brace Modifications/Configuration*.
"Stabilizing brace" accessories that have been modified from their original configuration will accrue additional points. Any "cuff-type" or "fin-type" accessory, which incorporates an arm strap too short to wrap around the shooter's arm or is manufactured from an elastic material (eliminating stabilizing support), will accrue 2 points, as will a "fin-type" accessory lacking an arm strap. Further, if these modifications reconfigure the device into a shoulder stock, 4 points will be accrued.

Peripheral Accessories.

firearms designed, made, and intended to be fired from the shoulder.

The relevant inquiry for this objective design feature is whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed. Sights or scopes that cannot be used without shouldering the weapon indicate that the firearm is designed, made, and intended to be fired from the shoulder.

(a) **Hand-stop Attachments.** The presence of a hand-stop will result in 2 points being accrued. Further, the presence of any secondary grip on a weapon with a "stabilizing brace" accessory change the classification from a one-handed to a two-handed weapon, thereby disqualifying it from being classified as a "braced pistol," and resulting in the subject firearm accruing 4 points.

(b) **Sights.** The presence of rifle-type flip-up, back-up iron sights ("BUIS") or lack of any sight will accrue 1 point. Further, firearms that incorporate a reflex sight (e.g., Red Dot) in conjunction with a flip-to-the-side ("FTS") magnifier with limited eye relief (distance between the shooter's eye and rear of sight/scope) will accrue 2 points. Finally, any weapon incorporating a sight or scope that possesses an eye relief (distance between the shooter's eye and rear of sight/scope) incompatible with one-handed firing will accrue 4 points, as this is a decisive indicator that the "stabilizing brace" is being utilized as a shouldering device.

(c) **Bipod/monopod.** Attachment of a bipod/monopod will accrue 2 points, regardless of the type of "stabilizing brace" attached.

(a) **Weight.** Any complete firearm with an installed "stabilizing brace" that weighs more than 120 ounces (7½ pounds), incorporating end-user accessories, will be considered too heavy to be fired with one hand,

and will accrue 4 points. The firearm will be weighed as configured, with an unloaded magazine.

*Catchall Provision*. Efforts to advertise, sell, or otherwise distribute "short-barreled rifles" as such will result in a classification as a "rifle" regardless of the points accrued on the ATF Worksheet 4999 because there is no longer any question that the intent is for the weapon to be fired from the shoulder.

**Factor 4 – Surface Area**

An assessment of whether a weapon that is equipped with an accessory or rearward attachment provides a surface area that allows the weapon to be fired from the shoulder shall be the first step in determining that a weapon is rifle designed, made, and intended to be fired from the shoulder. In making the determination of whether surface area "allows" for shoulder firing, ATF will not attempt to precisely measure the surface area or make the determination based on the existence of any minimum surface area. Instead, ATF will consider whether there is any surface area on the firearm that can be used to shoulder fire the weapon. If the firearm includes a surface area that can be used for shoulder firing the weapon, the weapon potentially qualifies as a "rifle." ATF will then need to consider whether the accessory, component, or other rearward attachment is necessary for the cycle of operations to aid in the determination of whether a firearm is designed, made, and intended to be fired from the shoulder. In contrast, if the

| | |
|---|---|
| | weapon does not include such surface area, then it does not qualify as a "rifle." |
| | **Factor 5 – Marketing & Promotional Materials**<br>ATF plans to consider the marketing of the attachment (e.g., indirect marketing through persons that manufacture or sell "stabilizing braces" but not firearms) and the direct marketing from the firearm manufacturer regarding the firearm to which the attachment or "brace" is assembled. By considering direct or indirect marketing or promotional materials available through videos, advertisements, or other sources, ATF can verify the manufacturer's purported intent regarding the use of the weapon. Indirect marketing materials can include statements from accessories manufacturers for the accessories that a firearms manufacturer attaches or incorporates into its firearm, such as a "brace" manufacturer that advertises that a "stabilizing brace" is a method to circumvent the NFA. |
| | **Factor 6 – Likely Use Information**<br>ATF plans to consider "information demonstrating the likely use of the weapon by the general community, including both the manufacturer's stated intent when submitting its item for classification and use by members of the firearms industry, firearms writers, and in the general community." These sources provide insight into the ways that manufacturers market their products and whether the firearm equipped with a "stabilizing brace" as configured is designed, made, and intended to be shoulder-fired. ATF would also consider information such as the firearms magazines that similarly exhibited the |

| | use of this "stabilizing brace" as a shoulder stock. |
|---|---|

By this comparison, the Court finds Plaintiffs have shown a likelihood of success on their claim that the Final Rule is not a logical outgrowth of the NPRM. First, the NPRM focuses almost entirely on Sections II and III of Worksheet 4999 to determine whether a brace-equipped firearm is a rifle. However, the Final Rule focuses on six factors with minimal overlap from the NPRM and no certainty or predictability as to scoring criteria in ATF's analysis. The Final Rule also clarifies that "surface area" is the threshold, and most important, factor because "[a] firearm that does not have [a] surface area that allows for the weapon to be fired from the shoulder cannot qualify as a rifle." See 88 Fed. Reg. at 6,478-01, at *6,511. Upsetting the order, certainty, and predictability afforded by the NPRM's Worksheet 4999, the Final Rule's ATF-subjective factors amount to a total shift in the "rifle" analysis that interested parties would never have been able to predict. See e.g., Georgia v. Wheeler, 418 F. Supp. 3d at 1376 (finding no logical outgrowth where the final rule "created an entire distance-based scheme without giving any indication of a range of alternatives to interested parties"). This preliminary observation is bolstered by and mirrors the Fifth Circuit's finding that "the Worksheet allowed an individual to analyze his own weapon and gave each individual an objective basis to disagree with the ATF's determinations, the Final Rule vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." See Mock v. Garland, 75 F.4th 563, 584 (5th Cir. 2023).

Second, the current record does not reflect factors 5 and 6 were adequately presented for notice and comment. Defendants have offered no evidence at this time to suggest that the NPRM notified citizens that ATF would consider videos, advertisements, or other sources to determine whether a firearm/pistol would be reclassified as a "rifle" under the Final Rule. Also, Defendants have not offered evidence to suggest citizens were otherwise on notice that ATF would consider a weapon's "use by members of the firearms industry, firearms writers, and in the general community" under the Final Rule. Nor is there any indication that interested parties would, could, or should have anticipated the Final Rule's complete extraction of the NPRM's prerequisites and accessory characteristic sections of Worksheet 4999 into separate and subjective categories for consideration by ATF only. For this reason alone, Defendants have not yet shown the Final Rule is the logical outgrowth of the NPRM. Cf. Miami-Dade, 529 F.3d at 1060.

Third, the Court is satisfied Plaintiffs would likely have been able to mount a credible challenge to the Final Rule if the subjective test and factors 5 and 6 had properly been presented for notice and comment. (Dkt. 21 at 11-13); Cf Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms & Explosives, No. 3:21-cv-0116, 2023 WL 7490149, at *1, --- F.Supp.3d ---- (N.D. Tex. Nov. 14, 2023) (denying injunctive relief on the logical outgrowth claim because plaintiffs failed to delineat[e] any reasons why their notice interests were harmed when the ATF did not conduct a second notice and comment process ). Therefore, for the reasons independently stated above and for the well-reasoned points explained in Mock, the Court finds Plaintiffs

have shown a likelihood of success on the merits regarding their APA-logical outgrowth claim at this time. See 75 F.4th at 586.

### b. Second Amendment Claim

Plaintiffs also mount a Second Amendment challenge to the regulation. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II; District of Columbia v. Heller, 554 U.S. 570, 576 (2008). The bar for overcoming constitutional challenges to infringement of the Second Amendment has recently been raised--significantly. In fact, the Supreme Court articulated a rigorous two-step inquiry for Second Amendment claims. New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022). Under its standard, a plaintiff must show the plain text of the Second Amendment covers the proposed restricted conduct. Id. at 18. If so, the government must "justify its regulation by demonstrating that [the challenged regulation] is consistent with the Nation's historical tradition of firearm regulation." Id. at 24. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"[15] Id. To satisfy their burden under the strictures of Bruen, Defendants must, at the preliminary injunction stage, show they are likely to prevail on Plaintiffs' challenge

---

[15] History will ultimately judge whether the Bruen standard will stand the test of time in an era in which the proliferation of weapons and the associated, necessary regulation of them could not possibly find an historical analogue dating to the days of muskets and pump loaded shotguns and six-shot percussion pistols. Compare, for example, laser equipped, semi-automatic and automatic rifles, single use 3-D Glocks and hypersonic rifle and ammunition to any historical analogue, and any modern regulation would likely come up lacking. But, for now, Bruen is the law of the land and constrains any other analysis of the matter.

that these strictures find analogs in the Nation's historical tradition of firearm regulation. To be sure, <u>Bruen</u> makes clear that Defendants' choice of analog need not be an historic twin, even so, finding a close archival comparator is no small feat, especially in the infancy of litigation. <u>See</u> 597 U.S. at 30.

So, with little time to mine the annals of history, Defendants offer that the Final Rule's pertinent support rests on centuries of taxation and registration requirements that reflect what they describe as an "unbroken historical tradition of firearm regulation 'relevantly similar' to that required by the NFA." (Dkt. 22 at 36-39)

Specifically, Defendants cite a litany of state regulations dating to 1631 to show that many "states" required registration, inspection, or surveying of citizens' firearms. (<u>Id.</u> at 37-39) The cited regulations, ordinances, and practices, however, concerned civilian readiness for combat, adequacy of stock, and taxation of firearms and ammunition to raise revenue for the general welfare. That is to say—at this stage in the litigation, all the Defendants have produced are historical inspection analogs that were undertaken to ensure that the citizenry was well-armed, not to ensure that weapons were removed for non-compliance with regulatory limitations.

 Plaintiffs counter that there is "no historical basis for the regulation, and no historical law [is] analogous to the attachment of felonious consequences to firearms by barrel length." (Dkt. 21 at 6) As Plaintiffs point out, the historic analogs offered by Defendants have nothing to do with the inspection or registration of firearms for crime control or to prevent shoulder fire, as is the case with the Final Rule. Just by way of example, Defendants cite Professor Robert Churchill's article for his discussion of the

colonial militia practice of surveying firearms. Robert H. Churchill, <u>Gun Regulation,</u> <u>the Police Power, and the Right to Keep Arms in Early America: The Legal Context</u> <u>of the Second Amendment</u>, 25 LAW & HIST. REV. 139 (2007). To the contrary, Professor Churchill notes: In New Jersey, for example, the legislature ordered that every militiaman should "*be provided*" with arms and ammunition "in his house or place of abode" and imposed a fine whenever "said *persons shall be deficient in keeping the arms* and stores aforesaid." <u>See</u> Churchill, 25 LAW & HIST. REV. at 148 (emphasis added). Likewise, South Carolina and Georgia ordered that "*every person* liable to appear and bear arms ... *shall constantly keep one gun or musket fit for service*" as well as ammunition.") <u>Id.</u> (emphasis added). Professor Church's article does not speak at all to the regulation of firearms for the purpose of removing offending types of weapons or ensuring certain limitations related to the weapon's firing capabilities or otherwise limiting or controlling of citizens' rights to bear certain types of arms.

The Supreme Court has made it clear that a district court's analogical inquiry should consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." <u>Bruen</u>, 597 U.S. at 29.

Because the Court concludes Plaintiffs have demonstrated a likelihood of success on their claim that the Final Rule violates the APA and finds that an injunction should issue for that reason alone, the Court declines to address the adequacy of the offered historically analogous laws as they relate to the constitutional claim.

**Irreparable Harm**

As to the statutory claim, Plaintiffs contend that they are suffering irreparable harm because they face the threat of criminal prosecution, felony arrest, and imprisonment. (Dkt. 21 at 13) Defendants contend that Plaintiff Second Amendment Armory has failed to show irreparable injury because it has not articulated how or why the Final Rule creates a risk of criminal consequences or loss of its license. (Dkt. 26 at 11) Defendants also argue the Individual Plaintiffs have failed to show irreparable harm because they "cannot plausibly [establish] that their decision making as to compliance with the [Final] Rule is so subjectively difficult that it creates" an irreparable injury. (Id. at 13) Defendants add that all Plaintiffs have failed to identify a legal interest that would be injured by their compliance with the NFA's registration procedures. (Id. at 12)

A party seeking a preliminary injunction must demonstrate irreparable harm. See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990). An injury is irreparable if it is "neither remote nor speculative, but actual and imminent." See id. (citation omitted). A violation of any constitutional right does not always constitute irreparable harm. See Siegel v. LePore, 234 F.3d 1163, 1177 (11th Cir. 2000). The relevant inquiry is whether there is "direct penalization, as opposed to incidental inhibition" of the constitutional right alleged. Cate v. Oldham, 707 F.2d 1176, 1188-89 (11th Cir. 1983).

Here, the claims as asserted by Plaintiffs Colon, Kling, and Mele present a wrinkle in the irreparable harm analysis because Plaintiffs Colon, Kling, and Mele are

presumably protected by the injunctions entered in other federal cases. All acknowledge they are members of Second Amendment Foundation or are otherwise protected because of their membership in a gun rights group. The Fifth Circuit Court of Appeals is now considering three cases consolidated on appeal that involve the gun rights groups in which Plaintiffs claim membership. See Mock v. Garland, No. 4:23-cv-00095, 2023 WL 6457920, at *18, --- F. Supp. 3d ---- (N.D. Tex. Oct. 2, 2023) (granting preliminary relief); Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives, No. 6:23-cv-00013, 2023 WL 7116844, at *12, --- F. Supp. 3d ---- (S.D. Tex. Oct. 27, 2023) (partially granting preliminary relief); but see Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms & Explosives, No. 3:21-cv-0116, 2023 WL 7490149, at *20, --- F. Supp. 3d ---- (N.D. Tex. Nov. 13, 2023) (denying preliminary relief). Assuming injunctive relief continues to enjoin the enforcement of the Final Rule for Plaintiffs Colon, Kling, and Mele, an injunction in this case would be overlapping protection.

Whether irreparable harm can be proven in this scenario was addressed in Florida v. Department of Health & Human Services, 19 F.4th 1271 (11th Cir. 2021). There, the Eleventh Circuit applied the capable-of-repetition-yet-evading-review exception to the mootness doctrine to decide whether the Western District of Louisiana's nationwide injunction that enjoined the Omnibus COVID-19 Health Care Staff Vaccination interim rule rendered moot the State of Florida's claim for preliminary injunction of the same interim rule. See 19 F.4th at 1280. The Eleventh Circuit found there was a "reasonable expectation that th[e] situation would recur"

because the Fifth Circuit could eliminate the nationwide reach of the Louisiana district court's injunction. Id. at 1284. If the Fifth Circuit eliminated the nationwide reach of the injunction, then Florida would certainly lose its shield, and there likely would be too short a window between the interim rule's effective date and the date on which Florida would again be susceptible to the United States' enforcement of the interim rule. Id. at 1284. Therefore, the Eleventh Circuit concluded it had jurisdiction, the capable-of-repetition-yet-evading-review exception applied, and prudential concerns militated in favor of reviewing the Northern District of Florida's order denying the State of Florida's motion for preliminary injunction. Id. at 1285.

The Court likewise finds the risk of irreparable harm to Plaintiffs Colon, Kling, and Mele is not eliminated by the existing injunctions in Mock and Texas. Given the inconsistent decisions in the Texas cases that are being addressed in the consolidated appeal, Plaintiffs Colon, Kling, and Mele may face the same exposure and short window before enforcement that the State of Florida faced in Florida v. Department of Health & Human Services if the Fifth Circuit determines preliminary relief is unwarranted or that nationwide relief is too broad.

Without injunctive relief, the Individual Plaintiffs face direct penalization of their right to own, possess, or sell brace-equipped pistols. The deprivation of Plaintiffs' due process rights under the APA is sufficient to support this Court's conclusion that

the irreparable harm element is met. <u>See</u> <u>e.g.</u>, <u>Minard Run Oil Co. v. U.S. Forest Serv.</u>, 670 F.3d 236, 256 (3d Cir. 2011), <u>as amended</u> (Mar. 7, 2012).[16]

### C. Balancing of Harms

The remaining two requirements to grant a preliminary injunction "involve a balancing of the equities between the parties and the public." <u>Florida v. Dep't of Health & Human Servs.</u>, 19 F.4th 1271, 1293 (11th Cir. 2021). "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." <u>Swain v. Junior</u>, 958 F.3d 1081, 1091 (11th Cir. 2020).

The Court, having balanced the equities, finds this factor favors granting preliminary relief because Plaintiffs have shown a likelihood of success on their claim, and the Government suffers no countervailing harm from being prevented from violating their rights. The Court also finds the public suffers minimal harm from non-enforcement of the Final Rule. <u>Cf.</u> <u>Florida</u>, 19 F.4th at 1293. As a result, equity demands the issuance of an injunction until this Court can evaluate this case on a more developed record.

### D. Scope

Plaintiffs seek a nationwide injunction because of "complications and pitfalls" associated with local injunctions, the "acute nature of the potential harms posed by

---

[16] Defendants' timeliness argument is unpersuasive because the Final Rule stated, "the Department will wait to actually initiate such enforcement actions for at least 60 days from publication of the rule in the Federal Register." <u>See</u> 88 Fed. Reg. 6,478-01, at *6,481. The Final Rule also explained that "affected firearms have until 120 days after this rule is published to take the necessary actions . . . to comply with Federal law [and] to avoid civil and criminal penalties." <u>Id.</u> at *6,553. Thus, the Court finds Plaintiffs acted timely by moving for injunctive relief before the expiration of the 120-day compliance period.

Defendants, the implication of Plaintiffs' interstate travel rights, and the interstate nature of Plaintiffs' business." (Dkt. 21 at 17) Defendants argue nationwide relief is unwarranted because the Final Rule is subject to litigation in at least five other federal district courts, so judicial restraint counsels in favor of letting each court independently assess the Final Rule's legality. (Dkt. 26 (citing <u>Trump v. Hawaii</u>, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); <u>DHS v. New York</u>, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring)). The Court, being cognizant of this Circuit's reluctance to affirm nationwide injunctions gratuitously entered, has carefully considered many of the factors suggested in <u>Florida</u>, including what is necessary to provide complete relief to the Plaintiffs, and finds that limiting its relief to the parties before it is sufficient to afford the relief that is sought.

First, the named Plaintiffs in this case are all located within the State of Florida, so the geographic dispersion factor counsels against a nationwide injunction. <u>See</u> <u>Florida</u>, 19 F.4th at 1282 ("this case raises no concerns that a non-nationwide preliminary injunction wouldn't provide the plaintiffs with complete relief because the plaintiffs were not dispersed among the United States or 'myriad jurisdictions' like in a nationwide class action."). The fact that all named Plaintiffs are located in the State of Florida suggests that statewide relief may be appropriate, <u>See</u> <u>Garcia v. Stillman</u>, No. 1:22-cv-24156, 2023 WL 3478450, at *3 (S.D. Fla. May 16, 2023), especially in light of one named Plaintiff having demonstrated *jus tertii* standing for its customers.

Second, the Eleventh Circuit has recognized that "injunctive relief operates on specific parties, not geographic territories" to the extent that "identifying the [parties]

. . . is possible." <u>Georgia</u>, 46 F.4th at 1307. All of the parties are capable of being identified. The Plaintiffs are named in the complaint and the customers of 2nd Amendment Armory can identify themselves if approached by the Defendants and threatened with enforcement.

Third, these challenges are being raised in several actions, and are being resolved under the precedents of several circuits. Should the resolutions not align, the matter can be addressed at the highest level of appeals. Thus, upon careful consideration of the foregoing, the Court finds that the Final Rule should be enjoined as to the named Plaintiffs and 2nd Amendment Armory's past and future customers. This carefully tailored injunction will eliminate the identification concerns mentioned in <u>Health Freedom Def. Fund, Inc. v. Biden</u>. <u>See</u> 599 F. Supp. 3d 1144, 1177 (M.D. Fla. 2022). Moreover, the Court's limited injunction will allow the Final Rule's legality to be independently litigated in district and circuit courts outside the State of Florida. <u>See</u> <u>Florida</u>, 19 F.4th at 1281.

## IV.    CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** that Plaintiffs' Motion for Preliminary Injunction, (Dkt. 21), is **GRANTED in PART** and **DENIED in PART**. It is hereby **ORDERED** that Defendants Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, United States Department of Justice, and Merrick B. Garland, their agents, servants, employees, officers, and all other persons who have notice of this Order and are in active concert or participation with

Defendants, be and are, without prior written or oral notice, preliminarily restrained and enjoined from, in any way, either directly or indirectly, enforcing the Final Rule against the named Plaintiffs and 2nd Amendment Armory's past and future customers (collectively, "Covered Persons") who reside in the State of Florida. For purposes of this injunction, the term "customer" includes any Florida resident who has purchased or subsequently purchases a brace-equipped firearm from 2nd Amendment Armory before final resolution of this action. The injunctive relief authorized by this Order expressly does not grant Covered Persons any additional privileges during interstate travel. Covered Persons engaging in interstate travel are required to comply with any requirements pertinent to traveling with their respective firearms in existence before the Final Rule became effective.

It is further **ORDERED** that Plaintiffs have shown there is a minimal risk of monetary loss to be suffered by Defendants if an injunction is imposed and the Defendants have not countered that assertion. Therefore, the Court waives the security requirement outlined in Rule 65(c) of the Federal Rules of Civil Procedure.

**DONE** and **ORDERED** in Tampa, Florida, this 26th day of January 2024.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any pro se party

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |
|---|---|
| JOSIAH COLON, *et al.*,<br><br>       *Plaintiffs*,<br><br>   v.<br><br>BUREAU OF ALCOHOL,<br>TOBACCO, FIREARMS, AND<br>EXPLOSIVES, *et al.*,<br><br>       *Defendants*. | Case No. 8:23-cv-223-MSS-NHA |

### NOTICE OF APPEAL

PLEASE TAKE NOTICE that all defendants hereby appeal to the United States Court of Appeals for the Eleventh Circuit from this Court's opinion and order dated January 26, 2024, ECF No. 47, granting in part plaintiffs' motion for a preliminary injunction, ECF No. 21.

Dated: March 22, 2024       Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Taylor Pitz*
TAYLOR PITZ (CA Bar No. 332080)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
FAITH E. LOWRY (TX Bar No. 24099560)
Trial Attorneys

1

App.214

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-5200
Email: taylor.n.pitz@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On March 22, 2024, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Middle District of Florida, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Taylor Pitz*
TAYLOR PITZ
Trial Attorney
U.S. Department of Justice

App.215