No. 24-10897

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

———————————————

JOSIAH COLON, *et al.*,

*Plaintiffs-Appellees*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, *et al.*,

*Defendants-Appellants*.

———————————————

On Appeal from the United States District Court
for the Middle District of Florida
No. 8:23-cv-223-MSS-NHA (Hon. Mary S. Scriven)

———————————————

**BRIEF OF AMICI CURIAE BRADY CENTER TO PREVENT GUN
VIOLENCE, EVERYTOWN FOR GUN SAFETY SUPPORT FUND,
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, AND
MARCH FOR OUR LIVES FOUNDATION IN SUPPORT OF
DEFENDANTS-APPELLANTS AND REVERSAL**

———————————————

Paul J. Fishman
ARNOLD & PORTER
 KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
Paul.Fishman@arnoldporter.com
 [Additional Counsel Listed on
 Signature Page]

Samuel I. Ferenc
ARNOLD & PORTER
 KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-5000
Fax: (202) 942-5999
Sam.Ferenc@arnoldporter.com

No. 24-10897, *Josiah Colon, et al. v.*
*Bureau of Alcohol, Tobacco, Firearms, and Explosives, et al.*

## CERTIFICATE OF INTERESTED PARTIES AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(1), *Amici Curiae* Brady Center to Prevent Gun Violence, Everytown for Gun Safety Support Fund, Giffords Law Center to Prevent Gun Violence, and March For Our Lives Foundation, through undersigned counsel, hereby submit this Certificate of Interested Persons and Corporate Disclosure Statement.

*Amici Curiae* each state that they have no parent corporation, nor have they issued shares or debt securities to the public. None of the *Amici Curiae* organizations is a subsidiary or affiliate of any publicly owned corporation, and no publicly held corporation holds ten percent of any of the *Amici Curiae* organizations' stock.

I hereby certify that the disclosure of interested parties submitted by Defendants-Appellants is complete and correct except for the following additional interested persons:

1.    Arnold & Porter Kaye Scholer LLP, *Attorneys for Amici*

2.    Brady Center to Prevent Gun Violence, *Amicus*

3.    Esty, Aaron, *Attorney for Amicus Everytown for Gun Safety Support Fund*

4.    Everytown Law, *Attorneys for Amicus Everytown for Gun Safety Support Fund*

5.    Everytown for Gun Safety Support Fund, *Amicus*

No. 24-10897, *Josiah Colon, et al. v.*
*Bureau of Alcohol, Tobacco, Firearms, and Explosives, et al.*

6.      Feldman, Shira Lauren, *Attorney for Amicus Brady Center to Prevent Gun Violence*

7.      Ferenc, Samuel I., *Attorney for Amici*

8.      Fishman, Paul J., *Attorney for Amici*

9.      Giffords Law Center to Prevent Gun Violence, *Amicus*

10.     Klein, Jenna, *Attorney for Amicus Brady Center to Prevent Gun Violence*

11.     Letter, Douglas N., *Attorney for Amicus Brady Center to Prevent Gun Violence*

12.     Malone, Ciara Wren, *Attorney for Amicus March For Our Lives Foundation*

13.     March For Our Lives, *Attorneys for Amicus March For Our Lives Foundation*

14.     March For Our Lives Foundation, *Amicus*

15.     Percival, Kelly M., *Attorney for Amicus Giffords Law Center to Prevent Gun Violence*

16.     Sanchez-Gomez, Esther, *Attorney for Amicus Giffords Law Center to Prevent Gun Violence*

17.     Tirschwell, Eric, *Attorney for Amicus Everytown for Gun Safety Support Fund*


*/s/ Samuel I. Ferenc*
Samuel I. Ferenc

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE
DISCLOSURE STATEMENT ..................................................................C-1

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF *AMICI CURIAE* ............................................................1

STATEMENT OF THE ISSUES....................................................................4

SUMMARY OF THE ARGUMENT ...........................................................5

ARGUMENT ...................................................................................................6

I.      Certain "Stabilizing Braces" Are Used and Marketed as
        Shoulder Stocks ...............................................................................6

        A.      Firearm Owners Use Certain Stabilizing Braces as
                Shoulder Stocks....................................................................6

        B.      Manufacturers Expressly Market Certain Stabilizing Braces as
                Shoulder Stocks...................................................................12

II.     Historical Regulation and the Use of Short-Barreled Rifles Establish
        Their Dangerousness .......................................................................16

        A.      Congress Regulated Short-Barreled Rifles in the National
                Firearms Act of 1934 Because They Are Highly Dangerous ............16

        B.      Congress and the Courts Have Consistently Deemed
                Short-Barreled Rifles Unreasonably Dangerous................................21

III.    The Stabilizing Brace Rule Is Consistent with the Intent of Congress
        in Enacting the National Firearms Act ........................................22

CONCLUSION...................................................................................................24

CERTIFICATE OF COMPLIANCE.......................................................26

CERTIFICATE OF SERVICE ...............................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*District of Columbia v. Heller*,
554 U.S. 570 (2008)............................................................21

*Johnson v. United States*,
576 U.S. 591 (2015)............................................................18

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)..............................................................21

*United States v. Gonzales*,
2011 WL 5288727 (D. Utah Nov. 2, 2011)................................20, 21

*United States v. Miller*,
2023 WL 6300581 (N.D. Tex. Sept. 27, 2023) ............................21

*United States v. Miller*,
307 U.S. 174 (1939)............................................................21

*United States v. Sredl*,
2023 WL 3597715 (N.D. Ind. May 23, 2023) ..............................18

*United States v. Thompson/Center Arms Co.*,
504 U.S. 505 (1992)........................................................17, 18

**Statutes, Rules & Regulations**

26 U.S.C. § 5841 ..............................................................20

26 U.S.C. § 5845 ..............................................................20

26 U.S.C. § 5845(a) ............................................................8

26 U.S.C. § 5845(c) ............................................................4

27 C.F.R. § 478.11 ..............................................................4

27 C.F.R. § 479.11 ..............................................................4

Factoring Criteria for Firearms With Attached "Stabilizing Braces,"
88 Fed. Reg. 6478 (Jan. 31, 2023) ...................................................7, 8, 9, 12, 13

National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 .......................20

**Legislative Materials**

*ATF's Assault on the Second Amendment: When is Enough Enough?:
Hearing Before the Subcomm. on Econ. Growth, Energy Pol'y, & Regul.
Affs. of the H. Comm. on Oversight & Accountability and the Subcomm.
on Crime & Fed. Gov't Surveillance*, 118th Cong. (2023) .............10, 11, 12, 23

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on
Ways and Means*, 73d Cong. 4 (1934).......................................16, 17, 18, 20, 23

S. Rep. No. 90-1501 (1968) ......................................................................................21

**Other Authorities**

*4 Points of Contact: How to Hold an AR-15*,
NRA Women (Aug. 9, 2022)....................................................................................8

Century International Arms, Inc.,
*SB 47 Stabilizing Brace* (Sept. 6, 2013) ............................................................14

Clyde Armory, *Stocks* (Feb. 1, 2023) .....................................................................15

Frank Melloni, *Why (& How) You Should Learn To Shoot
One-Handed*, NRA Family (Aug. 4, 2022) ..........................................................8

Press Release, Everytown for Gun Safety, *The Nashville Shooter Used
a Gun with an Arm Brace. House Republicans Want to Make it
Easier to Get One.* (Mar. 29, 2023).....................................................................23

SB Tactical, *Pistol Stabilizing Brace Shooting Techniques*,
YouTube (July 29, 2016) ......................................................................................12

TFB TV, Testing the Upgraded FS1913 Folding Brace,
YouTube (May 12, 2020) ...............................................................................15, 16

Tom McHale, *Rifle vs. Pistol Shooting: Six Fun Facts*,
NRABlog (June 8, 2016) ........................................................................................8

# INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Brady Center to Prevent Gun Violence ("Brady") is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady works across Congress, courts, and communities, uniting gun owners and non-gun-owners alike, to prevent gun violence. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live.

Brady has filed *amicus* briefs in many cases involving the regulation of firearms, including in this Court. *See, e.g.*, *NRA v. Swearingen*, No. 21-12314 (11th Cir. Oct. 25, 2021); *GeorgiaCarry.org v. Atlanta*, 318 F. App'x 851 (11th Cir. 2009) (per curiam); *United States v. Rahimi*, No. 22-915 (U.S. Aug. 21, 2023); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *District of Columbia v. Heller*, 554 U.S. 570 (2008). Multiple decisions have cited Brady's research and expertise on these issues. *See, e.g.*, *United States v. Hayes*, 555 U.S. 415 (2009); *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-cv-00501-BLF, 2023 WL 4552284 (N.D. Cal. July 13, 2023); *Hanson v. District of Columbia*, No. 22-cv-2256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023).

---

[1]  All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no person, other than *Amicus* or their counsel, contributed money intended to fund the preparation or submission of this brief.

*Amicus curiae* Everytown for Gun Safety Support Fund is the education, research, and litigation arm of Everytown for Gun Safety ("Everytown"), the largest gun violence prevention organization in the country. Everytown seeks to improve public understanding of the causes of gun violence and to help reduce that violence by conducting groundbreaking original research, developing evidence-based policies, communicating this knowledge to the American public, and advancing gun safety and gun violence prevention in communities and the courts. Everytown has extensive experience litigating cases involving the interpretation of federal firearms laws and has submitted numerous amicus briefs in cases involving challenges to federal firearms laws and regulations. *See, e.g.*, *VanDerStok v. Garland*, No. 23-10718 (5th Cir. Aug. 16, 2023); *Morehouse Enterprises, LLC v. ATF*, Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022); *Everytown for Gun Safety Support Fund v. ATF*, No. 21-cv-00376 (S.D.N.Y. 2021) (challenge to ATF action); *City of Syracuse v. ATF*, No. 20-cv-06885 (S.D.N.Y. 2020) (challenge to ATF actions).

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun-violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. Through partnerships with gun-violence researchers, public-health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven

to effectively reduce gun violence. Together with its partner organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that gun-safety legislation and community violence prevention strategies are not only consistent with the Second Amendment—they are essential to protecting the health, safety, and lives of every person in the nation.

*Amicus curiae* March For Our Lives Foundation ("MFOL") is a nonprofit organization of young people from across the country that seeks to promote civic engagement in support of sensible gun regulation and to give voice to those who have been harmed by gun violence. MFOL was formed in the wake of the February 14, 2018, mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, and immediately began organizing the largest single day of protest against gun violence in our nation's history. Now, almost six years later, MFOL has established itself as one of the foremost authorities at the intersection of youth-led activism and advocacy for gun violence prevention, and thousands of young people have formed MFOL chapters across the country. In the nationwide effort to enact sensible gun regulation, MFOL serves as a platform for the indispensable voice of the younger generations, and is a key resource for those who want to see an end to gun violence in this country.

## STATEMENT OF THE ISSUES

The National Firearms Act defines a "rifle" as a weapon that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). ATF issued a rule explaining the considerations that bear on when a firearm with "an accessory, component, or other rearward attachment (e.g., a 'stabilizing brace')" is designed and intended to be fired from the shoulder—and is, thus, a "rifle" under the statute. 27 C.F.R. § 478.11; *id.* § 479.11.

Plaintiffs—four individuals and a retailer—challenged the Rule and moved for preliminary relief. The district court concluded that plaintiffs were likely to succeed on the merits of their claim that the Rule violated the APA's notice-and-comment procedures because the final rule was a legislative rule that was not a logical outgrowth of the proposed rule. After assessing the equities, the district court issued a preliminary injunction preventing ATF from enforcing the Rule against the named plaintiffs and the plaintiff retailer's past and future customers who reside in Florida. The issues presented are the following:

1.    Whether plaintiffs are likely to succeed on their claim that the Rule violated the APA's notice-and-comment requirements;

2.    Whether the equitable factors weigh in favor of preliminary relief; and

3.    Whether the injunction entered by the district court was impermissibly overbroad.

## SUMMARY OF THE ARGUMENT

*Amici curiae* gun violence prevention groups urge this Court to uphold Rule 2021R-08F, "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'" (the "Rule" or "Stabilizing Brace Rule"), issued by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). That Rule reinforces ATF's position that pistols equipped with certain modern forms of stabilizing braces are short-barreled rifles subject to regulation under the National Firearms Act of 1934 (as amended). In that statute, Congress imposed restrictions on short-barreled rifles and other highly dangerous firearms, including sawed-off shotguns, as a reaction to gangsters' and other criminals' rapidly increasing use of these weapons, which endanger public safety and serve no legitimate purpose.

The Stabilizing Brace Rule is a valid regulation that ensures proper enforcement of the National Firearms Act for modern firearms. As the Rule explains, short-barreled rifles are deadlier than pistols because they enable a shooter to fire with more accuracy, at greater distances, and with more velocity, while remaining easier to conceal than a similarly powered long gun.

Ninety years ago, Congress reasonably decided to protect public safety by regulating these firearms. In recent years, their particularly dangerous nature has been disastrously demonstrated in several mass shootings around the United States.

5

In one murderous rampage in Dayton, Ohio, for example, a shooter armed with a short-barreled rifle *killed 9 people and wounded 27 others in only 32 seconds.*

The mass-murder weapon in that shooting was the type that the challenged Rule regulates: a pistol modified into a short-barreled rifle using a shoulder stock marketed as a stabilizing brace. Indeed, ATF has long understood that such a transformation greatly increases the accuracy and deadliness of a traditionally hand-held pistol, especially when the weapon is fired rapidly.

Accordingly, in response to the Dayton tragedy and others, ATF acted to protect the safety of the American people and advance the purposes of the National Firearms Act by making clear that pistols equipped with certain modern forms of stabilizing braces are short-barreled rifles that are highly dangerous and serve no legitimate self-defense purpose. This Court should uphold the Stabilizing Brace Rule, which validly protects public safety and further implements Congress's almost century-long statutory directive.

## ARGUMENT

### I.  Certain "Stabilizing Braces" Are Used and Marketed as Shoulder Stocks

#### A.  Firearm Owners Use Certain Stabilizing Braces as Shoulder Stocks

According to the Federal Firearms Licensee that submitted the original design for a stabilizing brace to ATF in 2012, the accessory was intended to provide a certain amount of stability for someone operating a heavy pistol with a single arm.

In particular, the stabilizing brace enabled the user to attach the firearm (rather awkwardly) to a shooter's wrist.[2]  The original design was consistent with that objective, as these photographs show:





**2012 submission of original "stabilizing brace" attached to an AR-type pistol**

88 Fed. Reg. at 6482.

Today, however, certain stabilizing braces are marketed and used as shoulder stocks, which users press against their shoulder to provide more stability and, therefore, more accuracy.  That use of the stabilizing brace transforms the pistol into a rifle.

---

[2]  *See* Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6479 (Jan. 31, 2023).

The critical distinction between a pistol and a rifle is the number of points of contact between the weapon and the shooter's body.[3]  Firing a pistol is typically a one- or two-handed affair, with the pistol held in front of the shooter's body.  Under those circumstances, there are only one to two points of contact between the shooter and the pistol grip:  the shooter's hands.[4]  Firing a rifle, by contrast, usually involves four points of contact: both hands, the cheek, and—most importantly—the shoulder, which supports the firearm with the bulkiest and most stable part of the body.[5]

For that reason, a device designed and intended so that a shooter can fire an AR-15-type or other pistol with those additional points of contact—in particular, contact with the shoulder—turns the firearm into a rifle.[6]  As the challenged Rule explains, "a majority of these firearms … are configured as rifles and have a barrel or barrels of less than 16 inches in length," which puts them "under the purview of the" National Firearms Act of 1934.[7]

Although the stabilizing brace design that ATF first considered in 2012 facilitated use of the firearm, it did not alter the number of points of contact between

---

[3]  *See* Tom McHale, *Rifle vs. Pistol Shooting: Six Fun Facts*, NRABlog (June 8, 2016), http://bit.ly/6riflevpistolfunfacts.

[4]  *See* Frank Melloni, *Why (& How) You Should Learn To Shoot One-Handed*, NRA Family (Aug. 4, 2022), http://bit.ly/shootonehanded.

[5]  *See 4 Points of Contact: How to Hold an AR-15*, NRA Women (Aug. 9, 2022), http://bit.ly/holdingAR15.

[6]  88 Fed. Reg. at 6479.

[7]  *Id.*; *see* 26 U.S.C. § 5845(a) (regulating rifles with barrels less than 16 inches).

8

the gun and the shooter.  But beginning in 2014, ATF "began to see 'braces' being used to fire weapons from the shoulder and new 'brace' designs that included characteristics common to shoulder stocks."[8]  The photograph below, included in the Rule, demonstrates the way in which certain new "stabilizing braces" were in fact being used to market as "pistols" what were functionally short-barreled rifles:



**Pistol with attached "stabilizing brace" (top) compared to rifle (bottom), both marketed by the same company**

88 Fed. Reg. at 6493.  Indeed, there are virtually no distinctions between those two guns.

Around the same time, "how-to" guides and videos from gun enthusiasts, professional reviewers, and social media influencers reviewing and discussing these particular new stabilizing braces began appearing on the Internet.  A decade later, these content creators now have millions of online followers, and their videos, which

---

[8]  88 Fed. Reg. at 6479.

have been viewed tens of millions of times, clearly demonstrate ongoing, growing, and widespread use of certain stabilizing braces as shoulder stocks.

A compilation of such videos was submitted into the record of a joint hearing that subcommittees of the U.S. House of Representatives Committee on the Judiciary and Committee on Oversight and Accountability held on March 23, 2023.[9] That compilation video begins with gun enthusiasts, reviewers, and influencers showing pistols equipped with certain stabilizing braces. As the video explains, these particular stabilizing braces can be used merely to stabilize the gun on a shooter's forearm. But, as one reviewer describes with great understatement and irony, "you can, occasionally, accidentally fire it from your shoulder."[10] Indeed, the next reviewer recounts that "we all know what these are actually used for and nobody is wondering about that"—making clear that these "braces" are, in fact, designed to be and intended for use as shoulder stocks.[11]

Later in the compilation, another reviewer describes that "we're just going to see, like, does it really feel like a stock, even though it's 'not' a stock."[12] And, when

---

[9]  *ATF's Assault on the Second Amendment: When is Enough Enough?: Hearing Before the Subcomm. on Econ. Growth, Energy Pol'y, & Regul. Affs. of the H. Comm. on Oversight & Accountability and the Subcomm. on Crime & Fed. Gov't Surveillance*, 118th Cong. (2023) ("House Committee Hearing Video"), http://bit.ly/atfassualtsecondamendment.

[10]  House Committee Hearing Video at 1:15:45.

[11]  *Id.* at 1:16:00.

[12]  *Id.* at 1:16:05.

uttering the word "not," the reviewer's hands gesture with "air quotes." Then, with the "stabilizing brace" firmly against his shoulder, he repeatedly fires a pistol that this screenshot clearly shows has been transformed into a short-barreled rifle:



House Committee Hearing Video at 1:16:10.

Further in this video, another reviewer confirms that these particular "braces" are not really for stabilizing a pistol on a forearm. Rather, they are to be used as shoulder stocks: "Back to this brace," he says, "it changes the game, like I said, and it gives you four points of contact, with the occasional shouldering."[13] In this self-edited video, the reviewer then visibly winks at the camera and adds a graphic that actually bears the words "wink, wink":

---

[13] *Id.* at 1:16:22.



*Id.* at 1:16:28.  In other words, the "reviewer" makes his sarcasm crystal clear:  the use of the brace as a shoulder stock is hardly "occasional."  Rather, such use is entirely the point.

### B.    Manufacturers Expressly Market Certain Stabilizing Braces as Shoulder Stocks

The Stabilizing Brace Rule also explains that such use of particular stabilizing braces as shoulder stocks is not mere happenstance, and it is not solely because of the habits of particular purchasers.  Rather, these specific "braces" are marketed for this precise use, as is evident in a manufacturer's video from SB Tactical, which the Rule cites.[14]  That video demonstrates various "techniques" for using the "brace,"

---

[14]    *See* 88 Fed. Reg. at 6503 n.90 (citing SB Tactical, *Pistol Stabilizing Brace Shooting Techniques*, YouTube (July 29, 2016), https://www.youtube.com/watch?v=FoTHRWsCz64).

including the two instances in the screenshots below that clearly illustrate the pistol's use as a rifle:



SB Tactical describes this technique as sternum mounting.



SB Tactical describes this technique as "cheek welding."

88 Fed. Reg. at 6504-05.

Quite tellingly, sellers of certain stabilizing braces actually classify their braces as "stocks" on their websites. The screenshot below shows an archived

version of the Century Arms website, with an SB47 Stabilizing Brace listed under "stocks":



Century International Arms, Inc., *SB 47 Stabilizing Brace* (Sept. 6, 2013), bit.ly/StabilizingBraceListing.

Similarly, an archived website of Clyde Armory markets a pistol stabilizer on the lower, right-hand corner of a page labeled "stocks":

14



Clyde Armory, *Stocks* (Feb. 1, 2023), https://bit.ly/ClydeArmoryListing.

The marketing history of the SB Tactical FS1913 folding brace further establishes that manufacturers of particular stabilizing braces design them for use specifically as shoulder stocks. In one video, a reviewer demonstrates using the FS1913 "brace" in this very way.[15] At the same time, the reviewer bluntly notes that he has had trouble doing so because the folding part of the brace collapses with recoil when used against the shoulder.[16] He further recounts that the manufacturer—SB Tactical—responded to his video and addressed his complaint by sending him a

---

[15] TFB TV, Testing the Upgraded FS1913 Folding Brace, YouTube (May 12, 2020), https://bit.ly/testingfs1913.
[16] *Id.*

replacement part.[17]   When he contacted SB Tactical to let them know that the replacement part had still not solved the "problem," the manufacturer responded by redesigning the brace.

SB Tactical's conduct is hardly logical or appropriate if it had designed the brace merely as a stabilizing device to be strapped to the forearm.   Instead, it confirms that SB Tactical designed the brace with the intent that it serve as a shoulder stock that creates a short-barreled rifle.

## II.    Historical Regulation and the Use of Short-Barreled Rifles Establish Their Dangerousness

### A.    Congress Regulated Short-Barreled Rifles in the National Firearms Act of 1934 Because They Are Highly Dangerous

In the 1930s, the United States faced what then-Attorney General Homer Cummings described as "a very serious national emergency."[18]   Gun violence and crime, perpetrated by organized crime syndicates and predatory criminals, plagued the country.[19]   In fact, at the time, there were "more people in the underworld … armed with deadly weapons … as there [we]re in the Army and Navy of the United

---

[17]  *Id.*

[18]  *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways and Means*, 73d Cong. 4 (1934) ("NFA House Hearings") (Statement of Homer S. Cummings, Att'y Gen. of the United States).

[19]  *Id.*

States … combined."[20]    Against this backdrop, Congress enacted the National Firearms Act of 1934 to "regulat[e] weapons useful for criminal purposes."[21]

The Attorney General and Congress took great care and deliberation in deciding which weapons would be regulated by this new statute.[22]   For its part, Congress was focused on dealing with the "crime situation" the country faced and naturally fixed its attention on weapons frequently used in crime.[23]  To that end, in determining which weapons to include in the National Firearms Act regulatory scheme, Congress considered: (1) how dangerous the weapon was; and (2) whether the weapon lacked a legitimate use.[24]  The choices Congress made in including and excluding certain, dangerous weapons from the statute were reasonable responses to public safety concerns that were present at the time and continue to apply today.

### 1.    The Dangerousness of Short-Barreled Rifles

Many of the weapons that Congress included in the National Firearms Act were found to be highly dangerous due to their ease of concealment.[25]  As Attorney General Cummings noted, "the modern gangster is not technically well equipped if he does not have several concealable small arms for use instantly."[26]

---

[20] *Id.*

[21] *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992).

[22] *See generally* NFA House Hearings.

[23] *Id.* at 4.

[24] *See, e.g.*, *id.* at 101.

[25] *See, e.g.*, *id.* at 6.

[26] *Id*. at 100.

One such weapon was the short-barreled rifle, which, similar to a sawed-off shotgun, poses a greater danger than a full-length rifle or shotgun because of the ease with which it can be concealed.[27]  In fact, Attorney General Cummings noted that "[a] sawed-off shotgun is one of the most dangerous and deadly weapons."[28]

Although a short-barreled rifle is by no means the only firearm that can be easily concealed, its other characteristics make it one of the deadliest and most dangerous.  In particular, a short-barreled rifle has the maneuverability of a pistol, while maintaining the accuracy, firepower, and lethality of a rifle.

### 2.    The Lack of Legitimate Use

In addition to considering their dangerousness, Congress focused its attention on weapons that had little to no lawful purpose and were frequently used in crime, as opposed to those with legitimate uses for hunting, self-defense, and other purposes.[29]  For example, during the first committee hearing on the bill, Representative Harold Knutson of Minnesota noted that long-barreled rifles are used

---

[27]  *See Johnson v. United States*, 576 U.S. 591, 640 (2015) (Alito, J., dissenting) (noting sawed-off shotguns are "[m]uch easier to conceal than long-barreled shotguns used for hunting and other lawful purposes [and] can be hidden under a coat, tucked into a bag, or stowed under a car seat"); *Thompson/Center Arms Co.*, 504 U.S. at 517 (a short-barreled rifle is a "concealable weapon" that is "likely to be used for criminal purposes"); *United States v. Sredl*, 2023 WL 3597715, at *3 (N.D. Ind. May 23, 2023) (noting that the National Firearms Act regulates "weapons that pack a punch yet are easy to conceal").

[28]  NFA House Hearings at 6.

[29]  *See generally* NFA House Hearings.

legitimately for hunting in his state.[30]   Although he opposed regulation of long-barreled rifles for that reason, Rep. Knutson nonetheless emphasized the importance of regulating other dangerous firearms used by criminals at the time, including short-barreled rifles.[31]

Several other committee members referenced the lack of legitimate uses for the weapons proposed for inclusion within the scope of the legislation.  For example, commenting on machine guns, Representative Allen Treadway of Massachusetts argued that "I cannot see what a machine gun would be for unless it was for breaking the law."[32]   Addressing machine guns, sawed-off shotguns, and silencers, Representative Claude Fuller of Arkansas similarly observed: "If a man is carrying that type of weapon, if he is not an officer, he ought to be taken into custody anyway, because we know that he is carrying it for unlawful purpose."[33]

Congress's intent to regulate only those weapons with little to no legitimate lawful purpose is plainly demonstrated by its decision to remove pistols and revolvers from the Act's definition of "Firearm."  Congress made that decision after receiving substantial public input raising the numerous legitimate uses for such

---

[30] *Id.* at 13.

[31] *Id.*

[32] *Id.* at 101.

[33] *Id.* at 111.

19

weapons, including self-defense.[34]  In contrast, there was no public input supporting an exclusion of short-barreled rifles from the scope of the new statute.  As courts have found, the absence of such evidence in the legislative record supports "the conclusion that citizen-groups and members of Congress did not consider such weapons to have been typically used for lawful purposes."[35]  To the contrary, "[t]he legislative history" of the National Firearms Act "supports that Congress concluded that short-barreled rifles were dangerous weapons not commonly used by law abiding citizens."[36]

Importantly, although Congress imposed regulations on firearms subject to the Act, it did not prohibit their manufacture, sale, purchase, or possession.  Instead, consistent with its aim to preserve legitimate, lawful use of firearms while protecting public safety, Congress created a system to ensure that such dangerous firearms were more stringently regulated and would be possessed only by law-abiding citizens.[37]

---

[34] *Compare* NFA House Hearings at 1 (reprinting original bill text including "pistol" and "revolver" in firearm definition) *with* National Firearms Act of 1934 § 1(a), Pub. L. No. 73-474, 48 Stat. 1236, 1236 (adopted legislation excepting "a pistol or revolver" from firearm definition).

[35] *See, e.g.*, *United States v. Gonzales*, 2011 WL 5288727, at *4 (D. Utah Nov. 2, 2011).

[36] *Id.*

[37] *See* 26 U.S.C. §§ 5841, 5845.

**B.     Congress and the Courts Have Consistently Deemed Short-Barreled Rifles Unreasonably Dangerous**

Since Congress declared unequivocally in 1934 that short-barreled rifles are highly dangerous weapons with little or no legitimate purpose, the courts and Congress itself have repeatedly ratified that judgment.  For example, when amending the National Firearms Act in 1968, Congress specifically noted that "short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection."[38]  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court interpreted a prior court's decision to say that the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," and found this decision "accords with the historical understanding of the scope of the right."[39] Finally, since the Supreme Court's ruling in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), every district court to consider whether a short-barreled rifle falls within the scope of the Second Amendment has reached the same conclusion: "short-barreled rifles are dangerous and unusual weapons" and thus fall within the historical tradition regulating the manufacture, sale, purchase, possession, and carrying of such weapons.[40]

---

[38]  *Gonzales*, 2011 WL 5288727, at *5 (quoting S. Rep. No. 90-1501, at 28 (1968)).
[39]  554 U.S. at 625 (citing *United States v. Miller*, 307 U.S. 174, 178-82 (1939)).
[40]  *United States v. Miller*, 2023 WL 6300581, at *4, *12-13 (N.D. Tex. Sept. 27, 2023).

### III.    The Stabilizing Brace Rule Is Consistent with the Intent of Congress in Enacting the National Firearms Act

The Stabilizing Brace Rule directly advances one of the objectives Congress set out to achieve in enacting the National Firearms Act: to protect public safety by regulating short-barreled rifles.  Specifically, the Rule applies the Act to regulate technological advancements that allow the creation of short-barreled rifles in ways that did not exist in 1934.  To argue that the Rule exceeds ATF's statutory authority would be tantamount to claiming that ATF cannot regulate firearms that incorporate plastics and carbon fiber because those materials did not exist when Congress passed the National Firearms Act.  Such an outcome is plainly incorrect.

Rather, the need to further implement the public safety aim of the National Firearms Act through regulation of modern short-barreled rifles is evident from the headlines that all too frequently dominate modern news.  Perpetrators have committed multiple mass murders using semi-automatic pistols that had been transformed into short-barreled rifles with the attachment of a stabilizing brace that was designed for shouldering.

The deadliest of these horrible episodes include the killing of 10 people at a grocery store in Boulder, Colorado, by a shooter armed with a firearm equipped with a stabilizing brace, and the tragedy outside a bar in Dayton, Ohio, where a shooter carrying a similar weapon killed 9 people and wounded 27 others in only 32

seconds.[41]  Other mass murders in which the perpetrators armed themselves with firearms equipped with stabilizing braces include the shooting at Club Q in Colorado Springs, Colorado, which killed five people and injured 25 others, and the killing of six people, including three nine-year-olds, at a Nashville, Tennessee school.[42]

Like the concealed weapons of the "modern gangster" of the 1930s that Attorney General Cummings described as the justification for the restrictions Congress imposed in 1934, today's mass shooters all too frequently arm themselves with a pistol transformed into a short-barreled rifle using a stabilizing brace designed and intended for use as a shoulder stock.[43]  The danger of such weapons, just like the original short-barreled rifles Congress regulated in 1934, is enhanced by the ease of their concealment.  Indeed, the fact that these stabilizing-brace-equipped firearms are so easy to conceal is one of their main marketing points.  As one online reviewer noted, a semi-automatic weapon fitted with a stabilizing brace is "a very shorty boy" that you can put "in a briefcase, [or] if you wanted to, in a backpack."[44]  This feature makes it all the easier for mass shooters and other criminals to possess these weapons

---

[41]  Press Release, Everytown for Gun Safety, *The Nashville Shooter Used a Gun with an Arm Brace. House Republicans Want to Make it Easier to Get One.* (Mar. 29, 2023), http://bit.ly/NashvilleEasierBrace.

[42]  *Id.*

[43]  NFA House Hearings at 100.

[44]  House Committee Hearing Video at 1:16:32.

in sensitive public places without detection—until it is too late and they begin shooting.

## CONCLUSION

ATF's Stabilizing Brace Rule is entirely consistent with and furthers Congress's constitutional aims in enacting the National Firearms Act—protecting public safety against the threat of highly dangerous weapons with no legitimate purpose.  In that way, it is also completely consistent with the Second Amendment. *Amici curiae* urge this Court to uphold the Rule.

Dated: May 24, 2024

Respectfully submitted,

/s/ *Samuel I. Ferenc*

Eric Tirschwell
Aaron Esty
EVERYTOWN LAW
450 Lexington Avenue
  P.O. Box 4184
New York, NY 10017
(646) 324-8222

Samuel I. Ferenc
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-5000
Fax: (202) 942-5999
sam.ferenc@arnoldporter.com

*Of Counsel for* Amicus Curiae
*Everytown for Gun Safety Support Fund*

Esther Sanchez-Gomez
Kelly M. Percival
GIFFORDS LAW CENTER TO
  PREVENT GUN VIOLENCE
268 Bush Street, # 555
San Francisco, CA 94104
(415) 433-2062

Paul J. Fishman
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000

*Counsel for* Amici Curiae

*Of Counsel for* Amicus Curiae *Giffords Law Center to Prevent Gun Violence*

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440

Douglas N. Letter
Shira Lauren Feldman
Jenna Klein
BRADY CENTER TO PREVENT
  GUN VIOLENCE
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100

*Of Counsel for* Amicus Curiae *March For Our Lives Foundation*

*Of Counsel for* Amicus Curiae *Brady Center to Prevent Gun Violence*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and 32(g)(1), the undersigned counsel for amicus curiae certifies the following:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,403 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared using Microsoft Office Word 365 and set in Times New Roman font in a size equivalent to 14 points or larger.


*/s/ Samuel I. Ferenc*
Samuel I. Ferenc

*Counsel for Amici Curiae*


26

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing brief was filed electronically on May 24, 2024 and will therefore be served electronically upon all counsel.


*/s/ Samuel I. Ferenc*
Samuel I. Ferenc

*Counsel for Amici Curiae*